**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

JOHNNY DAVIS; ABBY FUNKHOUSER; WILLIAM GARRISON; DAVID SEITZ; HOWARD OTTO; HANRATTY FARMS LLC; CLINT HUFFAKER; RONALD REHFELD; CLIVE BOTHA; RUSSELL DAMRON; HALES FARMS, INC.; LINDA SAPP; MARK STRECKER; JUSTIN DAMMANN; CARL GRIFFITHS; FISHER BROTHERS LLC; DENNIS KELLY; CHARLES HOLLOWAY; JOHN FRIEND; ALAN HUDSON; MITCHELL CREEK LLC; CARL KILLINGSWORTH; ELMWOOD CHURCH FARMS LLC; CHERRY TREE PROPERTIES, LLC; JESSE ANDREWS; LISH CHANDLER; GEOFFREY CLARK; RODNEY CRUMBLEY; MARK GORDON; DENNIS HANNAH; AMMON HERRING; JAMES MOSLEY; PHILLIP POE; GARY POWELL; SCOTT ROBERSON; MARK RYALS; KEN SPRADLING; TERRY WADE; LOREN SORENSON; SHAWN STREGE; LARRY ULRICH; KENNETH FREY; ALLEN HAASE; ALLEN MORAVEC; RYSTROM LAND AND CATTLE LLC; WELNIAK INC.; SCHUYLER ANDERSON; GLEN BONIFAS; MARCOS BACA; DAREN CHACON; TERESA HENIO; DEAN JACKSON; JON BEITIA; MARK CARTER; MATT IMWALLE; KEVIN ADKINSON; SHIRLEY BATES; TISHA CLEMENS; JON DAVIS; ANGELA FORREST; MICHAEL FULLER; JASON HARDY; LORI HART; CARL JOHNSON; JAMES MCGLOCKLIN; TYLER NEAL; GARY NICHOLS; PHILLIP PARRISH; KEVIN ROZELL; CHAD SIMON; PERRY STOVER; STEVE TROTTER; NOLAN EDWARDS;

JURY TRIAL DEMANDED

Case No.

*This case relates to:*

**IN RE CATTLE AND BEEF ANTITRUST LITIGATION**
MDL No. 22-md-3031 (JRT/JFD)

INDIRECT SELLER ACTION
Case No. 22-cv-2903
Case No. 26-cv-03623
Case No. 26-cv-03745

CHRIS KETCHAM; GARY & DENISE KLEGSETH, LLC; BRYN NEESE; DONOVAN VOLK; LEONARD BAKER; FULLER SYNDICATE, LLC; JH AND PR MOORE LLC; JOSEPH FURCO; DELANO KNEECE FARM & SON INCORPORATED; PHILLIP ROBINSON; STEPHEN STONE; LAURENCE HEITMANN; DONALD HOEKSEMA; CLAY HOFF; RORY THORSTENSON; CRYSTAL BLACK-PUCKETT; JOHN BONAR; MICHAEL DODD; MARK HENSLEY; JERRY KELSEY; STEVE LEE; DEREK MCKEE; SAM SNEED; JOE BEGAY; CHRIS CARTER; ENZIO LEBEN; DAVID BROWN; TIMOTHY COX; BRYAN GOTHAM; GALE NOYES; GENE ROTH; JOHN BUSER; TJ NYFFENEGGER; ROCKY OLSEN; TOM ROESCH; SCHREIBER ACRES LLC; ANTONIO ROMAN; AND GARY ALIBOZEK,

Plaintiffs,

v.

TYSON FOODS, INC.; TYSON FRESH MEATS, INC.; JBS S.A.; JBS USA FOOD COMPANY; SWIFT BEEF COMPANY; JBS PACKERLAND, INC.; CARGILL, INC.; CARGILL MEAT SOLUTIONS CORPORATION; and NATIONAL BEEF PACKING COMPANY, LLC,

Defendants.

**COMPLAINT**

## TABLE OF CONTENTS


Nature of the Case ....................2
Parties ....................12
I. Plaintiffs ....................12
II. Defendants ....................51
A. The Tyson Defendants ....................51
B. The JBS Defendants....................52
C. The Cargill Defendants ....................53
D. National Beef Packing Company LLC ....................54
E. The Defendants Conspired With Each Other....................54
F. Agents and Affiliates ....................55
Jurisdiction, Venue and Commerce ....................56
Joinder of Plaintiffs ....................58
The Beef Production Process....................58
Defendants Conspired to Depress Fed Cattle Prices ....................67
I. Defendants Agreed to Reduce and Restrain their Collective Slaughter Volumes to Pressure Cash Cattle Sellers ....................68
A. Hooker Was Well Positioned to Know About Defendants' Agreement....................70
B. Witness 1 Learns of an Agreement Among Defendants ....................72
C. The Available Data Corroborates Witness 1's Account ....................74
II. Defendants Agreed to Coordinated Slaughter Reductions ....................77
A. Defendants Agreed to Slash Cash Cattle Purchases During Slaughter Reductions....................78
B. Defendants Coordinated Their Procurement Practices for Cash Cattle ....................81
C. Defendants Agreed Not to Expand Their Slaughtering Capacity ....................91
III. Defendants' Conduct Precipitated the Collapse in Prices in 2015....................93
A. Defendants' Ongoing Conduct Continues to Depress Fed Cattle Prices ....................103
B. 2019 Brings Continued Parallel Slaughter and Pricing Behavior, a Fire at a Plant, and Regulatory Investigations....................109
1. Defendants react to a processing plant fire by suppressing cattle prices and inflating beef prices ....................113
2. USDA continues to investigate Defendants' price manipulation ....................118
C. Defendants Publicly Signaled Their Commitment to Supply Restraint....................120
D. Defendants' Conduct Directly Caused the Depression of Feeder Cattle Prices ....................122

E. Economic Analysis Supports the Existence of the Alleged Conspiracy ....127
F. Supply and Demand Drivers Do Not Explain the 2015 Price Collapse or Subsequent Low Prices ....131
G. Other Explanations for the Drop in Prices Do Not Withstand Scrutiny ....134
The Cattle Market is Conducive to Collusion ....136
I. The Beef Packer Industry is Highly Consolidated and Highly Concentrated ....136
II. The Supply of Cattle and Demand for Beef Are Relatively Insensitive to Short-Term Changes in Price ....137
III. Producers Face Significant Market Access Risk ....138
IV. There Are Many Trade Organizations and Opportunities for Defendants to Meet and Collude ....138
V. Defendants Benefit from High Barriers to Entry ....143
Defendants Have Similar Cost Structures and Have Significant Oversight of Each Other's Price and Production Decisions ....144
Defendants Are Recidivists with a History of Collusion ....146
Defendants' Conduct is the Subject of Ongoing Investigations ....147
I. The DOJ is Investigating Defendants for Price-Fixing, Market Manipulation and Unfair Practices in the Cattle and Beef Markets ....147
II. The USDA is Investigating Defendants' Activities in Light of the Fire at Tyson's Holcomb Plant and Covid-19 related Market Disruptions ....150
III. JBA S.A.'s Brazilian Parent and Related Companies are Guilty of Bribery and Corruption ....152
Statute of Limitations and Tolling ....153
Claims For Relief ....162
Count I: Market Allocation and Price Fixing in Violation of the Sherman Act (15 U.S.C. § 1; For Injunctive Relief Under the Clayton Act, 15 U.S.C. § 26) ....162
Count II: Violations Of Packers and Stockyards Act (7 U.S.C. §§ 192 And 209) ....163
Prayer For Relief ....165
Jury Demand ....165

Plaintiffs Johnny Davis; Abby Funkhouser; William Garrison; David Seitz; Howard Otto; Hanratty Farms LLC; Clint Huffaker; Ronald Rehfeld; Clive Botha; Russell Damron; Hales Farms, Inc.; Linda Sapp; Mark Strecker; Justin Dammann; Carl Griffiths; Fisher Brothers LLC; Dennis Kelly; Charles Holloway; John Friend; Alan Hudson; Mitchell Creek LLC; Carl Killingsworth; Elmwood Church Farms LLC; Cherry Tree Properties, LLC; Jesse Andrews; Lish Chandler; Geoffrey Clark; Rodney Crumbley; Mark Gordon; Dennis Hannah; Ammon Herring; James Mosley; Phillip Poe; Gary Powell; Scott Roberson; Mark Ryals; Ken Spradling; Terry Wade; Loren Sorenson; Shawn Strege; Larry Ulrich; Kenneth Frey; Allen Haase; Allen Moravec; Rystrom Land and Cattle LLC; Welniak Inc.; Schuyler Anderson; Glen Bonifas; Marcos Baca; Daren Chacon; Teresa Henio; Dean Jackson; Jon Beitia; Mark Carter; Matt Imwalle; Kevin Adkinson; Shirley Bates; Tisha Clemens; Jon Davis; Angela Forrest; Michael Fuller; Jason Hardy; Lori Hart; Carl Johnson; James McGlocklin; Tyler Neal; Gary Nichols; Phillip Parrish; Kevin Rozell; Chad Simon; Perry Stover; Steve Trotter; Nolan Edwards; Chris Ketcham; Gary & Denise Klegseth, LLC; Bryn Neese; Donovan Volk; Leonard Baker; Fuller Syndicate, LLC; JH and PR Moore LLC; Joseph Furco; Delano Kneece Farm & Son Incorporated; Phillip Robinson; Stephen Stone; Laurence Heitmann; Donald Hoeksema; Clay Hoff; Rory Thorstenson; Crystal Black-Puckett; John Bonar; Michael Dodd; Mark Hensley; Jerry Kelsey; Steve Lee; Derek McKee; Sam Sneed; Joe Begay; Chris Carter; Enzio Leben; David Brown; Timothy Cox; Bryan Gotham; Gale Noyes; Gene Roth; John Buser; TJ Nyffenegger; Rocky Olsen; Tom Roesch; Schreiber Acres LLC; Antonio Roman; and Gary Alibozek bring this action against defendants Tyson Foods, Inc.; Tyson Fresh Meats, Inc.;

JBS S.A.; JBS USA Food Company; Swift Beef Company; JBS Packerland, Inc.; Cargill, Inc.; Cargill Meat Solutions Corporation; and National Beef Packing Company, LLC, and state:

## NATURE OF THE CASE

1. This case arises from Defendants' unlawful acts, beginning June 1, 2015 and continuing through the present, to suppress the price of fed cattle in the United States, causing a corresponding suppression of the price of feeder cattle.[1]

2. Plaintiffs are producers of feeder cattle whose livelihoods depend on getting competitive prices for their cattle. Plaintiffs indirectly sold cattle to one or more Defendants in a market directly manipulated by Defendants' collusive conduct.

3. Plaintiffs have been damaged by Defendants' anticompetitive conduct because the prices that Defendants pay for fed cattle have a direct impact on the price that ranchers receive for feeder cattle. In fact, historical prices show that any suppression of the future price of fed cattle reduces the price of feeder cattle:

[1] "Feeder cattle," as used herein, means cattle that are ready to be sold to or placed on, whether individually or as a pen, feedlots or finishing operations to be fed to slaughter weight and sold to packers for beef production. Feeder cattle and fed cattle are referred to collectively as "cattle."

**Figure 1: Comparison of Fed Cattle and Feeder Cattle Index Prices.**




4. Defendants' coordinated conduct, including slashing their respective slaughter volumes, curtailing their buying of fed cattle in the cash cattle market, and effectively allocating the procurement of fed cattle, caused a collapse in fed cattle prices and a simultaneous collapse in feeder cattle prices in mid-2015. Defendants continue to suppress the price of fed cattle, and thereby the price of feeder cattle, through coordinated buying and periodic slaughter restraint.

5. USDA market data reflects the highly correlated prices of cattle throughout the production chain and reveals the causal impact of Defendants' conspiracy on all aspects of the beef cattle market, including fed and feeder cattle:

**Figure 2: Price Comparison of Cattle.[2]**




6. As middlemen in the supply chain, Defendants' profits are driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for beef. Because the supply of fed cattle is insensitive to short-term price changes – owing to the long lifecycle of cattle, their perishable nature, and the lack of any alternative use – and as beef demand is relatively insensitive to price changes, the meat margin is very sensitive to industry slaughter level changes. Defendants increased their meat margin by manipulating demand for fed cattle, which in turn causes reduced demand for feeder cattle.

7. Because Defendants have not passed on their illicitly gained lower cattle prices to their beef customers—indeed such a passthrough would undermine the effectiveness of

[2] U.S. Dep't of Agriculture, National Agricultural Statistics Service, https://www.nass.usda.gov/Charts_and_Maps/Agricultural_Prices/priceca.php (last visited Oct. 26, 2022).

Defendants' conspiracy to increase their profits by expanding their meat margin—cattle producers and end consumers both lose: That is, by depriving the market of fair price competition for cattle or beef, Defendants inflict economic injury on cattle producers, like Plaintiffs, in the form of artificially suppressed cattle prices, and on consumers in the form of artificially inflated beef prices. Defendants reap all the profits from using their collective market power to squeeze both producers and consumers.

8. As the DOJ has noted, the Sherman Act was enacted to prevent such buying cartels:

> The 1890 debates in both houses of the United States Congress demonstrated concern with the exercise of market power on both the buying and selling sides of the market. *Many legislators singled out large meat packers for condemnation, and they were condemned as much for reducing the prices paid to cattle farmers as for raising prices to consumers.* In response, Congress passed the Sherman Act, aimed at preserving free and unfettered competition as the rule of trade. The Act is comprehensive in its terms and coverage….The Sherman Act prohibits anticompetitive agreements and exclusionary conduct and both may be found unlawful on the basis of effects on the buying side of the market. Buyer cartels are unlawful *per se* ….
> *One of the earliest Sherman Act cases involved, among other things, a conspiracy among meat packers to reduce the price they paid for cattle.*

Note by the United States at 1, 3 Roundtable on Monopsony and Buyer Power, available at https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/monopsony.pdf (cleaned up) (emphases supplied). Indeed, "[t]he U.S. Department of Justice makes *no* distinction between seller cartels and buyer cartels in its cartel enforcement program." *Id.* (emphasis supplied).

9. Feeder cattle are the animals that ultimately are sold as "fat" or "fed" cattle. Fed cattle are steers and heifers fed for slaughter for the production and sale of beef products. Defendants then process the resulting carcasses into beef for sale to other processers,

wholesalers, and retail outlets. Cattle ranchers raise beef cattle through their life cycle, typically until selling to a Defendant or to a feedlot, as depicted below:

**Figure 3: Cattle and Beef Industry from Breeding to Consumption.**[3]




10. As Figure 3 outlines, cattle weighing 600 lbs. or more, or having been preconditioned, (*i.e.,* feeder cattle), are sold directly to feedlots for finishing. Cattle that do not meet either of those criteria are typically sold to a backgrounder or stocker, or backgrounded by the same rancher; once the cattle reach at least 600lbs, they are then ready to be sold to a feedlot for finishing.

11. Defendants purchase the overwhelming number of slaughter-weight fed cattle in the United States. Since 2011, Defendants have annually slaughtered over 80% of all fed cattle sold within the United States. The chart below demonstrates Defendants' overwhelming market share for the purchase of fed cattle.

---

[3] U.S. Gov't Accountability Off., GAO-18-296, U.S. Department of Agriculture: Additional Data Analysis Could Enhance Monitoring of U.S. Cattle Market (Apr. 2018) ("2018 GAO Report"), at 6, https://www.gao.gov/assets/700/691178.pdf.

**Figure 4: Defendants' Market Share of U.S. Fed Cattle Slaughter Volumes.**[4]




12. Defendants procure most of their fed cattle though alternative marketing agreements ("AMAs"), such as "formula" and "forward" contracts. Under these contracts, the producer agrees to deliver its cattle to a Defendant once they have reached slaughter-weight, at a price to be determined at or around the time of delivery. The price formulas used by formula contracts typically incorporate reported prices of fed cattle sold in the weekly cash cattle trade, the industry's spot market. The price formulas used by forward contracts incorporate live cattle futures prices, which, in turn, are directly impacted by reported cash cattle prices. As a result, the prices paid for fed cattle in the cash cattle trade – which constitute a minority (a mere 20-25%) of all fed cattle sold in the United States – determines the price of almost all fed cattle bought by Defendants.

---

[4] Cattle Buyers Weekly, "Steer And Heifer Slaughter Market Share", https://www.cattlebuyerweekly.com/users/rankings/packerssteerheifer.php.

13. Feeder and fed cattle prices rose steadily from 2009 to 2014 due to strong beef demand and a shortage of cattle following the droughts of 2011 through 2013. After prices peaked in November 2014, the industry expected the price of cattle to stabilize in 2015 and continue at or around that higher level for years.

14. This widely predicted price stability did not occur. Instead, Defendants used their market power, price sensitivities, and the thin cash cattle trade to their advantage and conspired to depress fed cattle prices. Defendants' conspiracy to depress fed cattle prices directly and nearly simultaneously caused feeder cattle prices to decline.

15. Defendants' conspiracy to reduce fed cattle prices, and thereby increase the meat margin, was carried out through at least the following coordinated conduct: (1) Defendants periodically reduced their slaughter volumes to reduce demand for fed cattle; (2) Defendants curtailed their purchase and slaughter of cash cattle during those same periods; and (3) Defendants coordinated their procurement practices for cash cattle.

16. Leading up to and during the relevant period, Defendants also closed and idled plants. Though Plaintiffs do not allege these practices were done in furtherance of the alleged agreement, this conduct nonetheless facilitated the success of Defendants' coordinated conduct by removing capacity from the industry.

17. Defendants' collusion on parallel slaughter volumes and reductions is demonstrated in the figure below showing they consistently reduced slaughter in the late winter/spring each year and details the remarkable extent to which Defendants' quarter-to-quarter slaughter changes move in lockstep consistent with an agreement to jointly manage collective demand:

**Figure 5: Defendants' Quarterly Fed Cattle Slaughter Volume.** [5]




18. Defendants' slaughter reductions and agreement to manage their demand below the available cattle supply directly impacted their annual slaughter volumes as illustrated in the figures below. Figure 6 compares the average annual slaughter volume before and after the conspiracy compared to independent regional packers ("Independent Packers"). It shows that Defendants have all reduced their annual slaughter volumes relative to the beginning of the conspiracy, while Independent Packers increased their slaughter volume as a whole:

---

[5] To derive Tyson, JBS and National Beef's slaughter volumes, Defendants' (in the case of National Beef, its shareholders') financial disclosures and Cattle Buyers Weekly's record of each Defendant's fed cattle and non-fed cattle slaughter ratio were used to isolate the portion of their reported quarterly revenue figures attributed to beef and by-products produced from fed cattle slaughtered within the United States. The volume of fed cattle (and beef) necessary to generate the disclosed revenue were then analyzed, taking into account prevailing beef and by-product prices (as reported by USDA AMS boxed beef cutout reports and USDA drop-credit values), carcass weights, carcass grading performance (by region), and hot carcass/dressing percentages. Having derived Tyson, JBS, and National Beef's quarterly slaughter volumes, Cargill's quarterly slaughter figures were derived by reference to Cargill's market share over time.

**Figure 6: Average Pre-/Post-Conspiracy Fed Cattle Slaughter–Defendants vs Others.**




**Figure 7: Average Pre- & Post-Conspiracy Fed Cattle Slaughter.**[6]




[6] CBW Top 30 Beef Packers; 2018 Meat & Poultry Facts, at 11. National Beef acquired Iowa Premium in June 2019, adding 300,000 head to its annual fed cattle slaughter volume. Absent that acquisition its 2019 slaughter volume was flat as against 2018, while Regional Packers' collective slaughter volume rose by approximately 100,000 head (net of Iowa Premium disposal).

19. Figure 7 compares Defendants' and Independent Packers' annual slaughter volumes before and after the conspiracy. The graph confirms that Defendants each slaughtered less fed cattle in every year after the conspiracy began than before. It also shows that Independent Packers increased their slaughter volume from 2016 on, as the supply of fed cattle increased, at a far greater rate than Defendants. Defendants used periodic slaughter reductions and underutilized plant capacity to ensure their demand for fed cattle never outstripped the supply of slaughter weight fed cattle to ensure the continued suppression of fed cattle prices.

20. The figures above show that each Defendant slaughtered significantly less fed cattle in 2015 than their respective prior averages and then maintained artificially low slaughter levels from that point forward.

21. Defendants' conspiracy succeeded in causing an unprecedented collapse in fed and feeder cattle prices in the second half of 2015 and continued to suppress fed and feeder cattle prices thereafter.

22. Despite the collapse in fed and feeder cattle prices, Defendants benefitted from record beef prices. This price divergence allowed Defendants to reap record per-head meat margins at the expense of fed and feeder cattle producers.

23. This conduct occurred in a market that is highly conducive to collusion due to the small number of large beef packers, high barriers to entry, and Defendants' frequent communications. Defendants' field buyers had opportunity to meet and exchange commercially sensitive information when they inspected feedlots in their territories. Field buyers reported "market color" obtained in the field – including reports of their

competitors' activities – back to their head office and their firms' other field buyers through daily conference calls. Defendants had more opportunities to conspire as members of various trade and industry organizations.

24. Economic evidence further supports the existence of the alleged conspiracy because supply and demand drivers of fed and feeder cattle prices, or other commonly offered explanations, do not explain the 2015 collapse in fed and feeder cattle prices or the low prices that have prevailed since then. Fed and feeder cattle prices have thus been artificially depressed since June 2015.

25. In support of their claims, Plaintiffs put forth (1) direct evidence of a conspiracy through eyewitness recollections; (2) parallel conduct involving periodic slaughter restraint and coordinated fed cattle procurement practices; (3) plus factors showing the market is susceptible to collusion; and (4) economic analysis showing anticompetitive effects on cattle prices and Defendants' margins.

## PARTIES

### I. Plaintiffs

26. Plaintiff Johnny Davis is a rancher residing in Arkansas who raises Feeder Cattle on his farm. During the relevant time period, Davis sold Feeder Cattle directly to Feedlots at sale barns such as Oklahoma National Stockyards, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Davis received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Davis's Feeder Cattle.

27. Plaintiff Abby Funkhouser is a rancher residing in Arkansas who raises Feeder Cattle on his farm, AR Farms. During the relevant time period, Funkhouser sold Feeder Cattle directly to Feedlots at sale barns such as Bradley County Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Funkhouser received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Funkhouser's Feeder Cattle.

28. Plaintiff William Garrison is a rancher residing in Arkansas who raises Feeder Cattle on his farm, 2 Drunk Cattle Co. During the relevant time period, Garrison sold Feeder Cattle directly to Feedlots at sale barns such as Searcy Sale Barn, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Garrison received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Garrison's Feeder Cattle.

29. Plaintiff David Seitz is a rancher residing in Arkansas who raises Feeder Cattle on his farm, David Seitz Farms. During the relevant time period, Seitz sold Feeder Cattle directly to Feedlots at sale barns such as Cattlemen's Livestock Auction, North Arkansas Livestock Auction, Decatur Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Seitz received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and

unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Seitz's Feeder Cattle.

30. Plaintiff Howard Otto is a rancher residing in Arizona who raises Feeder Cattle on his farm. During the relevant time period, Otto sold Feeder Cattle directly to Feedlots at sale barns such as Tulsa Livestock, Welch Livestock, and Vinata Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Otto received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Otto's Feeder Cattle.

31. Plaintiff Hanratty Farms LLC is a cattle operation located in Colorado that raises Feeder Cattle. During the relevant time period, Hanratty Farms LLC sold Feeder Cattle directly to Feedlots at sale barns such as Winter Livestock and via private sales directly to Feedlots such as Cactus Feeders, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Hanratty Farms LLC received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Hanratty Farms LLC's Feeder Cattle.

32. Plaintiff Clint Huffaker is a rancher residing in Colorado who raises Feeder Cattle on his farm. During the relevant time period, Huffaker sold Feeder Cattle directly to Feedlots at sale barns such as Winter Livestock and Monte Vista Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Huffaker received artificially suppressed prices for his Feeder Cattle sales because

Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Huffaker's Feeder Cattle.

33. Plaintiff Ronald Rehfeld is a rancher residing in Colorado who raises Feeder Cattle on his farm. During the relevant time period, Rehfeld sold Feeder Cattle directly to Feedlots at sale barns such as Burlington Livestock Exchange and Syracuse Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Rehfeld received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Rehfeld's Feeder Cattle.

34. Plaintiff Clive Botha is a rancher residing in Florida who raises Feeder Cattle on his farm, Botha Beef. During the relevant time period, Botha sold Feeder Cattle directly to Feedlots at sale barns such as Okeechobee Livestock Market and via private sales, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Botha received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Botha's Feeder Cattle.

35. Plaintiff Russell Damron is a rancher residing in Florida who raises Feeder Cattle on his farm, RDD Beef Masters. During the relevant time period, Damron sold Feeder Cattle directly to Feedlots at sale barns such as Sumter County Farmers Market, and those

Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Damron received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Damron's Feeder Cattle.

36. Plaintiff Hales Farms, Inc. is a cattle operation incorporated in Florida that raises Feeder Cattle. During the relevant time period, Hales Farms, Inc. sold Feeder Cattle directly to Feedlots at sale barns such as Okeechobee Livestock Market, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Hales Farms, Inc. received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Hales Farms, Inc.'s Feeder Cattle.

37. Plaintiff Linda Sapp is a rancher residing in Florida who raises Feeder Cattle on his farm, Coffee Cup Ranch. During the relevant time period, Sapp sold Feeder Cattle directly to Feedlots at sale barns such as Okeechobee Livestock Market, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Sapp received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Sapp's Feeder Cattle.

38. Plaintiff Mark Strecker is a rancher residing in Florida who raises Feeder Cattle on his farm, Strecker Cattle. During the relevant time period, Strecker sold Feeder Cattle

directly to Feedlots at sale barns, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Strecker received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Strecker's Feeder Cattle.

39. Plaintiff Justin Dammann is a rancher residing in Iowa who raises Feeder Cattle on his farm, Dammann Farms. During the relevant time period, Dammann sold Feeder Cattle directly to Feedlots at sale barns such as Clarinda Livestock, United Producers, Redoak Livestock, Unionville Livestock, and Superior Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Dammann received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Dammann's Feeder Cattle.

40. Plaintiff Carl Griffiths is a rancher residing in Indiana who raises Feeder Cattle on his farm, 3G Ranch. During the relevant time period, Griffiths sold Feeder Cattle directly to Feedlots at sale barns such as Shipshewana Livestock and Topeka Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Griffiths received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Griffiths's Feeder Cattle.

41. Plaintiff Fisher Brothers LLC is a cattle operation incorporated in Kansas that raises Feeder Cattle. During the relevant time period, Fisher Brothers LLC sold Feeder Cattle directly to Feedlots at sale barns such as Rezac Livestock, Superior Livestock, and Manhattan Commission Co., and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Fisher Brothers LLC received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Fisher Brothers LLC's Feeder Cattle.

42. Plaintiff Dennis Kelly is a rancher residing in Kansas who raises Feeder Cattle on his farm, Harmony Acres. During the relevant time period, Kelly sold Feeder Cattle directly to Feedlots at sale barns such as Paola Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Kelly received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Kelly's Feeder Cattle.

43. Plaintiff Charles Holloway is a rancher residing in Louisiana who raises Feeder Cattle on his farm. During the relevant time period, Holloway sold Feeder Cattle directly to Feedlots at sale barns such as Delhi Livestock and Red River Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Holloway received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market,

which caused a simultaneous and immediate impact on the prices received for Holloway's Feeder Cattle.

44. Plaintiff John Friend is a rancher residing in Maryland who raises Feeder Cattle on his farm. During the relevant time period, Friend sold Feeder Cattle directly to Feedlots at sale barns such as Friends Stockyard, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Friend received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Friend's Feeder Cattle.

45. Plaintiff Alan Hudson is a rancher residing in Maryland who raises Feeder Cattle on his farm. During the relevant time period, Hudson sold Feeder Cattle directly to Feedlots at sale barns such as Dills Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Hudson received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Hudson's Feeder Cattle.

46. Plaintiff Mitchell Creek LLC is a cattle operation incorporated in Michigan that raises Feeder Cattle. During the relevant time period, Mitchell Creek LLC sold Feeder Cattle directly to Feedlots at sale barns such as West Branch Feeder Calf Sale, Clare Livestock Auction, and United Producers, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Mitchell Creek LLC received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and

unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Mitchell Creek LLC's Feeder Cattle.

47. Plaintiff Carl Killingsworth is a rancher residing in Missouri who raises Feeder Cattle on his farm, Killingsworth Heritage Farm. During the relevant time period, Killingsworth sold Feeder Cattle directly to Feedlots at stockyards such as Springfield Livestock Marketing Center, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Killingsworth received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Killingsworth's Feeder Cattle.

48. Plaintiff Elmwood Church Farms LLC is a cattle operation incorporated in Missouri that raises Feeder Cattle. During the relevant time period, Elmwood Church Farms LLC sold Feeder Cattle directly to Feedlots at sale barns such as Callaway Livestock Market and via private sales to Feedlots such as Meyer Cattle Co., and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Elmwood Church Farms LLC received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Elmwood Church Farms LLC's Feeder Cattle.

49. Plaintiff Cherry Tree Properties, LLC is a cattle operation incorporated in Missouri that raises Feeder Cattle. During the relevant time period, Cherry Tree Properties sold Feeder Cattle directly to Feedlots at sale barns such as Windsor Livestock, and those

Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Cherry Tree Properties LLC received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Cherry Tree Properties LLC's Feeder Cattle.

50. Plaintiff Jesse Andrews is a rancher residing in Mississippi who raises Feeder Cattle on his farm. During the relevant time period, Andrews sold Feeder Cattle directly to Feedlots at sale barns such as Livestock Producers Associated, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Andrews received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Andrew's Feeder Cattle.

51. Plaintiff Lish Chandler is a rancher residing in Mississippi who raises Feeder Cattle on her farm, Lish Farm. During the relevant time period, Chandler sold Feeder Cattle directly to Feedlots at sale barns such as Macon Stockyard, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Chandler received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Chandler's Feeder Cattle.

52. Plaintiff Geoffrey Clark is a rancher residing in Mississippi who raises Feeder Cattle on his farm. During the relevant time period, Clark sold Feeder Cattle directly to Feedlots at sale barns such as Tadlock Stockyards and Superior Livestock Auction, and

those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Clark received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Clark's Feeder Cattle.

53. Plaintiff Rodney Crumbley is a rancher residing in Mississippi who raises Feeder Cattle on his farm, Cypress Crossing Farms. During the relevant time period, Crumbley sold Feeder Cattle directly to Feedlots at sale barns such as Tadlock Stockyards, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Crumbley received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Crumbley's Feeder Cattle.

54. Plaintiff Mark Gordon is a rancher residing in Mississippi who raises Feeder Cattle on his farm. During the relevant time period, Gordon sold Feeder Cattle directly to Feedlots at sale barns such as Meridian Livestock, Inc., and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Gordon received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Gordon's Feeder Cattle.

55. Plaintiff Dennis Hannah is a rancher residing in Mississippi who raises Feeder Cattle on his farm, 3 D Farms. During the relevant time period, Hannah sold Feeder Cattle

directly to Feedlots at sale barns such as Pontotoc Livestock, Limpson Bros, Y&R Sale Barn, and Salem Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Hannah received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Hannah's Feeder Cattle.

56. Plaintiff Ammon Herring is a rancher residing in Mississippi who raises Feeder Cattle on his farm, Punkin Ridge Farm. During the relevant time period, Herring sold Feeder Cattle directly to Feedlots at live auctions, video auctions, and via private sales, such as to Bentley Feedyard, Cochrane Cattle Company, and Parker Cattle Company, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Herring received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Herring's Feeder Cattle.

57. Plaintiff James Mosley is a rancher residing in Mississippi who raises Feeder Cattle on his farm. During the relevant time period, Mosley sold Feeder Cattle directly to Feedlots at sale barns such as Tadlock Stockyard, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Mosley received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Mosley's Feeder Cattle.

58. Plaintiff Phillip Poe is a rancher residing in Mississippi who raises Feeder Cattle on his farm, Poe Farm. During the relevant time period, Poe sold Feeder Cattle directly to Feedlots at sale barns such as People's Livestock, West Point Mississippi Livestock, and Pontotoc Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Poe received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Poe's Feeder Cattle.

59. Plaintiff Gary Powell is a rancher residing in Mississippi who raises Feeder Cattle on his farm, G and R Farms. During the relevant time period, Powell sold Feeder Cattle directly to Feedlots at sale barns and live auctions, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Powell received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Powell's Feeder Cattle.

60. Plaintiff Scott Roberson is a rancher residing in Mississippi who raises Feeder Cattle on his farm. During the relevant time period, Roberson sold Feeder Cattle directly to Feedlots at sale barns such as Hattiesburg Mississippi Stockyard and George Co. Mississippi Stockyard, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Roberson received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in

the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Roberson's Feeder Cattle.

61. Plaintiff Mark Ryals is a rancher residing in Mississippi who raises Feeder Cattle on his farm, R & K Cattle Company. During the relevant time period, Ryals sold Feeder Cattle directly to Feedlots such as Irsik & Doll Feed Services, Inc., and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Ryals received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Ryals's Feeder Cattle.

62. Plaintiff Ken Spradling is a rancher residing in Mississippi who raises Feeder Cattle on his farm, Spradling Farms. During the relevant time period, Spradling sold Feeder Cattle directly to Feedlots at sale barns such as West Point Cattlemen Livestock and Russellville Northwest Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Spradling received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Spradling's Feeder Cattle.

63. Plaintiff Terry Wade is a rancher residing in Mississippi who raises Feeder Cattle on his farm, Wade Cattle Company. During the relevant time period, Wade sold Feeder Cattle directly to Feedlots at sale barns such as Tadlock Stockyard, Winona, and Kosciusko, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Wade received artificially suppressed prices for his Feeder Cattle sales

because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Wade's Feeder Cattle.

64. Plaintiff Loren Sorenson is a rancher residing in North Dakota who raises Feeder Cattle on his farm, Sorenson Ranch. During the relevant time period, Sorenson sold Feeder Cattle directly to Feedlots at sale barns such as Sitting Bull Auction and Sidney Livestock Marketing Center, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Sorenson received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Sorenson's Feeder Cattle.

65. Plaintiff Shawn Strege is a rancher residing in North Dakota who raises Feeder Cattle on his farm, Strege Farm. During the relevant time period, Strege sold Feeder Cattle directly to Feedlots at sale barns such as Sisseton Livestock Auction and Hub City Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Strege received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Strege's Feeder Cattle.

66. Plaintiff Larry Ulrich is a rancher residing in North Dakota who raises Feeder Cattle on his farm. During the relevant time period, Ulrich sold Feeder Cattle directly to Feedlots at sale barns and video auctions such as Hub City, Faith, Mandan, Harriet, and Napoleon

Livestock Market, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Ulrich received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Ulrich's Feeder Cattle.

67. Plaintiff Kenneth Frey is a rancher residing in Nebraska who raises Feeder Cattle on his farm, Frey Ranch. During the relevant time period, Frey sold Feeder Cattle directly to Feedlots at sale barns such as Sheridan Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Frey received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Frey's Feeder Cattle.

68. Plaintiff Allen Haase is a rancher residing in Nebraska who raises Feeder Cattle on his farm. During the relevant time period, Haase sold Feeder Cattle directly to Feedlots at sale barns such as West Point Livestock Market and Stockmen's Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Haase received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Haase's Feeder Cattle.

69. Plaintiff Allen Moravec is a rancher residing in Nebraska who raises Feeder Cattle on his farm. During the relevant time period, Moravec sold Feeder Cattle directly to Feedlots at sale barns such as Columbus Sales Pavillion, and those Feedlots in turn sold

cattle to beef packers, including one or more of the Defendants. Moravec received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Moravec's Feeder Cattle.

70. Plaintiff Rystrom Land and Cattle LLC is a cattle operation incorporated in Nebraska that raises Feeder Cattle. During the relevant time period, Rystrom Land and Cattle LLC sold Feeder Cattle directly to Feedlots at sale barns such as Columbus Sales Pavillion and Huss Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Rystrom Land and Cattle LLC received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Rystrom Land and Cattle LLC's Feeder Cattle.

71. Plaintiff Welniak Inc. is a cattle operation incorporated in Nebraska that raises Feeder Cattle. During the relevant time period, Welniak Inc. sold Feeder Cattle directly to Feedlots at sale barns such as Burwell Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Welniak Inc. received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Welniak Inc.'s Feeder Cattle.

72. Plaintiff Schuyler Anderson is a rancher residing in Nebraska who raises Feeder Cattle on his farm. During the relevant time period, Anderson sold Feeder Cattle directly

to Feedlots at sale barns and video auctions such as Lexington Livestock and Superior Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Anderson received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Anderson's Feeder Cattle.

73. Plaintiff Glen Bonifas is a rancher residing in Nebraska who raises Feeder Cattle on his farm. During the relevant time period, Bonifas sold Feeder Cattle directly to Feedlots at sale barns and via private sales to feedlots such as Great Plains and M&M Feeders, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Bonifas received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Bonifas's Feeder Cattle.

74. Plaintiff Marcos Baca is a rancher residing in New Mexico who raises Feeder Cattle on his farm, Baca Ranch. During the relevant time period, Baca sold Feeder Cattle directly to Feedlots at sale barns such as 5 States Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Baca received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Baca's Feeder Cattle.

75. Plaintiff Daren Chacon is a rancher residing in New Mexico who raises Feeder Cattle on his farm. During the relevant time period, Chacon sold Feeder Cattle directly to Feedlots at sale barns such as Clara's Trading Post, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Chacon received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Chacon's Feeder Cattle.

76. Plaintiff Teresa Henio is a rancher residing in New Mexico who raises Feeder Cattle on her farm. During the relevant time period, Henio sold Feeder Cattle directly to Feedlots at sale barns such as Cattleman Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Henio received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Henio's Feeder Cattle.

77. Plaintiff Dean Jackson is a rancher residing in New Mexico who raises Feeder Cattle on his farm. During the relevant time period, Jackson sold Feeder Cattle directly to Feedlots at sale barns and live auctions such as Clovis Livestock and Roswell Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Jackson received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Jackson's Feeder Cattle.

78. Plaintiff Jon Beitia is a rancher residing in Nevada who raises Feeder Cattle on his farm, Beitia Livestock. During the relevant time period, Beitia sold Feeder Cattle directly to Feedlots at sale barns such as Twin Falls Livestock Commission and Producers Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Beitia received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Beitia's Feeder Cattle

79. Plaintiff Mark Carter is a rancher residing in Ohio who raises Feeder Cattle on his farm, MC Ranch. During the relevant time period, Carter sold Feeder Cattle directly to Feedlots at sale barns such as Producers Livestock and via private sales to Feedlots such as RL Valley Feedlot, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Carter received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Carter's Feeder Cattle.

80. Plaintiff Matt Imwalle is a rancher residing in Ohio who raises Feeder Cattle on his farm, Imwalle Show Cattle. During the relevant time period, Imwalle sold Feeder Cattle directly to Feedlots at sale barns and live auctions such as Egbert Stockyard, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Imwalle received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market,

which caused a simultaneous and immediate impact on the prices received for Imwalle's Feeder Cattle.

81. Plaintiff Kevin Adkinson is a rancher residing in Oklahoma who raises Feeder Cattle on his farm, High Call Ranch. During the relevant time period, Adkinson sold Feeder Cattle directly to Feedlots at sale barns such as Oklahoma City National Stockyards, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Adkinson received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Adkinson's Feeder Cattle.

82. Plaintiff Shirley Bates is a rancher residing in Oklahoma who raises Feeder Cattle on her farm, Shirley Bates SP. During the relevant time period, Bates sold Feeder Cattle directly to Feedlots at sale barns such as Oklahoma City Stockyards, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Bates received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Bates's Feeder Cattle.

83. Plaintiff Tisha Clemens is a rancher residing in Oklahoma who raises Feeder Cattle on his farm, Rockin' C Ranch. During the relevant time period, Clemens sold Feeder Cattle directly to Feedlots at sale barns such as Atoka Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Clemens received artificially suppressed prices for his Feeder Cattle sales because Defendants'

anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Clemens's Feeder Cattle.

84. Plaintiff Jon Davis is a rancher residing in Oklahoma who raises Feeder Cattle on his farm, Davis Farms. During the relevant time period, Davis sold Feeder Cattle directly to Feedlots at sale barns such as OKC West Livestock Market and OKC National, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Davis received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Davis's Feeder Cattle.

85. Plaintiff Angela Forrest is a rancher residing in Oklahoma who raises Feeder Cattle on his farm, Circle F Farms. During the relevant time period, Forrest sold Feeder Cattle directly to Feedlots at sale barns, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Forrest received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Forrest's Feeder Cattle.

86. Plaintiff Michael Fuller is a rancher residing in Oklahoma who raises Feeder Cattle on his farm, Fuller Cattle Company. During the relevant time period, Fuller sold Feeder Cattle directly to Feedlots at sale barns such as Durant Stockyards Co., Hugo Livestock Market, and McAlester Stockyards, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Fuller received artificially suppressed prices for

his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Fuller's Feeder Cattle.

87. Plaintiff Jason Hardy is a rancher residing in Oklahoma who raises Feeder Cattle on his farm, Hardy Angus Ranch. During the relevant time period, Hardy sold Feeder Cattle directly to Feedlots at sale barns such as Woodward Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Hardy received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Hardy's Feeder Cattle.

88. Plaintiff Lori Hart is a rancher residing in Oklahoma who raises Feeder Cattle on her farm, Hart Cattle. During the relevant time period, Hart sold Feeder Cattle directly to Feedlots at sale barns such as Welch Stockyard, Coffeyville Stockyard, and Delaware County Stockyards, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Hart received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Hart's Feeder Cattle.

89. Plaintiff Carl Johnson is a rancher residing in Oklahoma who raises Feeder Cattle on his farm, Carl and Camellia Johnson SP. During the relevant time period, Johnson sold Feeder Cattle directly to Feedlots at sale barns such as Tulsa Stockyard and Bristow Stockyard, and those Feedlots in turn sold cattle to beef packers, including one or more of

the Defendants. Johnson received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Johnson's Feeder Cattle.

90. Plaintiff James McGlocklin is a rancher residing in Oklahoma who raises Feeder Cattle on his farm, McGlocklin Ranch. During the relevant time period, McGlocklin sold Feeder Cattle directly to Feedlots at sale barns such as Southern Oklahoma Livestock Auction and Durant Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. McGlocklin received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for McGlocklin's Feeder Cattle.

91. Plaintiff Tyler Neal is a rancher residing in Oklahoma who raises Feeder Cattle on his farm, Neal Cattle Company. During the relevant time period, Neal sold Feeder Cattle directly to Feedlots at sale barns, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Neal received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Neal's Feeder Cattle.

92. Plaintiff Gary Nichols is a rancher residing in Oklahoma who raises Feeder Cattle on his farm, Nichols Farms. During the relevant time period, Nichols sold Feeder Cattle directly to Feedlots at sale barns such as Waurika Livestock, and those Feedlots in turn

sold cattle to beef packers, including one or more of the Defendants. Nichols received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Nichols's Feeder Cattle.

93. Plaintiff Phillip Parrish is a rancher residing in Oklahoma who raises Feeder Cattle on his farm, PnS Ranch. During the relevant time period, Parrish sold Feeder Cattle directly to Feedlots at sale barns such as Mid America Stockyards, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Parrish received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Parrish's Feeder Cattle.

94. Plaintiff Kevin Rozell is a rancher residing in Oklahoma who raises Feeder Cattle on his farm, Rozell SP. During the relevant time period, Rozell sold Feeder Cattle directly to Feedlots at sale barns such as Hobart Sale Barn, Elk City Livestock Auction, and Clinton Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Rozell received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Rozell's Feeder Cattle.

95. Plaintiff Chad Simon is a rancher residing in Oklahoma who raises Feeder Cattle on his farm, Simon Ranch. During the relevant time period, Simon sold Feeder Cattle directly to Feedlots at sale barns such as Woodward Livestock Auction and Elk City

Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Simon received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Simon's Feeder Cattle.

96. Plaintiff Perry Stover is a rancher residing in Oklahoma who raises Feeder Cattle on his farm, Stover Ranch. During the relevant time period, Stover sold Feeder Cattle directly to Feedlots at sale barns such as Elk City Livestock Auction and Hollis Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Stover received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Stover's Feeder Cattle.

97. Plaintiff Steve Trotter is a rancher residing in Oklahoma who raises Feeder Cattle on his farm, Steve Trotter Ranch. During the relevant time period, Trotter sold Feeder Cattle directly to Feedlots at sale barns such as Tulsa Stockyard, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Trotter received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Trotter's Feeder Cattle.

98. Plaintiff Nolan Edwards is a rancher residing in Oregon who raises Feeder Cattle on his farm, Colony Ranch. During the relevant time period, Edwards sold Feeder Cattle

directly to Feedlots at sale barns such as Producers Vale and Nevada Livestock Marketing, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Edwards received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Edwards's Feeder Cattle.

99. Plaintiff Chris Ketcham is a rancher residing in Oregon who raises Feeder Cattle on his farm, Chris Ketcham Farms. During the relevant time period, Ketcham sold Feeder Cattle directly to Feedlots at sale barns such as 101 Livestock, Cottonwood Sales, Klamath Falls Sale Barn, Alturas Sale Barn, Nine Livestock, and Dwayne Baxley Livestock, and via private sales, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Ketcham received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Ketcham's Feeder Cattle.

100. Plaintiff Gary & Denise Klegseth, LLC is a cattle operation incorporated in Oregon that raises Feeder Cattle. During the relevant time period, Gary & Denise Klegseth, LLC sold Feeder Cattle directly to Feedlots at sale barns such as Western Livestock, Orlin Auction Yard, and Superior Livestock Auction, and via private sale to Feedlots such as Dan McFarland Livestock LLC, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Gary & Denise Klegseth, LLC received artificially suppressed prices for his Feeder Cattle sales because Defendants'

anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Gary & Denise Klegseth LLC's Feeder Cattle.

101. Plaintiff Bryn Neese is a rancher residing in Oregon who raises Feeder Cattle on her farm, Gods Good Earth. During the relevant time period, Neese sold Feeder Cattle directly to Feedlots at sale barns such as Shasta Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Neese received artificially suppressed prices for her Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Neese's Feeder Cattle.

102. Plaintiff Donovan Volk is a rancher residing in Oregon who raises Feeder Cattle on his farm, KDR Farms. During the relevant time period, Volk sold Feeder Cattle directly to Feedlots at sale barns such as Chehalis Livestock Auction, Woodburn Livestock Auction, Lebanon Auction Yard, and McMinnville Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Volk received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Volk's Feeder Cattle.

103. Plaintiff Leonard Baker is a rancher residing in Pennsylvania who raises Feeder Cattle on his farm, Len Baker Farms. During the relevant time period, Baker sold Feeder Cattle directly to Feedlots at sale barns such as Union City Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Baker

received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Baker's Feeder Cattle.

104. Plaintiff Fuller Syndicate, LLC is a cattle operation incorporated in Pennsylvania that raises Feeder Cattle. During the relevant time period, Fuller Syndicate, LLC sold Feeder Cattle directly to Feedlots at sale barns such as Union City Livestock Auction and Meadville Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Fuller Syndicate, LLC received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Fuller Syndicate, LLC's Feeder Cattle.

105. Plaintiff JH and PR Moore LLC is a cattle operation incorporated in Pennsylvania that raises Feeder Cattle. During the relevant time period, JH and PR Moore LLC sold Feeder Cattle directly to Feedlots at sale barns such as Wilmington Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. JH and PR Moore LLC received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for JH and PR Moore LLC's Feeder Cattle.

106. Plaintiff Joseph Furco is a rancher residing in South Carolina who raises Feeder Cattle on his farm, Furco Farm. During the relevant time period, Furco sold Feeder Cattle directly to Feedlots at sale barns such as Cleveland County Livestock Exchange and

Laurens Livestock Exchange, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Furco received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Furco's Feeder Cattle

107. Plaintiff Delano Kneece Farm & Son Incorporated is a cattle operation incorporated in South Carolina that raises Feeder Cattle. During the relevant time period, Delano Kneece Farm & Son Inc. sold Feeder Cattle directly to Feedlots, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Delano Kneece Farm & Son Inc. received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Delano Kneece Farm & Son Inc.'s Feeder Cattle.

108. Plaintiff Phillip Robinson is a rancher residing in South Carolina who raises Feeder Cattle on his farm, Phillip A. Robinson Farms. During the relevant time period, Robinson sold Feeder Cattle directly to Feedlots at sale barns and auctions as Superior Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Robinson received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Robinson's Feeder Cattle

109. Plaintiff Stephen Stone is a rancher residing in South Carolina who raises Feeder Cattle on his farm. During the relevant time period, Stone sold Feeder Cattle directly to Feedlots at sale barns such as Laurens Stockyard, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Stone received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Stone's Feeder Cattle.

110. Plaintiff Laurence Heitmann is a rancher residing in South Dakota who raises Feeder Cattle on his farm, Heitmann Farm. During the relevant time period, Heitmann sold Feeder Cattle directly to Feedlots at stockyards, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Heitmann received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Heitmann's Feeder Cattle.

111. Plaintiff Donald Hoeksema is a rancher residing in South Dakota who raises Feeder Cattle on his farm. During the relevant time period, Hoeksema sold Feeder Cattle directly to Feedlots at sale barns such as Platte Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Hoeksema received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Hoeksema's Feeder Cattle.

112. Plaintiff Clay Hoff is a rancher residing in South Dakota who raises Feeder Cattle on his farm. During the relevant time period, Hoff sold Feeder Cattle directly to Feedlots at sale barns, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Hoff received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Hoff's Feeder Cattle.

113. Plaintiff Rory Thorstenson is a rancher residing in South Dakota who raises Feeder Cattle on his farm, Rory Thorstenson SP. During the relevant time period, Thorstenson sold Feeder Cattle directly to Feedlots at sale barns such as Mobridge Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Thorstenson received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Thorstenson's Feeder Cattle.

114. Plaintiff Crystal Black-Puckett is a rancher residing in Tennessee who raises Feeder Cattle on her farm, Big Bear Cattle Company. During the relevant time period, Black-Puckett sold Feeder Cattle directly to Feedlots at live auctions barns such as Tri-State Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Black-Puckett received artificially suppressed prices for her Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed

prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Black-Puckett's Feeder Cattle.

115. Plaintiff John Bonar is a rancher residing in Tennessee who raises Feeder Cattle on his farm, Creek View Farms. During the relevant time period, Bonar sold Feeder Cattle directly to Feedlots at sale barns such as South Western Sale Barn, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Bonar received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Bonar's Feeder Cattle.

116. Plaintiff Michael Dodd is a rancher residing in Tennessee who raises Feeder Cattle on his farm, Thousand Hills Ranch. During the relevant time period, Dodd sold Feeder Cattle directly to Feedlots at sale barns, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Dodd received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Dodd's Feeder Cattle.

117. Plaintiff Mark Hensley is a rancher residing in Tennessee who raises Feeder Cattle on his farm, Hensley Farm. During the relevant time period, Hensley sold Feeder Cattle directly to Feedlots at live auctions, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Hensley received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct

suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Hensley's Feeder Cattle.

118. Plaintiff Jerry Kelsey is a rancher residing in Tennessee who raises Feeder Cattle on his farm, Kelsey Farms. During the relevant time period, Kelsey sold Feeder Cattle directly to Feedlots at sale barns such as Warren County Livestock and Crossville Stockyard, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Kelsey received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Kelsey's Feeder Cattle.

119. Plaintiff Steve Lee is a rancher residing in Tennessee who raises Feeder Cattle on his farm, Circle L Ranch. During the relevant time period, Lee sold Feeder Cattle directly to Feedlots at sale barns such as Joplin Stockyards and TC Cattle Co., and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Lee received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Lee's Feeder Cattle

120. Plaintiff Derek McKee is a rancher residing in Tennessee who raises Feeder Cattle on his farm, McKee Farms. During the relevant time period, McKee sold Feeder Cattle directly to Feedlots at live auctions, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. McKee received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed

prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for McKee's Feeder Cattle.

121. Plaintiff Sam Sneed is a rancher residing in Tennessee who raises Feeder Cattle on his farm, Sneed Farms. During the relevant time period, Sneed sold Feeder Cattle directly to Feedlots at sale barns such as Pulaski Stockyard, Dickson Livestock, and OKC Stockyards, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Sneed received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Sneed's Feeder Cattle.

122. Plaintiff Joe Begay is a rancher residing in Utah who raises Feeder Cattle on his farm. During the relevant time period, Begay sold Feeder Cattle directly to Feedlots at live auctions such as Salina Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Begay received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Begay's Feeder Cattle.

123. Plaintiff Chris Carter is a rancher residing in Utah who raises Feeder Cattle on his farm, Carter Ranch and Livestock. During the relevant time period, Carter sold Feeder Cattle directly to Feedlots via private sales through R Livestock and Producers Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Carter received artificially suppressed prices for his Feeder Cattle sales

because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Carter's Feeder Cattle.

124. Plaintiff Enzio Leben is a rancher residing in Utah who raises Feeder Cattle on his farm, LPH Ranch. During the relevant time period, Leben sold Feeder Cattle directly to Feedlots at sale barns such as Salina Livestock Auction and Anderson Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Leben received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Leben's Feeder Cattle.

125. Plaintiff David Brown is a rancher residing in Virginia who raises Feeder Cattle on his farm. During the relevant time period, Brown sold Feeder Cattle directly to Feedlots such as G&G Livestock, LLC, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Brown received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Brown's Feeder Cattle.

126. Plaintiff Timothy Cox is a rancher residing in Virginia who raises Feeder Cattle on his farm. During the relevant time period, Cox sold Feeder Cattle directly to Feedlots at sale barns such as Narrows Stockyard, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Cox received artificially suppressed prices for

his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Cox's Feeder Cattle.

127. Plaintiff Bryan Gotham is a rancher residing in Washington who raises Feeder Cattle on his farm. During the relevant time period, Gotham sold Feeder Cattle directly to Feedlots at sale barns such as Stockland Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Gotham received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Gotham's Feeder Cattle.

128. Plaintiff Gale Noyes is a rancher residing in Washington who raises Feeder Cattle on his farm, G & M Cattle. During the relevant time period, Noyes sold Feeder Cattle directly to Feedlots at sale barns such as Toppenish Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Noyes received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Noyes's Feeder Cattle.

129. Plaintiff Gene Roth is a rancher residing in Washington who raises Feeder Cattle on his farm. During the relevant time period, Roth sold Feeder Cattle directly to Feedlots at sale barns such as Lewiston Livestock Market and Toppenish Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Roth received artificially suppressed prices for his Feeder Cattle sales because Defendants'

anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Roth's Feeder Cattle.

130. Plaintiff John Buser is a rancher residing in Wisconsin who raises Feeder Cattle on his farm, Buser Cattle Company. During the relevant time period, Buser sold Feeder Cattle directly to Feedlots at sale barns such as Equity Livestock and Bloomington Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Buser received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Buser's Feeder Cattle.

131. Plaintiff TJ Nyffenegger is a rancher residing in Wisconsin who raises Feeder Cattle on his farm, Nyff Farms. During the relevant time period, Nyffenegger sold Feeder Cattle directly to Feedlots at sale barns such as Bloomington Livestock Exchange, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Nyffenegger received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Nyffenegger's Feeder Cattle.

132. Plaintiff Rocky Olsen is a rancher residing in Wisconsin who raises Feeder Cattle on his farm, Olsen Farms a/k/a Olsen Cattle. During the relevant time period, Olsen sold Feeder Cattle directly to Feedlots at sale barns and video auctions such as Premier Livestock and Superior Livestock Auction, and those Feedlots in turn sold cattle to beef

packers, including one or more of the Defendants. Olsen received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Olsen's Feeder Cattle.

133. Plaintiff Tom Roesch is a rancher residing in Wisconsin who raises Feeder Cattle on his farm, Roeschland Farms. During the relevant time period, Roesch sold Feeder Cattle directly to Feedlots at sale barns such as Bloomington Livestock Exchange, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Roesch received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Roesch's Feeder Cattle.

134. Plaintiff Schreiber Acres LLC is a cattle operation incorporated in Wisconsin that raises Feeder Cattle. During the relevant time period, Schreiber Acres LLC sold Feeder Cattle directly to Feedlots at sale barns such as Premier Livestock and Equity Livestock, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Schreiber Acres LLC received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Schreiber Acres LLC's Feeder Cattle.

135. Plaintiff Antonio Roman is a rancher residing in West Virginia who raises Feeder Cattle on his farm, Tyler Ranch. During the relevant time period, Roman sold Feeder Cattle

directly to Feedlots at sale barns such as Riverton Livestock Auction, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Roman received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Roman's Feeder Cattle.

136. Plaintiff Gary Alibozek is a rancher residing in Massachusetts who raises Feeder Cattle on his farm. During the relevant time period, Alibozek sold Feeder Cattle directly to Feedlots at sale barns, and those Feedlots in turn sold cattle to beef packers, including one or more of the Defendants. Alibozek received artificially suppressed prices for his Feeder Cattle sales because Defendants' anticompetitive and unfair conduct suppressed prices in the fed cattle market, which caused a simultaneous and immediate impact on the prices received for Alibozek's Feeder Cattle.

## II. Defendants

### A. The Tyson Defendants.

137. Defendant Tyson Foods, Inc. ("Tyson Foods") is a Delaware corporation with its principal place of business in Springdale, Arkansas. Tyson Foods is the parent company of the Tyson group.

138. Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh Meats" and collectively with Tyson Foods, "Tyson" or the "Tyson Defendants") is a wholly owned subsidiary of Tyson Foods. Tyson Fresh Meats is a Delaware corporation with its principal place of business in Dakota Dunes, South Dakota. Tyson Fresh Meats is the contracting entity for fed cattle

bought and slaughtered at its numerous slaughter plants throughout the United States and is the principal operating entity within Tyson Foods' cattle and beef business.

139. At all relevant times, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise to further the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from Plaintiffs.

140. The Tyson defendants collectively participated in the agreement, understanding, and conspiracy alleged herein.

**B. The JBS Defendants.**

141. Defendant JBS S.A. ("JBS") is a Brazilian corporation with its principal place of business located in Sao Paulo, Brazil. JBS is the parent company of the JBS group.

142. Defendant JBS USA Food Company ("JBS USA") is a Delaware corporation with its principal place of business in Greeley, Colorado. JBS USA acts as both an operating entity and holding company within JBS's U.S. cattle and beef business. JBS USA is the contracting entity for JBS's fed cattle purchases in the United States.

143. Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business in Greeley, Colorado. Swift operates JBS's fed cattle slaughter plants throughout the United States and also contracts for the majority of fed cattle purchases to be slaughtered at these plants.

144. Defendant JBS Packerland, Inc. ("JBS Packerland") is a Delaware corporation with its principal place of business in Greeley, Colorado. JBS Packerland operates JBS's Regional Beef business unit. In that capacity, JBS Packerland owns, directly or indirectly

through its subsidiaries, JBS slaughter plants throughout the U.S., and contracts for the majority of purchases of fed cattle to be slaughtered at these plants.

145. JBS has admitted that JBS USA, Swift, and JBS Packerland each employed or engaged various senior staff and executives responsible for the operation of JBS's U.S. fed cattle and beef business during the relevant time period.

146. Defendants JBS USA, Swift, and JBS Packerland were, throughout the relevant time period, wholly owned, direct or indirect subsidiaries of JBS. Defendants JBS, JBS USA, Swift, and JBS Packerland are referred to collectively herein as the "JBS Defendants."

147. During the relevant time period, the JBS Defendants shared a unity of corporate interest and operated as a single enterprise to further the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from Plaintiffs.

148. The JBS defendants collectively participated in the agreement, understanding, and conspiracy alleged herein.

**C. The Cargill Defendants.**

149. Defendant Cargill, Incorporated ("Cargill") is a Delaware corporation with its principal place of business in Wayzata, Minnesota. Cargill is the parent company of the Cargill group.

150. Defendant Cargill Meat Solutions Corporation ("CMS" and, collectively with Cargill, the "Cargill Defendants"), a subsidiary of Cargill, is a Delaware corporation with its principal place of business in Wichita, Kansas. CMS is the principal operating entity for Cargill's U.S. cattle and beef business and owns and operates, directly or indirectly through

its subsidiaries, Cargill's fed cattle slaughter plants in the United States. CMS is the contracting entity for fed cattle purchased and slaughtered at these plants.

151. At all relevant times, the Cargill Defendants shared a unity of interest and operated as part of a single enterprise to further the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from Plaintiffs.

152. The Cargill defendants collectively participated in the agreement, understanding, and conspiracy alleged herein.

**D. National Beef Packing Company, LLC.**

153. Defendant National Beef Packing Company, LLC ("National Beef") is a Delaware limited liability company with its principal place of business in Kansas City, Missouri. National Beef owns and operates, directly or through its subsidiaries, fed cattle slaughter plants in the U.S. and is the contracting entity for fed cattle slaughtered at these plants.

**E. The Defendants Conspired With Each Other.**

154. During the relevant time period, each Defendant purchased fed cattle in the United States and sold the resultant beef. In 2017, the Tyson, JBS, Cargill, and National Beef Defendants accounted for approximately 26%, 21%, 22%, 12.5% of the total U.S. fed cattle slaughter, respectively.[7] In their 2017 fiscal years, the Tyson, JBS, Cargill, National Beef

[7] CBW Market Share.

Defendants had approximately $14.8 billion, $13.4 billion, $13.1 billion, $7.3 billion, in sales in their respective beef segments.[8]

155. Each Defendant exploited the relationship between physical cash cattle and the CME Live Cattle market and transacted in cattle futures and/or options at prices they had suppressed, including futures for feeder cattle.

156. Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in both this District and the Transferor District.

**F. Agents and Affiliates.**

157. "Defendants" refers to and includes each of the named Defendants' predecessors, successors, parents, wholly owned or controlled subsidiaries or affiliates, employees, officers, and directors.

158. All references to any act, deed, or transaction of any corporate group, corporation, or partnership, mean that the corporate group, corporation, or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parents, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs of the corporation or partnership.

[8] Jefferies 2018 Annual Report at 38; Nat'l Cattlemen's Beef Ass'n "Directions statistics", at 2, http://www.beefusa.org/CMDocs/BeefUSA/Publications/CattleFaxSection.pdf; Cattle Buyers Weekly; "Top 30 Beef Packers 2018," http://www.cattlebuyersweekly.com/users/rankings/beefpackers2018.php.

## JURISDICTION, VENUE, AND COMMERCE

159. Subject matter jurisdiction exists over Plaintiffs' claims for injunctive relief, 15 U.S.C. § 26, and for damages, 7 U.S.C. § 209, under 28 U.S.C. § 1332(d)(11) because Plaintiffs consist of more than 100 persons seeking a joint trial of their claims on the ground that their claims involve common questions of law and fact, and the amount in controversy requirements are satisfied.

160. Subject matter jurisdiction for Plaintiffs' claims also exists under 28 U.S.C. §§ 1331 and 1337(a).

161. This Court has personal jurisdiction over Defendants because they purposefully directed their business activities toward this jurisdiction, have substantial contacts with this jurisdiction, and because Plaintiffs' claims for relief arise from and relate to illegal acts committed by Defendants in this jurisdiction.

162. Defendants' activities were within the flow of and were intended to and did have a substantial effect on interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

163. By reason of the unlawful activities alleged herein, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed Class members. Defendants, directly and through their agents, engaged in activities affecting all states.

164. Plaintiffs seek injunctive relief, compensatory damages, all damages available under applicable statutes, costs, and reasonable attorneys' fees.

165. Venue is proper in this District under 15 U.S.C. §§ 15 and 22 and 28 U.S.C. §1391(b), (c), and (d) because at all times relevant to the Complaint: (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce has been carried out in this District. Among other conduct, Defendants purchased cattle owned or located in this District, and/or sold resultant beef products to customers located in this District.

166. During the relevant period, Defendants engaged in anticompetitive conduct in the United States, that was purposefully directed at the United States and was specifically intended to affect the prices of fed and feeder cattle in the United States. Defendants' acts were acts in furtherance of the conspiracy that, because they occurred in the United States by Defendants' domestic entities, provide specific personal jurisdiction over all conspirators.

167. The conspiracy and the overt acts in furtherance of it, were directed at, and had the intended effect of, causing injury to persons residing in or doing business in the United States, including in this District.

168. Defendants' conspiracy was motivated by profits. As members of the conspiracy, foreign-based Defendants are liable for acts taken to further the conspiracy by domestic Defendants, as well as their own actions taken in the United States, and personal jurisdiction attaches, regardless of whether some portion of the conduct to further the conspiracy might have occurred overseas.

## JOINDER OF PLAINTIFFS

169. Joinder of the Plaintiffs in this matter is proper because the claims of all Plaintiffs arise out of closely related transactions, and there are significant questions of law or fact that are common to all the parties. All claims involve common questions regarding, inter alia, (a) Defendants' coordinated conduct with respect to the procurement and slaughter of cattle, (b) Defendants' misrepresentations regarding the procurement and slaughter of cattle; and (c) damages suffered by the Plaintiffs.

170. These significant questions of law and fact are common to all Plaintiffs, and the claims of all Plaintiffs are due to be tried together and jointly.

171. Plaintiffs seek a joint trial of all claims.

## THE BEEF PRODUCTION PROCESS

172. A head of cattle begins life as a calf, typically weighing between sixty-five and ninety pounds, and will nurse from its dam. At six to nine months, cattle are weaned and transitioned to forage and, sometimes, supplemental feed. At approximately twelve months, cattle are transitioned to grain and roughage. Cattle are typically slaughtered at approximately twelve to fourteen months or nine hundred and fifty to fifteen hundred pounds. Their carcasses are then processed into beef.

173. Until slaughter, a bovine is a unitary organism. It grows, as all living things do, but does not change in type, for it remains a bovine throughout its life. Moreover, its essential character as an agricultural product—an animal raised for consumption as food—remains the same throughout its life. This is so even though a bovine's ownership may change along its journey from birth to slaughter because, in the context of the beef industry,

a calf has no other purpose than to become a young adult bovine, and a young adult bovine has no other purpose than to be raised to slaughter weight. That is, feeder cattle and fed cattle are alike in *nature* even if only the latter are marketed to beef processors.[9]

174. The production of fed cattle occurs as part of an integrated whole in a *single-product supply chain* designed to raise an animal from birth to slaughter weight. While one may distinguish, for purposes of economic analysis, between the sale of feeder cattle to finishers and the sale of fed cattle to beef processors, the market for feeder cattle and fed cattle are so intrinsically intertwined that the distinction between them is irrelevant for assessing Defendants' antitrust liability.

175. As noted above, the beef production process begins with a farmer or rancher that maintains a permanent herd of mature cattle that produce calves that are raised to become fed cattle. The herd produces one cattle crop per year, usually in the spring.[10]

176. The calves are weaned between 6 and 10 months of age and are then raised until large enough for "finishing," which is generally when the cattle are between approximately 700 and 900 pounds.

---

[9] Consider the lab-grown diamond. It is a diamond at the moment it forms its first isometrically crystalline layer. As it grows, its *nature* does not change. It remains a diamond. But it is not ready to be sold until it has reached a marketable carat weight. So it is with cattle. Feeder cattle and fed cattle are not different products. They are the same product at different weights.

[10] Womach, Jasper. *Agriculture: A Glossary of Terms, Programs, and Laws*, CONGRESSIONAL RESEARCH SERVICE, LIBRARY OF CONGRESS (2005 ed.).

177. Feedlots or "finishing operations" are the final phase of the beef production system where feeder cattle are fed to harvest weight, generally between 950 and 1,500 pounds, becoming fed cattle. This process generally takes three to six months.[11]

178. Because the stage of cattle is heavily dependent on weight, the price of feeder cattle is primarily driven by two things: (1) the expected value of fed cattle in the future, and (2) the cost of getting feeder cattle to that point.[12]

179. Once cattle reach between around 950 and 1,500 pounds, they are marketed, transported to, and slaughtered at a packing plant operated by a beef packer such as Defendants. Defendants process the carcasses into various primal cuts that are vacuum-packed and boxed for sale to buyers of "boxed beef." Such buyers then further process the beef into cuts that are ultimately sold to retail consumers and to foodservice operations, such as restaurants. Purchasers of boxed beef include foodservice companies such as Sysco and U.S. Foods and large retailers such as Costco and Sam's Club.

[11] *U.S. Feedlot Processing Practices for Arriving Cattle*, Centers for Epidemiology and Animal Health, (Oct. 2012), available at https://www.aphis.usda.gov/animal_health/nahms/feedlot/downloads/feedlot2011/Feed11_is_ArrProc_1.pdf.

[12] Kenny Burdine, *Rising Feed Prices Create Divergence Between Fed and Feeder Cattle Futures*, Ohio State University Beef Cattle Letter, (May 5, 2021), available at https://u.osu.edu/beef/2021/05/05/rising-feed-prices-create-divergence-between-fed-and-feeder-cattle-values/.

180. In 2017, roughly 25.8 million fed cattle were slaughtered and processed into beef products, accounting for 80% of the roughly 32.2 million commercial cattle slaughtered across the United States.[13]

181. The cattle production cycle, running from birth to slaughter, ranges from 15 to 24 months. Fed and feeder cattle availability varies seasonally, with supplies being more plentiful in the summer because most calves are born in the spring.

182. The economics of the cattle industry compel cattle producers to sell their cattle as soon as possible after reaching target weight. For example, fed cattle producers face significant pressure to sell their cattle to packers within a matter of weeks of reaching slaughter weight because such cattle face an increased risk of death the longer they stay on the lot, particularly after they spend 5 to 6 months at the feedlot. As noted by the Grain Inspection, Packers and Stockyards Administration (now a part of the AMS), "[c]attle held beyond the optimal marketing period begin to decrease in value because of excessive fat gain and the rising cost of grain."[14] This pressure limits fed cattle producers' ability to hold out for higher prices.[15]

---

[13] The remaining volume comprised slaughter cows (female cattle that have birthed a calf) and bulls, whose meat is typically used for lesser quality beef products such as hamburger patties. 2017 Meat & Poultry Facts, 46th Ed., N. AM. MEAT INST., 2018, at 11 ("2017 Meat & Poultry Facts").

[14] RTI Int'l, *GIPSA Livestock and Meat Marketing Study, Vol. 3: Fed Cattle and Beef Industries*, prepared for U.S.D.A. GRAIN INSPECTION, PACKERS AND STOCKYARD ADMIN. (2007), at 5-4, https://www.gipsa.usda.gov/psp/publication/livemarketstudy/LMMS_Vol_3.pdf.

[15] David Cooper, *Feedyard data reveals higher death losses*, PROGRESSIVE CATTLEMAN (Dec. 24, 2015), https://www.progressivecattle.com/topics/herd-health/feedyard-data-reveals-higher-death-losses.

183. Boxed beef is a commodity product, and competition to sell boxed beef is primarily on price as between boxes of equivalent USDA quality and yield grades. Defendants also process boxed beef in house and sell case-ready beef and other value-added products (*e.g.*, sausages) directly to retailers, restaurants, hospitals, and others at a premium over boxed beef prices.

184. As a perishable product, most domestic beef is sold on short-term contracts. Some large purchasers buy some of their beef on "forward" contracts (where beef is sold before delivery) and other long-term supply agreements.

185. Historically, beef-packing was a high volume, low margin business.[16]

186. Each Defendant operates a live cattle procurement team, run by a head buyer, who is supported by "field buyers" who are responsible for territories. Field buyers buy cattle from feedlots situated inside their territories. They conduct negotiations directly with the fed cattle producers and their agents within the parameters set by their head buyer.[17]

187. Each Defendant seeks to procure sufficient fed cattle to operate its slaughter plants at its chosen utilization rates without interruption. Weekly plant capacity is determined both by plant size and the number and length of shifts run each week. Defendants' average cost of production increases if they underutilize their plant capacity, thereby reducing efficiency.

---

[16] *See* Amended Complaint, ¶24, *U.S. v. JBS SA* (N.D. Ill.) (08-cv-05992), filed on Nov. 7, 2008 ("*U.S. v. JBS* Amended Complaint").

[17] Producers commonly delegate marketing authority to the commercial feedlot or to third-party marketing cooperatives. A small portion of the fed cattle sales to Defendants also occur at public auctions.

188. Before the packing industry became consolidated, almost all fed cattle was sold through the "cash" or "negotiated" cattle trade. Meat packers' buyers went to feedlots and auctions and paid a price set each day at the dollar mark where supply and demand met.

189. However, by 2015, the cash cattle trade had drastically thinned, and now it accounts for a minority of national fed cattle sales. Despite this, the cash cattle trade remains the industry's price discovery mechanism and continues to determine the price of fed cattle bought using "formula" or "forward" contracts – which now constitute most fed cattle sales.

190. Under these agreements, commonly referred to as "captive supply" agreements, producers commit to deliver their cattle to a packer once they reach slaughter-weight at a price to be determined at or around the point of delivery using an agreed formula.[18]

**Figure 8: USDA Records of Fed Cattle Procurement Methods – 2005 to 2019.**




[18] A small percentage of cattle are sold on so-called "negotiated grid" contracts. Under such contracts, seller and buyer negotiate a base price that is adjusted after slaughter based on carcass performance. Negotiated grid contract base prices move in parallel with cash cattle prices.

191. The price of fed cattle delivered under formula contracts is determined by reference to a stipulated measure of cash cattle prices at or just before the delivery date. These contracts commonly incorporate a specified average cash price reported by the USDA Agricultural Marketing Service's ("AMS") Livestock Mandatory Reporting ("LMR") cattle transaction price summaries.[19]

192. The price of fed cattle delivered under forward contracts is typically set by referring to the price of the live cattle futures contract settling in the month of (or the month adjacent to) the expected delivery date. The price of live cattle futures contracts is directly impacted by current and expected cash cattle prices. The price of cash cattle thus sets or drives the price of the bulk of Defendants' fed cattle purchases, despite comprising only a small percentage of total fed cattle purchases.[20]

193. Each Defendant uses captive supply agreements for most of its purchases. Captive supply agreements have incentivized and enabled Defendants' suppression of cash cattle prices. The greater a Defendant's supply of captive cattle, the less reliant it is on participating in the cash cattle trade to procure enough cattle to operate its slaughter plants at its desired throughput. This, in turn, allows a Defendant to abstain from buying cash cattle when prices are too high.

[19] These price series collate the information Defendants and others are required to submit to the USDA on a daily and weekly basis regarding their live cattle purchases and deliveries under the Livestock Mandatory Reporting Act of 1999. The Act imposes similar reporting obligations on packers for boxed beef sales.

[20] The base prices used in negotiated grid contracts are also impacted by changes in cash cattle prices.

194. Abstaining from buying cash cattle in this way also gives Defendants leverage to compel would-be cash sellers to instead agree to a formula contract. All things being equal, reduced demand for cash cattle reduces cash cattle prices, as producers are forced to lower their asking price to attract buyers willing to purchase and slaughter the producers' perishable product. And because cash cattle prices are used to set the prices paid under formula contracts and directly impact the live cattle futures prices used in forward agreements, reduced cash cattle prices reduce the price Defendants pay for formula cattle.

195. As the cost of fed cattle constitutes most of a packer's production cost, Defendants' profitability is driven by the "meat margin," which is the spread between the price packers pay for fed cattle and the price they charge for beef.[21] The meat margin is very sensitive to changes in industry aggregate slaughter levels, and Defendants can, through cooperation, increase it. As noted by the DOJ:

> [A]ll else being equal, when the meat Packer industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase. Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-term changes in price, even small changes in industry production levels can significantly affect packer profits.

---

[21] *See, e.g.*, Jefferies Financial Group Inc., Annual Report, (Form 10-K) (Jan. 10, 2019) https://www.sec.gov/Archives/edgar/data/96223/000009622319000009/jfg2018113010kcombodoc.htm at 38 ("National Beef's profitability is dependent, in large part, on the spread between its costs for live cattle, the primary raw material for its business, and the value received from selling boxed beef and other products, coupled with its overall volume.").

*U.S. v. JBS* Amended Complaint, ¶¶ 26-27. As a result, Defendants can and do increase their profitability by coordinating their respective slaughter levels at or below the supply of slaughter-weight fed cattle.

196. As also noted by the DOJ:

> The major packers obtain significant information about each other's past and future output decisions, including the number of days and shifts that competitors' plants operate. Information about production levels is obtained by directly observing plant operation and from third party sources, including USDA reports showing aggregate industry slaughter of fed cattle. Major packers use this information to calculate market shares based on output and consider this information when setting their own production schedules.

*Id.* at ¶27.

197. The fed cattle market is highly concentrated. In fact, since 2015, Defendants have collectively purchased and slaughtered between 81 to 85% of the 23 to 27 million fed cattle slaughtered in the United States annually.[22]

198. Since 2015, each Defendant's share of annual fed cattle slaughter has been stable. The remainder of the U.S.'s fed cattle slaughter capacity is primarily provided by small Independent Packers.[23] However, Independent Packers lack the capacity to process the excess cattle created by Defendants' decrease in slaughter production, leaving cattle producers to sell cattle at even smaller facilities yielding significantly reduced prices.[24]

---

[22] 2017 Meat & Poultry Facts at 11; CBW Market Share.

[23] Lee Schulz, *et al.*, "Economic Importance of Iowa's Beef Industry," IOWA STATE UNIV. (Dec. 2017), https://store.extension.iastate.edu/product/Economic-Importance-of-Iowas-Beef-Industry; and CBW Market Share.

[24] Jen Skerritt, *et al.*, *Meat Shortages Reopen Costly Path to Smaller U.S. Plants*, BLOOMBERG (June 26, 2020, 5:00 AM),

## DEFENDANTS CONSPIRED TO DEPRESS FED CATTLE PRICES

199. Fed cattle prices increased consistently from 2009 through 2014, peaking in November 2014 at approximately $170 per one hundred pounds, a measure known as "hundredweight" ("CWT") in the cattle industry.[25] Market analysts, such as the USDA Economic Research Service, predicted that 2014 price levels would continue for a number of years before experiencing a gradual decline.[26] Some forecasters even foresaw no drastic change from 2014 prices "barring any outside market shocks like drought or a U.S. economic recession."[27] Such predictions show knowledge in the industry of beef demand getting higher while slaughter rates would stay low.

---

https://www.bloomberg.com/news/articles/2020-06-26/meat-shortages-reopen-costly-path-to-small-u-s-slaughterhouses.

[25] Cattle are typically priced on a live-weight basis (the price/CWT applied to the live-weight of the animal before slaughter, typically right before delivery) or a carcass-weight or "dressed" basis (the price/CWT applied to the animal once "dressed," *i.e.*, slaughtered with its head, hide, and internal organs removed). References to fed cattle prices in this Complaint are on a live-weight basis unless otherwise stated. Live-weight and carcass-weight prices typically move together.

[26] U.S. Dep't of Agric., OCE-2015-1, Off. of the Chief Economist: USDA Agricultural Projections to 2024, Interagency Agricultural Projections Comm. (Feb. 2015) at 81, https://www.usda.gov/oce/commodity/projections/USDA_Agricultural_Projections_to_2024.pdf.

[27] "Livestock Monitor, A Newsletter for Extension Staff," LIVESTOCK MARKETING INFORMATION CENTER, STATE EXTENSION SERVICES IN COOPERATION WITH USDA (Jan. 12, 2015), at 2; "Cattle Fax Predicts Strong Prices to Remain in 2015," AGWEB (Feb. 6, 2015), https://www.agweb.com/article/cattlefax-predicts-strong-prices-to-remain-in-2015-naa-news-release/ ("Analyst[s] ... expect fed cattle prices averaging in the mid-$150s [per CWT in 2015], slightly higher than last year. Prices will trade in a range from the near $140 [per CWT] in the lows to near $170 [per CWT] in the highs in the year ahead.").

200. While Defendants initially benefited from the rise in fed cattle prices because wholesale beef prices rose in parallel, the meat margin fell to a low of approximately $50 leading up to 2015, sending the packers' margins into the red.

201. In response, Defendants commenced or accelerated their conspiracy to depress and stabilize the price of fed cattle bought in the United States. At the heart of the conspiracy was an agreement to reduce and then manage their respective slaughter volumes: a classic monopsony abuse and a classic feature of buying cartels. Defendants implemented their buying cartel by, among other conduct, agreeing to: (1) periodically restrain or reduce slaughter numbers to reduce demand for fed cattle; (2) limit their purchases of cash cattle during these periods; and (3) coordinate their buying practices of cash cattle.

## I. Defendants Agreed to Reduce and Restrain their Collective Slaughter Volumes to Pressure Cash Cattle Sellers.

202. As confirmed by Jason F. ("Witness 1"), each of the Defendants expressly agreed to periodically reduce their respective purchase and slaughter volumes to reduce the prices they would otherwise pay for fed cattle. *See In re Cattle Antitrust Litig.*, No. CV 19-1129 (JRT/HB), 2021 WL 7757881, at *3 (D. Minn. Sept. 14, 2021).

203. Witness 1 is a former employee of Swift. Witness 1 worked as quality assurance ("QA") at Swift's Cactus slaughter plant located in the Texas Panhandle for over 10 years until his employment ceased in early 2018. *Id.*

204. Witness 1 was a lead QA on the kill floor and was responsible for overseeing all the other kill floor QA's during his shift. The kill floor is where cattle are slaughtered and dressed. The carcasses are then moved to the hotboxes to cool down, before being stored

in the coolers ahead of fabrication, where they are broken down into smaller cuts, and thus Witness 1 was well-positioned to know about slaughter volumes. *Id.*

205. Witness 1 learned of Defendants' collusive purchase and slaughter reduction agreement from James Hooker. Mr. Hooker was the head of fabrication at Swift's Cactus plant and, as explained below, was therefore in a position to know about the unlawful agreement. *Id.*

206. Witness 1 regularly went to Mr. Hooker's office before his shift to learn the slaughter and fabrication numbers for that day and the upcoming day. These numbers affected Witness 1 and his team's responsibilities, including the placement of his team, arrangement of hotbox and cooler space, number of carcasses needed to process through the hotbox and coolers that day, and his interactions with USDA inspectors.

207. In addition to the fabrication plan, Mr. Hooker, like Witness 1, also needed to understand the number of cattle scheduled to be slaughtered each day. Among other matters, if the kill volume was lower, Mr. Hooker might order the carcasses to spend longer in the coolers before being fabricated into beef cuts to improve grading performance, and Witness 1 and his team spaced out carcasses in the hotboxes. If it were higher, Mr. Hooker might increase the number of carcasses fabricated to ensure sufficient space in the hotboxes and coolers, and Witness 1 would space the carcasses closer when filling the hotboxes. Further, the number of carcasses expected to be put into the hotboxes would dictate the amount of air and water Witness 1 and his team used to ensure proper cooling speeds.

208. In sum, it was essential to both Mr. Hooker and Witness 1 that they know the plant's planned slaughter figures to perform their core job duties.

209. Witness 1 and Mr. Hooker regularly communicated with one another while at work.

**A. Hooker Was Well Positioned to Know About Defendants' Agreement.**

210. Plaintiffs understand that Mr. Hooker continues to work at Swift's Cactus plant, where he has worked for over 15 years as head of fabrication, with a short stint as head of slaughter operations. Witness 1 reports that before working for Swift in the early 2000s, Mr. Hooker worked at Tyson Fresh's Amarillo, Texas, slaughter plant, where he was also responsible for fabrication.

211. As a fabrication manager for Swift, Mr. Hooker reported directly both to the Cactus plant's General Manager, Manny Guerrero,[28] and directly to the beef production department of JBS USA/Swift/Packerland's head office at Greeley, Colorado.

212. Mr. Hooker needed to know about cattle buying, buy scheduling, slaughter, and beef selling aspects of JBS USA/Swift/Packerland's fed cattle business. He thus spoke with JBS USA/Swift/Packerland personnel. In addition to his direct reports, Mr. Hooker spoke directly to other managers in the JBS corporate office about plant operations, including scheduled slaughter and fabrication volumes. For example, Mr. Hooker often spoke to Sergio Sampaio Nogueira, Head of Operations and EVP of Plant Operations for JBS's Fed Beef Business, as JBS had direct connections between plant-level managers, like Hooker, and senior executives, like Mr. Nogueira. Mr. Nogueira was installed by Wesley Batista,

[28] Mr. Guerrero worked for CMS for about 17 years before moving to JBS's Cactus Plant. He was Plant Manager for CMS's Fresno, CA plant until early 2012.

JBS S.A.'s former CEO,[29] who made him primarily responsible for Swift's fed cattle plant scheduling and/or operations.

213. Mr. Hooker was also responsible for the Cactus plant in the absence of Mr. Guerrero and the Plant Engineer, along with Ryan Wagnon, Head of Slaughter Operations at Cactus. When acting as the Cactus plant's General Manager, Mr. Hooker worked closely with fed beef executives from across JBS's headquarters.

214. Mr. Hooker spoke regularly to individuals very highly placed at JBS. The following photo shows his close working relationship with management:[30]




[29] Wesley Batista is one of the sons of JBS S.A. founder Jose Batista Sobrinho. Wesley Batista and his brother Joesley Batista took control of JBS S.A. in the early 2000s, before JBS' acquisition of Swift and Pilgrim's Pride. Wesley became CEO and directed JBS' takeover of Swift. He remained in that role, and as a director and senior executive of JBS USA, Swift and Packerland, until he was implicated in a 2017 bribery and corruption scandal in Brazil, for which he was imprisoned. That same conduct led to FCPA fines.

[30] From right to left: James Hooker - Cactus Fabrication Operations Manager; Donna Estrada - Cactus Technical Services Manager; Al Almanza - JBS Global Food Safety Director; Sergio Sampaio - JBS Corporate Director of Operations; Paul Kieker - FSIS Undersecretary USDA Operations; Dr Hafeez - Texas USDA FLS; Dr. Mindy Brashears

215. Mr. Hooker, Mr. Nogueria, and Mr. Wagnon are respectively pictured on the far left, fourth from the left, and far right.

216. In addition to having corporate information for JBS, Mr. Hooker had information regarding the other Defendants. Mr. Hooker regularly told Witness 1 that he was in contact with his former colleagues at Tyson Fresh's Amarillo plant, where he had formerly worked, including his replacement there. Mr. Hooker also told Witness 1 that he had friends and former colleagues with whom he stayed in touch at other Defendants' plants. Mr. Hooker would often provide Witness 1 with detailed information as to the current and future operations of Tyson Fresh's, CMS's, and National Beef's respective nearby packing plants.

### B. Witness 1 Learns of an Agreement Among Defendants.

217. Witness 1 reports having a discussion with Mr. Hooker in 2015, during which Mr. Hooker explained that all Defendants reduced their purchase and slaughter volume to reduce fed cattle prices when Defendants viewed prices as being or becoming too high. During the conversation, Mr. Hooker specifically admitted that Defendants had an "agreement" to reduce their purchase and slaughter volumes in response to what they perceived to be high cattle prices.

---

- FSIS Undersecretary USDA FS; Brian McFarlane - JBS Corporate Director of Technical Services; Mark DeRaad - Cactus Value Added Manager; Ryan Wagnon - JBS Slaughter Operations Manager. *See* https://www.facebook.com/jbsbeefcactus/photos/a.760788460716768/2857652041030389/?type=3&is_lookaside=1 (last visited Aug. 22, 2022).

218. Witness 1 reports that he was in Mr. Hooker's office when Mr. Hooker received an angry phone call from Mr. Calhoun, a fabrication manager who worked out of JBS USA/Swift/Packerland's central office in Greeley, Colorado.

219. After the call concluded, Witness 1 reports that he asked Mr. Hooker how "many are we [Swift, Cactus] cutting [*i.e.*, fabricating]?" Witness 1 reports that Mr. Hooker replied the "cut" was going to be steady that day, but that the "kills are getting cut back, [because the] price is getting too high" (or words to that effect).[31] Witness 1 then reports asking Mr. Hooker whether Swift Cactus's competitor plants were also cutting back their kill, to which Mr. Hooker responded that they were because we have an "agreement" that "**we don't kill while prices are up for a while**".

220. Witness 1 is certain that Mr. Hooker intended to convey that all of the Defendants were reducing their slaughter volumes by agreement in response to high prices and was not simply commenting on the fact that one or some of the Defendants had independently decided to do so.

221. Witness 1 stated that the purpose of the agreed slaughter reductions was to force cattle producers (in particular, cash cattle producers) to feed their cattle for longer periods. By creating and encouraging an apprehension among producers that they might not be able to "get their cattle dead," Tyson Fresh, Swift/Packerland, CMS, and National Beef sought

[31] Witness 1 reports that there was typically a lag between the commencement of a slaughter reduction and the reduction of fabrication activities. Among other reasons, this reflected the fact that Slaughter Plant 1's fabrication team had to continue to process the carcasses that were already hanging in the coolers.

to increase their collective leverage over producers. As Witness 1 noted, once cattle are fed beyond their ideal slaughter-weight, producers face increasing "pressure to drop their prices in order to get rid of their [perishable] cattle."

222. Witness 1 stated that Swift's Cactus plant had a 5,500 to 6,000 head/day slaughtering capacity and might reduce its kill level to 4,800 to 5,200 head/day as part of Defendants' agreement around November and maintain kill volumes through April the following year. When Swift bought fewer cattle, it reduced hours at its slaughter plants, operated its plants at lower "chain speeds," and/or scheduled maintenance shutdowns. Witness 1 recalls management at Swift's Cactus plant, including Mr. Guerrero and Mr. Wagnon, telling staff when reducing slaughter that kill levels were being reduced due to fed cattle prices.

### C. The Available Data Corroborates Witness 1's Account.

223. Public reports, Defendants' slaughter data, and other data reflecting cattle sales indicate that all Defendants reduced and rationed their slaughter volumes during periods of high or rising prices to suppress price rises in fed cattle. Defendants managed their respective slaughter volumes in relative lockstep to ensure their collective demand for cattle did not exceed the available supply. Defendants did so even as the cattle supply grew and their margins ballooned.

224. The slaughter reductions, while most obvious at the start of each year to suppress the seasonal rise in fed cattle prices typically experienced in late winter/ early spring, occurred at various points over the past several years. In particular, Defendants moderated their slaughter volume in the second and third quarters of most years in a successful attempt

to both lower and to extend the yearly price trough, historically reached annually in July, across a number of months, thereby also forestalling both the onset and minimizing the effect of the seasonal rise in fed cattle prices that historically occurs in the fall. Defendants also reacted to short one-to-two-week rallies in prices, and to one-off opportunities presented by market shocks such as the fire at Tyson's Holcomb plant in August 2019.

225. Defendants' joint slaughter management was not a reaction to changes in beef demand, which, as admitted by Tyson Fresh's head of procurement in 2018, had been "off the charts."[32] Nor did any Defendants break from Defendants' collective restraint and buy more cattle in an attempt to capture greater margin share, despite all posting profit margins demonstrating that no Defendant was running at or near their marginal cost of production. From the end of the first quarter of 2015 through the years that followed, Defendants posted record per-head net margins. Even excluding 2019 and 2020, which saw Defendants' margins skyrocket in the aftermath of the Holcomb fire and COVID disruption (discussed below), Defendants' average per-head margins in the first, second, third and fourth quarters ($37, $127, $134 and $116, respectively) vastly exceeded their pre-conspiracy averages ($0, $21, $25, -$16, respectively).[33]

---

[32] Tyson Fresh Meats: What the Consumer Demands - John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, from the 2018 NIAA Antibiotic Symposium: New Science & Technology Tools for Antibiotic Stewardship, Nov. 13-15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3WBcqzo.

[33] Per-head net margin estimates cited in this Complaint were sourced from the Sterling Profit Tracker produced by Sterling Marketing Inc. and published weekly on www.drovers.com unless stated otherwise. Pre-2015 average per head margins calculated across 1997 to 2014.

226. Defendants' rationing of the fed cattle supply amongst themselves is demonstrated in Figure 5 above, which shows each Defendant's estimated quarterly slaughter volume.

227. These data show the consistent reductions made by Defendants in the winter/spring to constrain the seasonal rise in fed cattle prices historically witnessed at this time. It also shows that Tyson Fresh, Swift/Packerland, and National Beef each dramatically reduced their slaughter across 2015, while Cargill held its slaughter volumes steady following its 2014 cuts. These artificial reductions worked to cause the dramatic decline in fed cattle prices throughout 2015.

228. While the quarterly reporting period obscures certain shorter reductions described below, it illuminates the remarkable extent to which Defendants' quarter-to-quarter slaughter changes move in lockstep with each other. This parallelism is consistent with an agreement to jointly manage Defendants' collective demand.

229. The impact of Defendants' periodic coordinated slaughter reductions is further illustrated in Figure 8 above. Figure 8 compares Defendants' average annual slaughter volume before the conspiracy and the portion after the conspiracy for which data exists against that of the other U.S. beef packers. It shows that Tyson Fresh, Swift/Packerland, CMS, and National Beef each reduced their annual slaughter volumes relative to before the initiation of the conspiracy.

230. As shown above in Figure 7, each Defendant slaughtered significantly less cattle in 2015 than its previous average and maintained low slaughter levels in the years that followed. That Defendants each slowly raised their slaughter levels as the availability of fed cattle increased only reinforces the plausibility of a collective agreement to manage

slaughter levels after their initial cut – after five years, none of the Defendants returned to their pre-2015 levels, while Independent Packers slaughter was up nearly 25% against their previous averages, and 20% against their 2015 levels. The purpose of such action was not necessarily to reduce their respective slaughter volume in the long run – which is, in part, a function of the cattle supply. Rather, the purpose was to manage Defendants' collective demand such that it never outpaced supply, ensuring constant downward pressure on producers' prices, and to enable Defendants to act in coordinated fashion to depress prices, stall price rallies, and extend price troughs, as further explained below.

## II. Defendants Agreed to Coordinated Slaughter Reductions.

231. Defendants agreed to periodically reduce slaughter volumes in response to actual or anticipated rises in fed cattle prices.

232. On multiple occasions, beginning in or around June 2015, Defendants agreed to collectively reduce their slaughter volumes in response to rising fed cattle prices.

233. The purpose of the agreed slaughter reductions was to force fed cattle producers (in particular, cash cattle producers) to feed their cattle for longer periods, and in doing so, create a condition of oversupply that would force producers to either accept lower cash prices for their fed cattle or commit their fed cattle in advance on captive supply agreements. Put another way, by creating and encouraging fear for producers that they might not be able to timely sell their cattle, Defendants aimed to increase their collective leverage over producers because once cattle are fed beyond their ideal slaughter weight, producers face increasing pressure to drop their prices to sell their highly perishable cattle.

234. Each plant reduced its slaughter based on its slaughter capacity and the supply of fed cattle in the surrounding region. Slaughter plants appear to have implemented Defendants' agreement through planned and unplanned maintenance shutdowns, as well as deliberately reducing slaughter output below slaughter capacity.

235. Defendants' coordination extended to proportionate slaughter reductions designed to suppress seasonal rises in fed cattle prices, such as those traditionally experienced in late winter, early spring, and fall.[34]

### A. Defendants Agreed to Slash Cash Cattle Purchases During Slaughter Reductions.

236. To further depress fed cattle prices, Defendants agreed to drastically reduce their purchase of cash cattle during periods of agreed slaughter reduction or restraint. When doing so, Defendants could still obtain the cattle needed to satisfy their curtailed kill numbers by leaning on their own cattle and cattle deliverable under previously agreed formula and forward contracts.[35] And, because Defendants had successfully thinned the

---

[34] *See, e.g.*, Cassie Fish, "And the Beat Goes On," THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/ ("Packers also know that February is typically the lightest slaughter month and even though they are killing more cattle than a year ago – some plant 'dark days' began yesterday as plans to keep the balance between supply and demand are paramount. Some plants will undertake maintenance or upgrade projects and some will honor holidays such as Monday's President's Day. Others will pull back hours to 36-hour work week.").

[35] *See* Cassie Fish, "Futures Treading Water; Packers Keep Pressure On" The Beef (June 17, 2015), https://www.thebeefread.com/2015/06/17/futures-treading-water- packers-keep-pressure-on/ ("The news is well known this week and the packer has the upper hand. Boxes are higher and margins are black but packers are keeping kills small. The reliance of packers on captive supply coupled with enormous kill cuts enabled the packer to buy a limited number of negotiated cattle in June and to buy them cheaper.").

cash cattle trade in the decade preceding 2015, even small reductions in their cash cattle purchases had an outsized impact on cash cattle demand.

237. By reducing their purchases of cash cattle, Defendants sought to reduce the price of all cattle by utilizing the link between cash cattle prices and the prices paid under formula and forward contracts. By reducing their cash cattle purchases for a short period, Defendants could back-up the volume of slaughter-ready cash cattle or otherwise leverage producers' fear of not timely selling their cattle, thereby coercing producers to overfeed their cattle and/or accept lower prices or enter captive supply agreements to timely market their perishable product.[36]

238. In addition to this, Defendants at times used their control over the market to force fed cattle producers to accept formula and forward contracts as a condition to getting their cattle sold. This further reduced the number of cash cattle Defendants needed to purchase and thus further reduced cattle producers' leverage.

---

[36] Cassie Fish, "Whatever Happened to a Fair Fight," THE BEEF (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/ ("The conversation is no longer, what's cash going to be, but rather, who needs any.... The smaller feeder is left to fight it out. Hoping he can get a buyer to come by and look at his cattle. Pressured to sell cattle with time. Anything to get cattle gone. Those that attempt to fight the market run the risk of making cattle too big even by today's standards or worse, alienate their local buyer. Powerlessness is widely felt by smaller producers on a regular basis.").

239. Fed cattle producers have limited if any meaningful leverage to bid up Defendants in such circumstances, because if producers don't accept basis bids,[37] and thereby add to the packers' captive supply, they bear the risk that the cash price will drop.

240. In turn, producers' incentive to avoid the risk of a price drop creates downward pressure on the cash price, which in turn creates downward pressure on the formula and forward contracts.

241. The lower reported cash prices were then incorporated into Defendants' formula and forward contacts – the latter via a depression of live cattle future prices – thereby lowering the costs of all cattle delivered to Defendants' plants.[38] And once a condition of actual or perceived oversupply had been created, Defendants could gradually increase their cash cattle purchases (and slaughter volumes) without putting any significant upward pressure on prices. Defendants even moved back towards a preference of buying cash cattle in 2016, as they had already pushed cash cattle prices to significantly lower prices compared to earlier years at this point.

---

[37] The "basis bid" is a form of most favored nation contract under which the packer agrees to pay the producer some variant of that week's top reported cash price, with or without a premium. Defendants used such bids during the relevant time period to further reduce the number of cattle they needed to purchase during the weekly cash cattle trade, thereby putting further pressure on cash cattle prices.

[38] Cassie Fish, "Cash Trade Volume Tiny; Futures Shake it Off," THE BEEF (Jun. 8, 2015), https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156, though the official USDA tally isn't out yet. But at least at this writing it appears it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive.").

242. Defendants' implementation of their conspiracy precipitated the dramatic collapse in fed and feeder cattle prices in 2015 and continued to suppress cattle prices in the years that followed.

**B. Defendants Coordinated Their Procurement Practices for Cash Cattle.**

243. Industry practices related to the procurement of fed cattle facilitated the success of Defendants' conduct.

244. First, Defendants collectively enforce a queuing convention via threats of boycott. That convention works as follows: once Packer A provides a bid, the producer may either accept the bid or pass. But the producer may not "shop" that bid to other packers. If the producer passes on the bid to seek further bids from other packers, the producer must inform them that he was bid "X" by Packer A and that he can, therefore, only accept bids of X+$1.[39] If Packer B is only willing to bid X or if the producer wants to alter its reservation price, the producer is obligated to first return to Packer A, who is "on the cattle" at price X and offer it a right-of-first-refusal. Only if Packer A declines can the producer offer to sell to Packer B at X or the new reservation price. At this point, however, Packer B is under no obligation to purchase from the producer. This would continue if a third Packer C also made a bid on the cattle at the same price X, with the producer only being able to sell to Packer C if both Packer A and B refused to re-offer their bid price, and Packer C was still under no obligation to purchase at price X.

[39] In certain instances, it may be acceptable to offer/accept bids in $0.50 per CWT increments.

245. Further, if the producer returned to the packer "on the cattle," the field buyer would often refuse to renew their bid, citing that their employer was "full," having already secured the necessary cash cattle supply for the week. This mantra was echoed by the other packers who had previously made offers down the line. As a result, producers who attempted to negotiate a higher price were unable to sell their highly perishable cattle at the end of the week. Producers were thus conditioned to automatically accept the first bid they received.[40]

246. The effects of the queuing convention were amplified by the other market conditions existing at the time, especially the thin cattle trade and Defendants' trading windows and regional shunning discussed below.

247. The queuing convention also enabled Defendants to monitor each other's behavior and depress fed cattle prices by limiting competition among the packers.

248. Witness 2 confirmed that field buyers from Tyson Fresh (Brian Alsup), Swift (Levi Canales and Chad Myrick), CMS (Rick Vogel and Steve Brown), and National Beef (Richard Duffy) who visited his feedlot enforced strict adherence to this convention with threats of retaliation. Each of these field buyers individually spoke to him about the importance of his feedlot complying with the convention, and that they would not "come by" anymore should he break with it.[41]

---

[40] Economic literature finds that sellers, here the producers, tend to accept lower prices when they feel time is running out and their other options are relatively unattractive. Ariel Rubinstein, *Perfect Equilibrium in a Bargaining Model*, 50 ECONOMETRICA 97 (1982).

[41] Again, this shows that the queuing convention is unsustainable through a Defendant's unilateral conduct, and its enforcement requires explicit, coordinated action. A coordinated boycott is a mechanism for supporting collusion. *See*, *e.g.*, *Group Boycotts*, FEDERAL

249. Witness 2 further reports that when he took over management of the feedlot in 2012, the feedlot would only receive bids from National Beef and CMS. When he subsequently spoke to the field buyers from Tyson Fresh (Mr. Alsup) and Swift (Mr. Miller) responsible for his region in the fall of 2012, they both told him that they had stopped visiting the feedlot because Witness 2's predecessor had broken with the convention by "shopping" their bids. Witness 2 reports that the Tyson Fresh and Swift field buyers re-commenced visiting the feedlot after he confirmed his commitment to following the convention.

250. Witness 2 also heard from Defendants' field buyers and other industry participants about other producers being "blackballed" for breaking with the queuing convention. In those circumstances, Witness 2 understood that the Defendant who was "on the cattle" would be tipped off as to the producer's "breach" of the convention by the field buyer whom the producer contacted while shopping the Defendant's bid or would ex-post pressure the producer for details of its sale.

251. Witness 2 reports that very few producers or their agents were willing to break with the convention for fear of alienating one or more of the Defendant field buyers who visited his yard. He reports never breaking the convention for this reason. He said that commercial feedlots or third-party marketing bodies, such as his feedlot, were unwilling to risk Defendants' retaliation given the duties they owed to their clients. Cattle owners are

---

TRADE COMM'N, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/dealings-competitors/group-boycotts; G. W. Stocking, and M. W. Watkins, CARTELS IN ACTION: CASE STUDIES IN INTERNATIONAL BUSINESS DIPLOMACY 190, 403 (1991).

unwilling to feed their cattle at commercial yards or market their cattle with organizations that have poor relations with the Defendants, who constitute most producers' only marketing outlet. Producers and their agents thus fear breaking with the convention for these reasons. Tyson Fresh, Swift/Packerland, CMS, and National Beef's threats of boycott were sufficient to ensure adherence to the convention.

252. Further, Witness 2 elaborated on further examples of artificial market dynamics. For example, he reports that in 2014, the Tyson Fresh (Mr. Alsup), Swift (Mr. Canales), CMS (Mr. Vogel), and National Beef (Mr. Duffy) field buyers who attended his feedlot jointly demanded that he determine who had the right to make the first bid each week by having them draw cards in the office. Witness 2 reports he felt obligated to acquiesce, as he remained anxious to ensure that each Defendant visited his feedlot.

253. Thereafter, and at least until around when Witness 2 left the feedlot in or around July 1, 2015, the Defendant field buyers wishing to bid on the cattle being marketed by the feedlot during that week would draw cards to determine who could place the first bid.[42] Approximately one to two months before Witness 2 left, the Defendant field buyers transitioned to a rotation of being first on the cattle each week. Witness 2 cannot recall a single week during this period in which one of the other three Defendant field buyers

[42] Randomization devices like this have been used by other cartels. For example, the electrical contractors cartel used the phase of the moon to determine which bidding ring member had the right to bid, free from competition from other members. *See*, *e.g.*, J. Asker, *Bidding Rings, in* THE NEW PALGRAVE DICTIONARY OF ECONOMICS (In: Palgrave Macmillan eds., 2010); R. Preston McAfee and John McMillan, *Bidding Rings*, 82 AMERICAN ECONOMIC REVIEW 580, 585 (June 1992).

actually raised the initial bid placed by the field buyer who won the card draw. That is, Witness 2 reports that during this period Tyson Fresh, Swift/Packerland, CMS, and National Beef did not engage in any price competition for the cattle sold by Witness 2's feedlot.

254. The field buyers tried to justify the card drawing scheme to Witness 2 by saying it would allow them to avoid attending the feedlot at increasingly early hours to try to place the first bid. In a competitive market, however, in which the purchasers engaged in genuine competition to acquire a producer's products, no purchaser would have a unilateral incentive to propose or adhere to such a scheme (nor would a producer have an incentive to agree to such a scheme). Rather, each purchaser would instead have a unilateral incentive to preserve the right to make an offer to the producer and rely on its ability to offer the best terms to acquire the producer's products. This is especially true when the first bid at a given price carries with it an automatic right of first refusal, which has commercial value.

255. Second, on information and belief, a Defendant would, for periods of time, sometimes extending across many months, offer the only bid (or the only credible bid) for a particular feedlot's fed cattle (or substantially all its fed cattle) week to week, ensuring that the feedlots affected could not regularly procure credible bids from the other Defendants. Buyers for these other Defendants would even routinely fail to take or return calls from the producer until after the Friday trading window had closed. This happened even where the buyers' employers operated a closer geographical slaughter plant than the Defendant making the singular bid. These arrangements – akin to a "home-market" market

allocation scheme – indicate an agreement among Defendants to respect each other's relationships with each Defendant's preferred suppliers.

256. Third, Defendants periodically stopped buying cash cattle from feedlots in a specific region for weeks to back-up cash cattle in that region and break the resolve of producers to hold-out for higher prices. Having boycotted a region for weeks, Defendants then began purchasing cattle from that region again during the same week. When executing this scheme, Defendants often sought to initiate their weekly cash cattle trade in the region recently boycotted. This allowed them to use lower prices in that region to set the "market" for the remainder of the trade. In doing so, Defendants influenced fed cattle prices across the United States.

257. Defendants' conduct across Nebraska, Kansas, and Colorado in late March to early May 2016 is particularly illustrative of this practice. The average live steer price in Nebraska for the weeks ending Sunday, March 27 and Sunday, April 3, was steady at around $136/CWT. On information and belief, in the two trading weeks that followed, Tyson Fresh, Swift/Packerland, CMS and National Beef each reduced their purchase of cash cattle across Nebraska. The AMS reported that negotiated Nebraska sales during those two weeks were 17% and 10% lower than the average reported volume for those corresponding weeks between 2011 and 2014. In the subsequent trading week, ending Sunday, April 24, 2019, Defendants were able to take advantage of the artificial surplus of Nebraskan cattle carried over from the prior weeks by buying significantly more cattle at a lower price of $126/CWT. Consistent with AMS reporting, just 1,176 and 1,340 cash cattle were sold in Nebraska in weeks ending Sunday, March 27, 2016 and Sunday, April

3, 2016 respectively. The Defendant buyers were Swift and National Beef. By contrast 5,156 cash cattle were sold in Nebraska the week ending Sunday April 24, 2016, all on Friday April 22, 2016, with each of Tyson Fresh, Swift, CMS and National Beef purchasing lots.

258. After isolating Nebraska producers, Defendants shifted to isolate Kansas feedlots. The average live steer price in Kansas across the weeks ending Sundays, April 10 and 17, 2016 was steady at around $133/CWT. In the two trading weeks that followed, Tyson Fresh, Swift/Packerland, CMS and National Beef each reduced their purchase of cash cattle across Kansas and, at least Tyson Fresh, trucked Texas captive cattle to its Holcomb, Kansas plant.[43] As a result, AMS reported 44% and 28% fewer cash cattle sales in Kansas during those weeks as compared to the average reported volume for those corresponding weeks between 2011 and 2014. Aided by the price suppression begun by Defendants' prior isolation of Nebraska, live Kansas steer prices were also suppressed, dropping to $127/CWT for the week ending Sunday, April 24, before falling again to $124/CWT for the week ending Sunday, May 1, 2016.

259. Each of Tyson Fresh, Swift/Packerland, CMS, and National Beef then increased their purchase of cash cattle in Kansas in the first week of May, taking advantage of the artificial supply glut they had created across the course of the two prior weeks. For this

---

[43] "the radical left of cattle twit" (@trdaaron), TWITTER, (Apr. 14, 2016, 4:36 PM), https://twitter.com/trdaaron/status/720712349338832896?s=20 ("So tyson pulling lots of contract cattle from TX up to KS next two weeks which pushes rest of my cattle into first week of May.").

week, AMS reported a total of 24,000 cash sales in Kansas, a 7,000 head increase from the average reported sales of the two prior weeks, and a 2,000 head increase on the weekly average for the period between 2011 and 2014. Despite this significant uptake in purchases, the average price for live steers in Kansas remained low at $127/CWT.[44]

260. Again, sales in Kansas to Defendants during this period are recorded with AMS reporting. In the weeks ending Sundays April 24 and May 1, records indicate 9,666 and 4,119 cash cattle respectively to Defendants, against 5,148 in week ending May 8. In this regard, it's important to note that the 9,666 head recorded as sold in the week ending April 24 constituted 64% of the reported AMS total, while the figures for weeks ending May 1 and 8 constituted only 22% and 21% of the weekly AMS total, respectively.

261. Defendants then moved to isolate Colorado feedlots. Colorado reported 41% and 67% relative declines in cash sales for the trading weeks ending Sundays, May 1 and 8, 2016 compared to the average reported volume for those corresponding weeks from 2011 to 2014. In the following trading week, Colorado cash sales rose from 3,000 head to 4,000 head, 7% above historical averages.[45]

262. Fourth, Defendants suspiciously all chose to reserve most of their weekly cash trade procurement for Friday, typically after the CME had closed. This practice deprives producers of a price discovery mechanism and limits their ability to hedge their cattle on

---

[44] USDA Market News Service Report: LM_CT164 Kansas Weekly Weighted Average Direct Slaughter Cattle - Negotiated. Any of the USDA Market News Service Reports referenced in this Complaint can be generated at https://marketnews.usda.gov/mnp/ls-report-config.

[45] Records indicate less than 100 sold across these weeks.

the CME to manage their positions. While the exact time on Friday varied from week to week, Defendants consistently conducted all, or substantially all, of their weekly cash cattle trade during the same 30- to 60-minute window on a Friday. During that window, Defendants typically adhered to the price level established by the Defendant that opened the weekly cash cattle trade, which would quickly circulate across the market via word-of-mouth and industry reporting. If a Defendant felt it necessary to offer prices above this price level to secure the cattle it required, it would often hold such bids until after the core trading window had closed, which reduced the chance that reports of such bids might impact negotiations during the core trading window.

263. Field buyers had no discretion to negotiate prices above the opening price level, but instead contended that this price represented the market rate.

264. In contrast, Regional Packers continued to purchase cash cattle across nearly every day of the week, thereby securing pens of high-quality cattle with limited competition. When operated alongside Defendants' slaughter restraint and other bidding practices (outlined above), this practice reduced competition amongst Defendants for cash cattle to a race to place the first bid on each pen during the Friday cash trade. This practice also deprived producers of a price discovery mechanism and limited the ability of producers who hedge their cattle on the CME to manage their positions in response to the bids offered by the packers.

265. For similar reasons, Defendants would also, at times, seek to set the market price lower by opening the weekly trade by purchasing a pen of poor-quality cattle at a discount.

266. The reported cash cattle trade across AMS LMR's price reporting regions confirms that starting around June 2015 Defendants reduced their participation in the cash cattle trade, increased the numbers of days they did not conduct any cash cattle trades at all, and that they conducted the bulk of their cash trading on Fridays.

267. The reported data are consistent with an agreement among Defendants to both: (1) limit their purchases of cash cattle; and (2) conduct all, or substantially all, of their cash cattle trade in a short window on Friday. If any single Defendant took these actions in the absence of such an agreement, that Defendant would risk failing to secure a sufficient quantity or quality of cattle to operate its plants at the most efficient capacity and/or meet customer demand, without any guarantee that its actions would have the desired impact on fed cattle or beef prices. The data are even more striking when one considers that Regional Packers continued to purchase cash cattle throughout the week and thus can be regarded as being responsible for the bulk of the transactions reported mid-week.

268. Defendants' increased reliance on formula and forward contracts and the corresponding decrease in the number of cash cattle transactions does not explain the pattern reflected in the data. While the number of cash cattle bought annually fell continuously from 2005 to 2015, it was not until 2015 that the data show a dramatic increase in the number of days without any reported cash transaction. This rise is then sustained despite a slight increase in cash cattle buying year-on-year in 2016 and 2017.

269. In short, even though cash cattle slaughter numbers increased slightly after 2015, the number of days per month in which there were no cash cattle transactions also increased. Consequently, Defendants' coordinated reduction in the number of days on

which they purchase cash cattle is not explained merely by the decline in the number of cash cattle purchased annually.

### C. Defendants Agreed Not to Expand Their Slaughtering Capacity.

270. Defendants also stalled the expansion of their respective slaughtering capacities and coordinated any increases to the use of existing capacity to retain their leverage over the market.

271. Plant closures and idled plants before and during the relevant period also stripped out millions of head of cattle from the industry's annual slaughter capacity, thereby limiting demand for fed cattle.

272. During the run-up of fed cattle prices until their precipitous fall in mid-2015, Defendants reduced demand for cattle through a series of plant closures: Cargill closed its Plainview, Texas and Milwaukee, Wisconsin plants (4,000 and 1,300-1,400 head/day capacities, respectively) in February 2013 and August 2014, respectively; National Beef shut its Brawley, California plant (2,000 head/day) in June 2014; Tyson closed its Denison, Iowa plant (2,000 head/day) in August 2015; and, JBS left the Nampa, Idaho plant it acquired in April 2013 closed.[46]

---

[46] Tyson Fresh also closed its Cherokee, Iowa beef processing plant in September 2014, telling local officials that it would not consider selling the facility to "any firm that they believe is competition." Kevin Hardy, *Held 'hostage' by Tyson: An Iowa town's dilemma*, DES MOINES REGISTER, July 8, 2016, updated July 16, 2016, https://www.desmoinesregister.com/story/money/business/2016/07/08/held-hostage-tyson-iowa-towns-dilemma/86449400/. It ultimately sold the facility to an independent food processing company with an agreement that "limits the amount of cattle that can be processed at the plant for ... 10 years", notwithstanding that Tyson did not use it to slaughter fed cattle. Kevin Hardy, *'No hard feelings': Tyson finally agrees to leave empty Iowa*

273. The 125,500 head per day of industry-wide capacity remaining after Defendants implemented their final plant closure was the lowest in the modern history of the industry.

274. For each closure, the relevant Defendant offered pretextual reasons, such as a lack of available cattle in the adjacent regions and plant inefficiencies. National Beef even rejected a significant package of incentives offered by local government, utilities and nearby feedlots when it decided to close its Brawley plant.[47]

275. But by early 2013 the drought had passed, forage availability in cow-calf producing regions was above average, and producers' heifer retention rate – the percentage of heifers retained for breeding as opposed to being sent to the feedlot for slaughter – was already increasing, foreshadowing the gradual increase in slaughter-weight fed cattle the industry witnessed from 2016 onwards.[48] Defendants knew of the expected gradual rebuild of the beef cattle herd, as they routinely tout their visibility of upcoming supply numbers.[49]

*facility as new meat processor opens shop*, DES MOINES REGISTER, Sept. 19, 2018, https://www.desmoinesregister.com/story/money/business/2018/09/19/tyson-foods-cherokee-iowa-plant-iowa-food-group-moves-justin-robinson-pork-beef-chicken-processing/1356962002/. The plant was mostly used to produce hot dogs.

[47] "National Beef plant closing Brawley Facility," PROGRESSIVE CATTLEMAN (Mar. 24, 2014), https://www.progressivecattle.com/news/industry-news/national-beef-plant-closing-brawley-facility.

[48] Heifer placements in feedlots as a percentage of total placements fell from 38.2% in January 2012 to 36.2% in October 2012 before continuing to steadily decline to 31% in April 2015, signifying the retention of heifers for breeding. Thereafter, the heifer placement percentages gradually increased again, reaching 39.2% in October 2019.

[49] *See, e.g.*, JBS, Q3 2013 JBS SA Earnings Conference Call, Nov. 15, 2013, https://www.bamsec.com/transcripts/5008262?hl_id=nj-0rvvot ("we've seen some heifer retention of the US -- some cow retention in the US, which indicates that we're at the beginning of a recovery in the herd size in the US, something we've been talking about for

276. As a result, the United States has experienced both a decline in fed cattle slaughter capacity and an underutilization of that lowered capacity. This decline has been compounded in certain regions, where cattle producers now only have one or two slaughter plants at which to sell their cattle. This decline in slaughter capacity and underutilization of existing capacity has reduced demand (and thus prices) for indirect sales of feeder cattle ultimately slaughtered as fed cattle.

### III. Defendants' Conduct Precipitated the Collapse in Prices in 2015.

277. Defendants' conspiracy succeeded. Responding to the compression of their margins in late 2014, Defendants reduced their slaughter volumes, and this reduction had the desired effect.

278. Defendants began an unprecedented slaughter reduction in the second and third quarters of 2015. In the second quarter, Tyson Fresh, Swift/Packerland and National Beef's year-on-year slaughter were down roughly -5.3%, -12.7%, and -6.1%, respectively. CMS continued to hold to its low 2014 volume, posting a modest year-on-year growth of 1.9% in the second quarter.

---

some time"); Tyson, Q3 2014 Tyson Foods Earnings Conference Call, July 28, 2014, https://www.bamsec.com/transcripts/5202502?hl_id=nydyaewjk ("we expect next year [2015] to look a lot like this year [2014] from a cattle supply ... and we're starting to see signs of heifer retention"); and Jefferies Financial Group Inc., "Leucadia National Corporate 2015 Investor Day" (Oct. 8, 2015), Slides 113-14 (noting increase in heifer retention, and projecting increase in slaughter weight fed cattle from 2016 onwards).

279. Again, this reduction in cattle purchases was also reflected in Tyson Foods[50], JBS S.A.[51] and Jefferies (National Beef's)[52] financial reporting.

280. To further pressure cattle prices, Defendants drastically reduced their purchase of cash cattle, leaning heavily on their own cattle and other captive supplies to satisfy their curtailed kill numbers.[53] This strategy was immediately successful, with cash cattle – and

---

[50] Tyson recorded year-on-year declines in sales in its beef segment revenue due to a "reduction in live cattle processed." *See* Tyson Foods Aug. 2, 2015 10-Q, p.38; *see also* Nov. 23, 2015 10-K, p.29 noting reduction in sales revenue in FY 2015 as against FY 2014 due to lower cattle processing.

[51] JBS S.A., 2Q 2015 Results, Aug. 13, 2015 at 15, https://mz-filemanager.s3.amazonaws.com/043a77e1-0127-4502-bc5b-21427b991b22/central-de-resultadoscentral-de-downloads/8bc0bd99f655d7c38a18d265a7ed397678c5e9774341f1efd1c98745f1a8a360/1q15_earnings_release.pdf (noting -0.9% decline in cattle processing (both fed and non-fed) across its U.S., Australian and Canadian beef businesses).

[52] Jefferies 10-Q, Aug. 5, 2015 at 52, http://ir.jefferies.com/reports-filings/sec-filings/sec-filings-details/default.aspx?FilingId=10842029 (revenues for three and six month 2015 periods decreased year-on-year "primarily due to lower sales volume, as fewer cattle were processed"); Jefferies 10-Q, Nov. 5, 2015 at 53 (noting the same for 3Q 2015).

[53] Defendants' slaughter levels of their own cattle in the second half of 2015 were steady on a year-on-year basis. AMS LMR Report "LM_CT153 – National Weekly Direct Slaughter Cattle – Prior Week Slaughter and Contract Purchases," https://marketnews.usda.gov/mnp/ls-report-config; *see also* Cassie Fish, "*Cash Trade Volume Tiny; Futures Shake it Off*" THE BEEF (June 8, 2015), https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the eleventh hour late Friday and Saturday at $155-$156…. But at least at this writing it appears it was enough to price formulas $4 lower than last week, jerking packer margins back to a positive. Only problem is, packers weren't able to secure enough cattle cheaper, even when relying on captives, to easily fill an even curtailed kill expected this week at 540,000 head."); and Fish, "*Futures Treading Water; Packers Keep Pressure On*" ("The … packer has the upper hand. Boxes are higher and margins are black but packers are keeping kills small. The reliance of packers on captive supply coupled with enormous kill cuts enabled the packer to buy a limited number of negotiated cattle in June and to buy them cheaper.").

thus formula cattle – prices falling across June to about $150 CWT.[54] Meanwhile, with lower slaughter volumes and lower boxed beef output, the meat margin expanded rapidly, bloating Defendants' margins.

281. Tight fed cattle supplies do not explain Defendants' reduced slaughter volume. The available supply of fed cattle increased on a year-on-year basis, reflecting the continuing rebuild of the cattle herd. Fed cattle inventory was higher in almost every month of 2015, compared to 2014.

282. Industry analysts noted Defendants' determination to "break" cash cattle prices through their collective slaughter reductions and reduced cash cattle purchases. On June 12, 2015, analyst Cassandra Fish of "The Beef" and formerly a risk manager at Tyson, pondered when a Defendant might break ranks:

> All packers need to buy cattle inventory. Most have cut hours. So will someone break ranks, pay up for cattle and add hours to capture the better realization that the next boxed beef rally will bring? Will one short a customer only to find that order filled by a competitor?[55]

283. Ms. Fish answered her own question in the negative a few weeks later, remarking on June 25, 2015, that the "packers refuse to reach for cattle and are currently in command. After 3 weeks of sharply curtailed kills, packers are exhibiting incredible discipline and

---

[54] Cassie Fish, "*Smack Down*," THE BEEF (June 15, 2015), https://www.thebeefread.com/2015/06/15/smack-down/ ("Cash cattle prices broke hard Friday as packers successfully executed a strategy of slashed kills and limited negotiated purchases.").

[55] Cassie Fish, *Futures Holding Gains; Waiting on Cash*, THE BEEF, June 11, 2015, https://www.thebeefread.com/2015/06/11/futures-holding-gains-waiting-on-cash/.

letting the kill increase gradually," limiting the ability "of feeders to get all cattle marketed in a timely fashion."[56]

284. Defendants tightened the screws during the remainder of 2015. Despite the negative effect on their margins, they continued to restrain their slaughter levels and curtail their purchases of cash cattle even after it became clear that slaughter-ready cattle had been "backed up" and were reaching historically heavy weights.[57]

285. Tyson's CEO, Donnie Smith, admitted as much August 3, 2015, when discussing Tyson's decreased purchases over the preceding quarter, noting:

> Because we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short-term, we are negatively impacted, but markets will equilibrate and conditions are expected to improve for the long term.

Tyson Foods, Q3 2015 Earnings Call, Seeking Alpha Transcript (Aug. 3, 2015). In response to a question regarding the consequent impact of Tyson's underutilization of its plant capacity Mr. Smith elaborated:

> In terms of quantifying the impact, we know when we're running 34s and 36s a week in our plants that that does cost us. It raises the cost in our plant, makes us a lot less efficient, so it does have a cost to us. I don't know that I can quantify that right off the bat, but it does impact margin.

*Id.*

---

[56] Cassie Fish, "Another Round of the Blues," THE BEEF (June 25, 2015), https://www.thebeefread.com/2015/06/25/another-round-of-the-blues/.

[57] Cassie Fish, "Kills Too Small For Too Long," THE BEEF (Sept. 8, 2015), https://www.thebeefread.com/2015/09/08/kills-too-small-for-too-long/.

286. This was particularly evident in September 2015 when Defendants used their previously gained leverage to push prices down to $120 CWT, despite increasing their cash cattle purchases. Defendants demanded extended delivery periods of two to four weeks as a condition of trade throughout the month, providing them with further leverage over producers who still had cattle to sell.[58] As a result, large numbers of these cash cattle were not slaughtered until October.

287. Defendants' concerted actions to depress cattle prices across 2015 are summarized in Figures 9 and 10 comparing the price of fed cattle across 2015 against fed cattle slaughtered across 2014 and 2015 at packing plants subject to AMS LMR reporting obligations.[59] These figures are a very good proxy for Defendants' cumulative slaughter volume because they operate the substantial majority of such plants and appear to provide over 90% of the reported transactions.

288. Figure 9 details the price and slaughter volumes of all fed cattle and Figure 10 details the price and slaughter volumes of cash cattle. These figures also detail the average monthly slaughter volumes between 2010 and 2014. As shown by these figures, the decline in cash cattle slaughter across the second and third quarters of 2015 depressed the price of all fed cattle. This enabled Defendants to increase their slaughter volumes in the final

---

[58] Cassie Fish, "No bottom in sight," THE BEEF (Sept. 16, 2015), https://www.thebeefread.com/2015/09/16/no-bottom-in-sight/.

[59] Figures 9 and 10 are based on USDA Market News Service Reports data: LM_CT106-National direct slaughter, committed and delivered, LM_CT151-National Weekly-Formula, Forward, Negotiated Net (Domestic), and LM_CT154-Weekly National direct slaughter, negotiated. Fed cattle prices shown in Figure 13 is the weighted average price of all four purchase categories (formula, forward, negotiated (*i.e.*, cash), negotiated grid).

quarter of 2015 by purchasing the oversupply of cash cattle they had created more cheaply across the preceding two quarters.[60]

**Figure 9: Total Fed Cattle Slaughter Volumes and Fed Cattle Prices.**




[60] This was reflected in JBS S.A.'s 4Q 2015 earnings presentation, which noted that its JBS USA beef segment increased total cattle slaughter 1.5% year-over-year in the fourth quarter (p.20). Jefferies did not address year-over-year change in cattle processing across National Beef's quarter four in its 2015 annual report. And while Tyson Fresh noted a decline in cattle processed in its 10-Q ending it attributed this "primarily due to the closure of our Denison, Iowa [slaughter plant]" (p.29).

**Figure 10: Cash Cattle Slaughter Volumes and Cash Cattle Prices.**




289. Despite increasing their respective slaughter volumes in the final quarter of 2015 on a relative basis to take advantage of the comparative glut they had created, Tyson Fresh, Swift/Packerland, and National Beef's annual slaughter volumes were still down 4%, 17%, and 6% on 2014 levels, respectively. While CMS's slaughter volume remained flat year-on-year, it was significantly below historic levels, having already reduced its annual purchase volume in 2014.[61]

290. Moreover, each Defendants' conduct stands apart from the Regional Packers who increased their annual slaughter volume in 2015 by 7.8% year-on-year.

291. Tight fed cattle supplies do not explain Defendants' coordinated reduction of their respective slaughter volume over the first three quarters 2015. Neither can the drastic drop in prices or Defendants' unseasonable rise in slaughter of cash cattle in the fourth quarter of 2015 be attributed to a significant increase in the availability of slaughter weight cattle.

---

[61] CBW Top 30 Beef Packers.

292. An analysis of the USDA's Cattle on Feed reports confirms this.[62] This monthly publication reports data on the number of fed cattle in U.S. feedlots (inventory), the number of cattle being placed into feedlots during the report month (placements), the number of cattle shipped out of feedlots for slaughter during the report month (marketings) and other disappearances (*e.g.*, death loss or move to pasture).[63]

293. Figure 11 below compares fed cattle inventory across 2014 and 2015. It shows that fed cattle inventory was at or slightly above 2014 levels in almost every month of 2015. While these changes may reflect, in part, the continuing rebuild of the cowherd, the key driver of the year-on-year increases in inventory across June to November 2015 was Defendants' respective slaughter reductions. These reductions forced producers to feed their cattle longer, causing feedlots to carryover cattle into subsequent reporting months.

---

[62] USDA National Agricultural Statistics Service ("NASS"), *Cattle on Feed*, ECONOMICS, STATISTICS AND MARKET INFORMATION SYSTEM, usda.library.cornell.edu/concern/publications/m326m174z?locale-en ("Cattle on Feed").

[63] Cattle on Feed reports pertain to fed cattle in feedlots with at least 1,000 head capacity. Such feedlots hold between 80 and 85% of all fed cattle on feed in the United States.

**Figure 11: Cattle on Feed Inventory Levels in 1000+ Head Feedlots – 2014 vs 2015.**




294. Figure 12 confirms these results. It estimates the number of cattle reaching slaughter weight in each month of 2014 and 2015, sometimes referred to as a placement against supply estimate, using monthly Cattle on Feed placement numbers and assumes a standard feeding period of around six months:[64]

**Figure 12: Slaughter Weight Fed Cattle in 1000+ Head Feedlots – 2014 vs 2015.**




---

[64] For example, an estimate of the number of slaughter weight cattle in July 2015 is derived by advancing the placements numbers from January 2015 forward six months.

295. As can be seen from Figure 12, the number of fed cattle scheduled to reach slaughter weight in 2015 was down on a year-on-year basis. Therefore, the year-on-year increases in inventory levels experienced from June to November 2015 was not driven by an increase in the availability of slaughter weight fed cattle. Rather, it was driven by a decrease in each Defendant's slaughter volume, which caused an artificial glut of supply by forcing producers to feed their cattle beyond their optimal weight.

296. This artificial increase in inventory levels is also confirmed by Figure 13's comparison of Cattle on Feed reports' record of marketings across 2014 and 2015:

**Figure 13: Marketings in 1000+ Head Feedlots – 2014 vs 2015.**




297. Consistent with the Figures above, Figure 13 shows slaughter volume across the first three quarters of 2015 to be appreciably lower than 2014 levels before rising in the final quarter. In sum, there were more cattle in feedyards in 2015 than in 2014, despite the fact that there were fewer cattle due to reach slaughter weight in 2015 than in 2014 due to Defendants' slaughter reductions.

298. As Ms. Fish lamented, the "[p]ackers no longer compete against each other to buy fed cattle each week," and were consequently reaping "gangbuster profits."[65]

299. The financial impact of Defendants' conspiracy can be seen in the chart below, which estimates producers' and packers' respective per head margins:

**Figure 14: Producer vs Packer per-head margins across 2015.**




300. In the second half of 2015, after Defendants embarked on their collusive reduction in slaughter volume, producer margins turned negative, while Defendants' margins remained positive and above their averages.

**A. Defendants' Ongoing Conduct Continues to Depress Fed Cattle Prices.**

301. Defendants continued to limit their collective slaughter numbers and cash cattle purchases in 2016. While monthly slaughter volumes for the first three quarters of 2016 were up after 2015's record lows, they remained flat or below 2014 levels despite the available supply of fed cattle having risen again.

---

[65] Cassie Fish, "Whatever Happened to a Fair Fight" THE BEEF (Nov. 10, 2015) https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/.

302. By "ration[ing] their new purchases" of cattle and running shorter 32-hour weeks in early January, they dampened rising cattle prices and extended the rally in boxed beef prices.[66] Defendants sustained low kills across February and March.[67]

303. This rationing resulted in average weekly margins of approximately $63 per head amongst Defendants, making it one of their "best Q1 in history."[68]

304. Knowing feedlots had been holding over cattle from the first quarter, Defendants increased their kills gradually in the spring. Defendants bought many of their cattle at this point with "time," meaning delivery periods longer than the standard one week. This caused fed cattle prices to drop in the second quarter.

305. By the end of July, analysts believed that a low had been reached at a price of $114/CWT.[69] However, Defendants increased their cash cattle purchases in August and maintained steady kills to ensure supply needs could be satisfied without increasing competition amongst them. Defendants further reduced their levels of negotiated cash purchases despite the high cattle availability.

---

[66] Cassie Fish, *Global Sell Off Smacks Cattle*, THE BEEF (Jan. 4, 2016), https://www.thebeefread.com/2016/01/04/global-sell-off-smacks-cattle/.

[67] Cassie Fish, *Yet More Consolidation*, THE BEEF (Jan. 6, 2016), https://www.thebeefread.com/2016/01/06/yet-more-consolidation/.

[68] Cassie Fish, *This Week's Cash Trade*, THE BEEF (Mar. 22, 2016), https://www.thebeefread.com/2016/03/22/sell-off-accelerates/ ("Packers continue to do a masterful job of matching throughput to supply and demand and margins, looking at the comprehensive cutout and $3 lower cash last week- are still solidly black.").

[69] https://www.thebeefread.com/2016/07/28/onward-and-upward/; https://www.thebeefread.com/2016/08/24/erode-erode-erode/.

306. These actions led to unprecedented prices that caused cattle industry expert Cassie Fish to state that "[t]his [2-year consecutive] break in cattle prices stands alone for its magnitude and its lack of an external market-moving event."[70]

307. Defendants bought cattle in September and October cheaper and with "time", displacing the typical fall fed cattle price rally. Defendants further reduced their slaughter volumes and/or reduced cattle purchases on any rare occasion that prices started to go up. This ensured that prices did not continue to rise.

308. For example, the number of fed cattle slaughtered dropped by 20,000 head the week beginning September 19, 2016,[71] exactly one week after cattle prices saw a minor $4/CWT increase.

309. As a result, the price of fed cattle continued to fall to a low of under $100 per CWT in mid-October. As in 2015, Defendants responded by dramatically increasing kill volumes in the fourth quarter of 2016. Defendants' fourth quarter kills were up an estimated 8.4%,

---

[70] Cassie Fish, *A Grave Time in History*, THE BEEF (Sept. 3, 2016), https://www.thebeefread.com/2016/09/02/a-grave-time-in-history/.

[71] Cassie Fish, *Feeders Take the Lead; Packers Play It Cool*, THE BEEF (Sept. 22, 2016), https://www.thebeefread.com/2016/09/22/feeders-take-the-lead-packers-play-it-cool/ ("It has been the behavior of the packer that has slowed down the upward momentum this week. Taking 20k head out of this week's fed kill coupled with adequate inventories seems to have been enough to return the balance of power to the packer for now."); Cassie Fish, *Wild and Wooly*, THE BEEF (Sept. 26, 2016), https://www.thebeefread.com/2016/09/26/wild-and-wooly/ ("Last week's cash cattle trade was inadequate and lots of cattle were carried over into this week.... Unquestionably, last week was the lightest movement of negotiated cattle in months coming in at just under 50k. This volume is about half of the normal.").

8.2%, 15.6% and 21.3% year-on-year, respectively. Industry wide kill levels in November 2016 alone were up 24% and 19% on a year-on-year basis compared to 2014 and 2015.[72]

310. Defendants' success in "backing-up" cash cattle in the summer of 2016 is confirmed by the fact that Defendants were able to raise cash cattle slaughter levels in the fourth quarter of 2016 over 2014 and 2015 levels without causing a dramatic rise in prices.[73] The gradual price increase was consistent with the seasonal rise in fed cattle prices typically experienced in the fourth quarter of each year as the availability of slaughter-weight cattle declines. But for the glut in slaughter-ready cattle created by Defendants' coordinated actions, the price of fed and feeder cattle prices would have risen significantly higher in response to the Defendants' dramatic increase in year-on-year slaughter numbers.

311. Each Defendants' refusal to break from their collective adherence to rationing the available cattle supply is even more remarkable given the margins on offer to Defendants throughout 2016. In the third and fourth quarters alone, Defendants realized average

---

[72] Year-on-year comparisons calculated using USDA Market News Service Report: LM_CT106-National direct slaughter, committed, and delivered.

[73] *See* Cassie Fish, "*And it All Falls Down*," THE BEEF (Sept. 27, 2016), https://www.thebeefread.com/2016/09/27/and-it-all-falls-down/ ("The big carryover of unsold negotiated cattle from last week has gained negative status as the hours have rolled by, with packers willing and able to sit back and lower bids to $104, $6 lower than 2 weeks ago and $3 lower than the few that traded Friday and Saturday"); Cassie Fish, "*Despondency*," THE BEEF (Oct. 11, 2018), https://www.thebeefread.com/2016/10/11/despondency/ ("As if on cue, kills this week are now rumored to be cutback to 585k-595k, with a cooler cleaning and Saturday kills out....A pull back in the kill with record packer margins cements the reality that easily and efficiently killing our way through the numbers, which used to be a reality, isn't any longer. This makes it difficult for the market to return to fully current marketing status if there is any slowdown in kill.").

margins of $123 and $153 per head on their fed cattle purchases. Not only were these margins significantly above pre-2015 averages ($25 and -$16 per head), but they also exceeded Defendants' most profitable third and fourth quarters in modern history by about $30 and $100 per head, respectively. Defendants thus had both the incentive and the ability to buy more cattle. Fed cattle producers, meanwhile, lost an average of $67 per head across 2016, causing parallel downward pressure on the prices feeder cattle received.

312. In 2017, Defendants continued to work together to ensure their slaughter volumes did not outpace slaughter cattle availability. Defendants each reduced their volumes in the first quarter and raised them together in the second quarter.

313. While prices rose from February to May consistent with traditional seasonal highs, Defendants responded by each reducing their number of kills. The result was another yearly low price of $105/CWT reached in mid-September, a far cry from historical season lows that were typically reached in July.

314. Defendants again posted record profits in 2017. The $128 and $147 per head margins in the second and third quarters of 2017 were the highest to date, and the first and fourth quarter margins of $42 and $88 per head were second only to their margins in 2016.

315. Instead of profiting from these conditions, each Defendant refused to expand its market share but continued to work in lockstep to keep production and supply in sync to ensure fed cattle prices remained low, thus ensuring that feeder cattle prices remained low.

316. As more fed cattle came available for slaughter in 2017 and into 2018, Defendants, having already reduced slaughter volumes below historic levels and curtailed cash cattle purchases, told the market they lacked capacity to slaughter the supposed "wall of cattle"

due to hit the market in the summer of 2018.[74] Defendants thus coerced producers to prematurely sign captive supply agreements to ensure they could "get their cattle dead" before Defendants ran out of "hook" or "shackle space."[75] And, Defendants limited their respective slaughter volumes to ensure their collective demand did not exceed the supply.[76]

317. Defendants' tactics succeeded. Prices fell in late Winter/Spring 2018, despite record strong beef demand and tight supplies of slaughter-ready cattle in March and April. Indeed, prices fell from approximately $129 per CWT at the beginning of March 2018 to $110 per CWT by the beginning of May 2018. Prices stayed at or around that mark until mid-November 2018, a significant extension of the one to two-month summer low typically experienced by the market. And of course, Defendants never did reach slaughter capacity.[77]

---

[74] Cassie Fish, "*Still Green!?!*" THE BEEF (Mar. 27, 2018), https://www.thebeefread.com/2018/03/27/still-green/ ("The [packers'] mechanical [slaughter] capacity exceeds needs [across Q2 2018]. ... The perception of there being a limitation has created fear and inspired some cattle feeders to "get in line" by selling [cattle] out-front [i.e., on captive supply agreements].").

[75] *See* Cassie Fish, "*Holding Gain*," THE BEEF (Apr. 18, 2018), https://www.thebeefread.com/2018/04/18/holding-gains/ ("Cattle feeders, still fearful of growing supplies in May, June and beyond continue to sell cattle for May at substantially lower prices than current values.").

[76] Cassie Fish, "*Futures Trade Both Sides; Cash Poised to Trade Lower*," THE BEEF (Apr. 2, 2018), https://www.thebeefread.com/2018/04/02/futures-trade-both-sides-cash-poised-to-trade-lower/ ("Looking back at March's fed slaughter rate, it underperformed expectations.... Packers appear to have responded to the tight supply of market-ready cattle in the north by keeping the kill constrained and margins profitable and stable.").

[77] Cassie Fish, "*Quiet Conclusion*," THE BEEF (June 1, 2018), https://www.thebeefread.com/2018/06/01/quiet-conclusion/ ("As each week goes by in June, the calendar will take the industry into the heart of one of the most well-advertised "walls" of market-ready cattle in memory. Now that it is a known fact that the industry can kill 540k head of fed cattle and that demand can absorb the largest beef production in 10-years, the panic experienced in March seems overdone.").

318. Once again, Defendants posted record profits in 2018, with the second, third, and fourth quarter margins per head of $229, $198, and $175 respectively being the highest ever to that date.

### B. 2019 Brings Continued Parallel Slaughter and Pricing Behavior, a Fire at a Plant, and Regulatory Investigations.

319. Ferocious weather greeted cattle feeders in the 2018/2019 winter, particularly across Kansas, Nebraska, and the northern feeding states. Snowstorms and bitterly cold weather stripped pounds off cattle in feedlots, driving down slaughter weights as much as 15 pounds year-on-year. After the snow thawed, cattle feeders were hit with a very wet spring, which further eroded their ability to add pounds to their cattle. At the same time, beef demand remained high, encouraging packers to run plants to meet customer demand.[78] In ordinary times, this would portend a substantial rally in cattle prices over and above the typical rise experienced in winter and early spring, as Defendants would be compelled to compete to secure a greater number of cattle to make up for their lower weights.

320. Defendants, however, worked to constrain and limit the advance in cattle prices that market conditions warranted. As with previous years, they each maintained comparably lighter slaughter volumes across the first three months of 2019, ensuring that

[78] Cassie Fish, *How About That,* THE BEEF (Feb. 11, 2019), https://www.thebeefread.com/2019/02/11/how-about-that-3/ ("Rather obviously, beef demand is terrific. Even in February, notoriously a slow beef demand month. Packer margins are record wide for February.").

their collective demand didn't exceed the available supply.[79]

321. Defendants further pressured prices by reducing their purchases of negotiated cash cattle during this period. To facilitate this, each Defendant pulled formula and forward contract cattle forward, and pressured cash sellers to sell with "time" (*i.e.*, more than one week before delivery, which is the industry standard).[80] By coordinating their actions to accumulate inventory in this manner, constraining weekly kill volume, and declining to increase production to meet beef demand, Defendants prevented producers from receiving fair market prices.[81]

---

[79] *See, e.g.*, Cassie Fish, *And the Beat Goes On*, THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/ ("Packers also know that February is typically the lightest slaughter month and even though they are killing more cattle than a year ago – some plant 'dark days' began yesterday as plans to keep the balance between supply and demand are paramount. Some plants will undertake maintenance or upgrade projects and some will honor holidays such as Monday's President's Day. Others will pull back hours to 36-hour work week.").

[80] Cassie Fish, *Picking Up,* THE BEEF (Jan. 16, 2019), https://www.thebeefread.com/2019/01/16/picking-up/ ("In the country, packer bids are virtually non-existent as packers schedule as many formula and contracted cattle as possible."); *see also* Cassie Fish, *CME Cattle Retreat,* THE BEEF (Jan. 4, 2019), https://www.thebeefread.com/2019/01/04/cme-cattle-futures-retreat/ ("Packers are pulling contracts and using the board weakness to their advantage and next week's cash cattle prices may weaken a buck"); Fish, *Cash Market Slips and Bids Surface,* THE BEEF (Jan. 23, 2019), https://www.thebeefread.com/2019/01/23/cash-market-slips-and-bids-surface/ ("…packers have masterly utilized a large number of formula cattle received in January as leverage against negotiated sellers, which has kept a lid on prices").

[81] Cassie Fish, *Here We Are,* THE BEEF (Mar. 8, 2019), https://www.thebeefread.com/2019/03/08/here-we-are/ ("Packers have been masterful at keeping long inventory and forcing producers to sell with time all year thus far- something that will continue and only increase as 2019 goes forward. It's hard to force prices higher if the buyer owns inventory."); Cassie Fish, *Hogs on Fire,* THE BEEF (Mar. 20, 2019), https://www.thebeefread.com/2019/03/20/hogs-on-fire/ ("The packer has done a masterful job managing inventory….").

322. Defendants' slaughter reductions were most pronounced in February, with only marginal increases in March. By April 2019, Defendants used a relative supply glut to "strategically back cash cattle prices down into summer and to keep them down."[82] As a result, prices rapidly fell from around $127 per/CWT on Friday April 26, 2019, to $123/CWT the following Friday May 3, and $120/CWT on May 10, 2019. Defendants then leveraged the pressure they had created, buying increasing volumes of cash cattle at knockdown prices throughout May 2019.

323. The same slaughter pattern detailed above is observed if one limits the analysis to fed cattle purchased by Defendants from the USDA AMS LMR Five Area states. As noted above, AMS LMR reports of cash cattle purchases from these states are commonly incorporated into Defendants' formula contracts.

324. Defendants' effort to create a glut of cattle at the start of 2019 is shown by Figure 15, which reflects that sales of cattle from 1000+ head feedlots in February through April were far less than the supply of slaughter weight cattle, and that cattle consequently held-over into the summer were bought across the summer:

[82] Cassie Fish, A Bounce, THE BEEF (May 1, 2019), https://www.thebeefread.com/2019/05/01/a-bounce/.

**Figure 15: 2019 Cattle on Feed Fed Cattle vs. Marketings in 1000+ Head Feedlots.**




325. Defendants' slaughter restraint at the start of 2019 and their adherence to a common pricing strategy reduced cash prices in summer, working their way to a bottom of about $109–110/CWT in June. Producers thus faced an average $106 per head loss while Defendants had an estimated per head profit of $257,[83] which decreased the prices Plaintiffs received for feeder cattle.

326. With continuing robust beef demand – wholesale beef prices remained higher on a year-on-year basis – fed cattle prices were expected to rise steadily into the fall high.

[83] *Sterling Beef Profit Tracker: week ending June 21, 2019*, STERLING MARKETING INC. (June 26, 2019), https://www.drovers.com/news/industry/profit-tracker-feeding-losses-reach-triple-digits.

However, prices largely moved sideways, as Defendants worked to extend the summer lows:

> Using the last two years as a roadmap, ***packers pressed feeders hard this week*** and successfully cheapened their inventory by $1 to $1.50 so far. The smaller packers more dependent on high grading cattle paid steady earlier in the week for the right kind, but the ***majors tipped the market over since***… [a]ttitudes in the country [amongst producers] are discouraged and fatigued. ***Most cattle being sold are losing money***, replacement costs are high and bargaining leverage is slim. Like another world, the ***wholesale beef news is sizzling, but zero of that money is being passed on to cattle feeders***.[84]

327. A slight $2-3/CWT rise in prices allowed fed cattle producers to realize a paltry profit of about $24/head by the week ending August 9, 2020, against the Defendants' profit of $192/head, with reduced profits at all life cycle stages.[85]

**1. Defendants react to a processing plant fire by suppressing cattle prices and inflating beef prices.**

328. Notwithstanding the predicted cash cattle strength across August, a fire at Tyson's Holcomb, Kansas slaughter and processing plant on August 9, 2019 provided an opportunity for Defendants to work cattle prices lower still, sending producers back into the red. Tyson closed the Holcomb plant indefinitely in the aftermath of the fire.[86]

---

84 Cassie Fish, *Packers Press and Cash Softens,* THE BEEF (Aug. 9, 2019), https://www.thebeefread.com/2019/08/09/packers-press-and-cash-softens/.

85 *Sterling Beef Profit Tracker: week ending August 9, 2019*, STERLING MARKETING INC. (Aug. 13, 2019), https://www.drovers.com/markets/profit-tracker/profit-tracker-margins-lower-soft-cash.

86 *Over 3,800 workers at Tyson Foods beef plant in Kansas out of work after fire*, REUTERS (Aug. 11, 2019), https://www.reuters.com/article/us-tyson-foods-fire/over-3800-workers-at-tyson-foods-beef-plant-in-kansas-out-of-work-after-fire-idUSKCN1V10J1?source=content_type%3Areact%7Cfirst_level_url%3Anews%7Csection%3Amain_content%7Cbutton%3Abody_link.

However, following the plant fire, Tyson Fresh, JBS, CMS, and National Beef all slashed their fed cattle bids and hiked their beef prices. These actions caused a $5/CWT drop in fed cattle prices and a $14/CWT rise in wholesale beef prices the following trading week.[87] This saw packer per head margins rise from $191 to $358 in the week ending August 16, 2019. The following week, packer margins continued to expand, with the spread between fed cattle prices and boxed beef values extending to a then-record high of $67.17/CWT, $39.51/CWT above the average spread for the same week from 2016 through 2018.

329. While Defendants blamed the loss of Holcomb's 5,500 to 6,000-head-per-day slaughter capacity for these price changes, weekly slaughter volume actually remained steady in the weeks following the fire (averaging around 521,900 head in the three weeks after the fire compared to 521,700 killed in the week of the fire).[88]

330. That Swift/Packerland, CMS and National Beef all had steady slaughter volumes in August 2019 against prior months confirms they had each chosen to idle capacity rather than grow market share, despite voracious beef demand and excellent margins. The same is true for Tyson Fresh, which admitted that, notwithstanding the temporary closure of the Holcomb plant, its slaughter volume loss would be "somewhat minimal."[89]

---

[87] *Sterling Beef Profit Tracker: week ending August 16, 2019*, STERLING MARKETING INC. (Aug. 20, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf. Live cattle futures contracts were also negatively impacted, with two limit-down trading days on September 12 and 13, 2019.

[88] These declines also reflected seasonally declining supplies of fed cattle.

[89] *Tyson Plant Back Online by January,* Feedlot (Sept. 6, 2019), http://feedlotmagazine.com/tyson-plant-back-online-by-january/.

331. To support their slashed fed cattle bids, Defendants drastically reduced their respective cash cattle purchases after the fire.[90] Tyson was largely absent from the cash cattle market in the weeks that followed the fire. This drop was severe in September. While National Beef's July and August cash slaughter volume increased quarter-over-quarter, this largely reflects its acquisition of Iowa Premium's Tama, IA plant in mid-June. The Tama plant sourced most of its 1,100 head per day capacity from cash cattle sellers while owned by Iowa Premium and continued to do so under National Beef's management until at least late 2019 when it finalized arrangements to accept formula grid cattle.

332. This reduction in cash cattle purchases in the aftermath of the fire placed further pressure on cash cattle prices (and thus reduced the price of each Defendants' contracted cattle). Tyson Fresh, Swift/Packerland, CMS, and National Beef continued to drop their bids in lockstep.

333. As a result, cash cattle prices continued to slide, bottoming out at around $100/CWT, with some trades as low as $97/CWT in the week ending September 13, 2019, down from $113/CWT ($183/CWT dressed) in the week of the fire.

334. Defendants' purchase and kill reductions in the aftermath of the Holcomb fire ensured their collective demand remained below the supply of cattle, as evidenced by Defendants' increased average carcass weights of slaughtered cattle.

---

[90] Cassie Fish, *Back from the Brink,* THE BEEF (Sept. 3, 2019), https://www.thebeefread.com/2019/09/03/back-from-the-brink/ ("Last week's negotiated cash cattle trade was small for the fourth week running.…Prices were $2 to $3 lower, averaging $105.54, the lowest since 2018").

335. Carcass weights increase the longer a steer or heifer is on feed. Thus, increasing carcass weights are a sign that producers have not been able to stay current with their marketings and have been forced to feed their cattle longer than is optimal. Consistent with the increase, reported carcass weights were up on average by 6 pounds across October and November 2019, year-on-year.

336. Defendants each reaped record high margins in the weeks following the Holcomb fire from lower fed cattle prices and higher beef prices. As cattle prices bottomed out the week ending September 13, 2019, the spread between packer and producers' per head margin exceeded $600, with ***packers making over $400 per head*** while ***producers sustained $200 per head losses***.[91] *See* Figures 16-18 below:

**Figure 16: Weekly Packer Per-Head Meat Margin.**




[91] *Sterling Beef Profit Tracker: week ending September 13, 2019*, STERLING MARKETING INC. (Sept 18, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf.

**Figure 17: Packers' Estimated Per Head Net Margins.**




**Figure 18: Rolling 12 Month Operational Income Percentages of JBS, Tyson, and National Beef US Beef Operations.**[92]




[92] These operational income percentages are derived from SEC filings or investor relations materials. JBS S.A. does not report operations income at the segment level, so the figure for JBS represents the EBITDA of its JBS USA beef operations. National Beef's operational incomes were reported by its shareholder U.S. Premium Beef, LLC. Tyson Foods' operational income for its U.S. beef business, operated by Tyson Fresh, was shifted to align with calendar quarters because Tyson's fiscal year is not a calendar year.

337. Having left many cash cattle producers without a bid for the two months that followed the Holcomb fire, Defendants took advantage of battered producers in the final quarter of 2019, drastically increasing cash cattle purchases, and securing cattle with extended delivery periods. Fed cattle prices did not recover to their supposed yearly bottom, set in July, until November 2019, with producers continuing to sell fed cattle at a loss until that point.[93]

**2. USDA continues to investigate Defendants' price manipulation.**

338. On August 28, 2019, along with the DOJ, the U.S. Secretary of Agriculture announced that the Packers and Stockyards Division, which is responsible for enforcing the Packers and Stockyards Act, was investigating Defendants' conduct in the aftermath of the fire at Tyson's Holcomb slaughter and processing plant.[94]

339. Disruptions in U.S. beef production peaked in late April 2020 when nearly 40 percent of the nation's beef processing capacity was idled due to COVID-19 illnesses among packing plant employees. During the second week of May, the largest difference –

---

[93] Tyson did not initially take advantage of the glut of cash cattle to the same extent as the other Defendants, but it rapidly increased its cash cattle purchases after Holcomb came back online in December. Press Release, Tyson Foods Inc., Tyson Beef Plant in Kansas to Resume Operations in December (Nov. 18, 2019), https://www.tysonfoods.com/news/news-releases/2019/11/tyson-beef-plant-kansas-resume-operations-december.

[94] *Secretary Perdue Statement on Beef Processing Facility in Holcomb, Kansas*, U.S. DEP'T OF AGRIC. (Aug. 28, 2019), https://www.usda.gov/media/press-releases/2019/08/28/secretary-perdue-statement-beef-processing-facility-holcomb-kansas ("I have directed USDA's Packers and Stockyards Division to launch an investigation into recent beef pricing margins to determine if there is any evidence of price manipulation, collusion, restrictions of competition or other unfair practices.").

or spread – between the boxed beef cutout value and fed cattle prices since the inception of Mandatory Price Reporting in 2001 was recorded at just over $279 per CWT. This constituted a 323% increase from the $66 per CWT spread that existed in early April 2020, which was already close to the prior record set in the aftermath of the Holcomb fire. This gap between cattle and beef prices caused each Defendant to realize startling margins estimated by Sterling Marketing to reach as high as $891/head in the first week of June 2020. In contrast, those producers able to find a marketing outlet for their cattle incurred triple digit losses per head.

340. On July 22, 2020, the USDA AMS issued The Boxed Beef & Fed Cattle Price Spread Investigation Report ("Report") summarizing market conditions, fed cattle prices, boxed beef values, and the spread before and during the COVID-19 pandemic, including the period just after the Holcomb plant fire. The Report stated that the USDA's investigation into potential violations of the Packers and Stockyards Act was ongoing and that the Report did "not examine" such violations. It further stated:

> Findings thus far do not preclude the possibility that individual entities or groups of entities violated the Packers and Stockyards Act during the aftermath of the Tyson Holcomb fire and the COVID-19 pandemic. The investigation into potential violations under the Packers and Stockyards Act is continuing. USDA does not solely own investigatory authority over anticompetitive practices in the meat packing industry and has been engaged in discussions with the Department of Justice (DOJ) regarding allegations of anticompetitive practices in the meat packing industry. Should USDA find a violation of the Packers and Stockyards Act, it is authorized to report the violation to DOJ for prosecution.[95]

---

[95] *Boxed Beef & Fed Cattle Price Spread Investigation Report*, USDA AMS (July 22, 2020),

341. Plaintiffs understand that the USDA's investigation, alongside the DOJ's Sherman Act investigation into the Defendants, remains ongoing.

**C. Defendants Publicly Signaled Their Commitment to Supply Restraint.**

342. Defendants' joint effort to periodically curtail slaughter levels to "balance" their demand to supply are further evidenced by their senior executives' statements about their firms' commitment to operating a "margin" rather than a "market share" business. Explicit and implicit in these statements was the importance of industry restrictions on slaughter levels and capacity.

343. For example, Tyson's COO stated that National Beef's closure of its Brawley, California plant "is consistent, I guess, with what we've been saying all along, as the calf crop declines and the noncompetitive feedlot areas or noncompetitive plants or the combination thereof, we'll probably have to curtail production ...."[96]

344. As prices continued to rise in 2014, JBS director Wesley Mendonca Batista responded to an analyst's question as to whether U.S. fed cattle slaughtering capacity needed to be rationalized by suggesting that JBS's recent acquisition of XL Foods' Omaha, Nebraska plant was probably a mistake, and that slaughtering capacity needed to come out of California and at least one other U.S. region ("If you want to be balanced you need to have capacity to be shut there.").[97]

---

https://www.ams.usda.gov/sites/default/files/media/CattleandBeefPriceMarginReport.pdf at 2, 10.

[96] Tyson Foods Q1 2014 Results Earnings Call Transcript (Jan. 31, 2014), at 4.

[97] JBS Q3 2014 Earnings Calls Transcript (Nov. 13, 2014), at 12.

345. Even after fed cattle prices collapsed, Tyson's then-CEO Donald Smith still stressed the need for further slaughter reductions in August 2015:

> Because we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short-term, we are negatively impacted, but markets will equilibrate, and conditions are expected to improve for the long term.

Tyson Foods Q3 2015 Results Earnings Call Transcript (Aug. 3, 2015), at 4.

346. JBS's André Nogueira de Souza publicly praised Defendants' efforts to reduce industry-wide slaughter capacity through plant closures, noting that it had left the industry in "a very good position, [to achieve] balance in the industry in 2016, 2017, and 2018."[98]

347. Defendants' executives knew they needed to tread carefully in public exhortations for slaughter restraint, as shown by Tyson's then-CEO Donnie Smith's admission during his discussion of output restraint during Tyson's Q4 2015 Earnings Call:[99]

> You've got relatively low cattle supply, you've got too much -- well, not to say too much, probably not the right way to say it, but you've got excess industry capacity. And that limits our ability to drive margins above the 1.5% to 3%, we think.

348. Such comments are typical in cartels like Defendants' because they serve to publicly affirm, in euphemistic terms, the conspirators' private understandings.

[98] JBS Q3 2015 Results Earnings Call Transcript (Nov. 12, 2015), at 9.

[99] Tyson Foods Q4 2015 Earnings Call Transcript (Nov. 24, 2015).

**D. Defendants' Conduct Directly Caused Depression of Feeder Cattle Prices.**

349. As a direct and proximate result of Defendants' conduct, the price of feeder cattle collapsed.

350. Industry data demonstrates the impact fed cattle prices have on feeder cattle prices, including that **feeder cattle price and demand is derivative of fed cattle price and demand**. That is, changes in the price of fed cattle cause changes in the price of feeder cattle.

351. Feeder cattle prices are directly tied to fed cattle prices and move in unison with the prices feedlots or other entities are receiving for their fed cattle, as demonstrated by Figure 19, below:

**Figure 19. Correlation in the cash prices of feeder cattle and fed cattle.**




352. Industry professionals and feedlots, with whom Defendants do business, speak with one voice as to the relationship between feeder cattle and fed cattle pricing. [redacted]

[redacted]

> [redacted]

[redacted]

353. During the alleged conspiracy period, feeder cattle futures prices, which correspond to the prices paid for feeder cattle, tracked future fed cattle prices with a nearly constant $30/contract difference, as shown in Figure 20:

**Figure 20. Correlation in the price of feeder cattle and fed cattle.[100]**




[100] https://www.beefmagazine.com/feedlots/feeder-cattle-prices-versus-fed-cattle-futures.

354. The Feeder Cattle Index represents "the price of [feeder] cattle purchased by feedlots," calculated using the cash sales price of cattle weighing between 700-899 pounds, with medium and large frames, grades 1 and 2, reported to the USDA from live auctions, internet auctions, video auctions, and feedlots' own reports of purchases.[101]

355. The CME deems feeder cattle weighing 700-899 pounds as purchased by feedlots to be finished and sold for beef production, regardless of whether they are sold face-to-face, via live auction, via internet auction, or via video auction, and treats cattle with these characteristics as an accurate proxy for the market for feeder cattle generally.

356. While the CME's Feeder Cattle Index includes only sales of steers in pricing its feeder cattle futures contracts, the industry at large, and the USDA's reporting on feeder cattle sales, includes steers and heifers.[102]

357. Additionally, while the CME only includes feeder cattle weighing between 700-899 pounds, USDA placement data demonstrates that feeder cattle are regularly sold directly to or placed on feedlots at weights beyond this range.[103]

---

[101] Hedging with the CME Feeder Cattle Index (Dec. 21, 2018), available at https://www.cmegroup.com/education/articles-and-reports/heding-with-the-cme-feeder-cattle-index-white-paper.html; CME Rule book Chapter 102, Feeder Cattle Futures, Section 10203.A, available at https://www.cmegroup.com/content/dam/cmegroup/rulebook/CME/II/100/102/102.pdf.

[102] *See* Feeder Cattle Grades and Standards, USDA, available at https://www.ams.usda.gov/grades-standards/feeder-cattle-grades-and-standards.

[103] Management Practices on U.S. Feedlots, USDA (2021), available at https://www.aphis.usda.gov/sites/default/files/feedlot-health-2021-mgmt-practice-dr1.pdf.

358. The price of feeder cattle is the majority of the cost of finishing cattle.[104] An industry expert determined feeder cattle prices represented 72% of the cost of fed cattle in 2018 and 2019 based on industry data.[105] Indeed, "[t]he most important factor influencing feeder cattle prices is the price of the animal when finished."[106]

359. A study of the relationship between feeder and fed cattle prices showed that "a change in the live cattle price of a dollar per hundred pounds leads to approximately 93% pass-through to the feeder cattle price in about one month."[107] Similarly, other studies have confirmed that fed cattle prices are one of the primary – if not the greatest – determinant of feeder cattle prices.[108]

360. Another study analyzing calf prices, corn prices, and expected live cattle prices from January 1993 through March 2016 determined that the impact of live cattle price expectations is three or more times larger than the impact of corn price, and that the relative

---

[104] Roger Wayne Eldrige, *Kentucky Feeder Cattle Price Analysis: Model for Price Predictions and Grazing Management*, University of Kentucky Master's Theses, at p.67 (2005).

[105] *Sterling Beef Profit Tracker: week ending August 9, 2019*, Sterling Marketing Inc. (Aug. 13, 2019), https://www.drovers.com/markets/profit-tracker/profit-tracker-margins-lower-soft-cash.

[106] Jerry Klassen, *Key Factors that Influence Feeder Cattle Prices*, Grainews (Sept. 25, 2020), https://www.grainews.ca/cattlemans-corner/key-factors-that-influence-feeder-cattle-prices.

[107] Huan Zhao, Xiadong Du, David Hennessy, *Pass-Through in United States Beef Cattle Prices: A Test of Ricardian Rent Theory*, 40 Empirical Economics 497-508 (Feb. 4, 2010).

[108] Tonsor, T., Mollohan, E., *Price Relationships Between Calves and Yearlings: An Updated Structural Change Assessment*, 1 J. of Applied Farm Economics 1:3 (2017).

impact of live cattle price expectations on feeder cattle prices has only become more influential in recent years.[109]

361. As one industry expert explained, "[f]eeder cattle markets are expectation markets that are primarily driven by two things: (1) the expected value of fed cattle in the future and (2) the cost of getting those feeder cattle to that point."[110] "The demand for feeder cattle is derived from the demand for fed cattle. So, anything that impacts the profitability of finishing cattle will impact the value of feeders."[111]

362. "Feeder swaps," also knows as "fed to feeder swaps," "feeder to fat swaps," "fed/feeder cattle swaps," and other names, are a common tool or methodology used by feedlots and the industry alike to determine the demand and placements of feeder cattle.

363. The "feeder swap" is an analysis of current fed cattle prices versus future fed cattle prices. If the expected price of fed cattle in the future is less than the current price of fed cattle, feedlots are less willing to purchase feeder cattle. If the expected price of fed cattle in the future is higher than the current price of fed cattle, feedlots are more willing to sell their fed cattle and purchase feeder cattle.

---

[109] *Id.*

[110] Kenny Burdine, *Rising Feed Prices Create Divergence Between Fed and Feeder Cattle Values*, Ohio State University Beef Cattle Letter, (May 5, 2021), available at https://u.osu.edu/beef/2021/05/05/rising-feed-prices-create-divergence-between-fed-and-feeder-cattle-values/.

[111] Kenny Burdine, *Recent Trends in Feed Prices on Feeder Cattle Values*, Farm Progress, (Apr. 2, 2024), available at https://www.farmprogress.com/cattle-news/prospective-plantings-feed-prices-and-implications-for-feeder-cattle-markets.

364. Thus, the demand and price of feeder cattle is primarily driven by the current price and future price of fed cattle.

365. [redacted][112]

366. Defendants were not only aware of but routinely tracked the price of feeder cattle. [redacted]"[113]

367. Because anticompetitive conduct that suppresses fed cattle prices necessarily reduces feeder cattle prices, a necessary target of Defendants' price-fixing conspiracy was the suppression of feeder cattle prices.

368. Defendants' internal documents admit they were aware of fed and feeder cattle's pricing relationship while implementing their conspiracy and routinely monitored and tracked feeder cattle prices.

**E. Economic Analysis Supports the Existence of the Alleged Conspiracy.**

369. Economic data and analysis corroborate the direct and circumstantial evidence of the alleged conspiracy. In particular, data and analysis confirm that: (a) the collapse in fed

---

[112] [redacted]

[113] [redacted]

cattle prices in 2015 cannot be explained by common supply or demand drivers; (b) from at least June 1, 2015, prices were artificially depressed; and (c) other explanations potentially offered for the 2015 price collapse do not withstand scrutiny.

370. Economic data and analysis also corroborate the previously alleged journals, newsletters, and market analysts demonstrating the inextricable link between fed cattle and feeder cattle prices. The data support the fact that when Defendants' unlawful conduct and conspiracy reduced the price of fed cattle, it in turn caused depressed feeder cattle prices. Figure 21 below compares feeder cattle and fed cattle prices, separated by the five USDA Livestock Mandatory Reporting Regions: (1) Colorado; (2) Iowa and Minnesota; (3) Kansas; (4) Nebraska; and (5) Texas, New Mexico, and Oklahoma.

**Figure 21. AMS LMR Reported Prices for Fed and Feeder Cattle by Region.**[114]




[114] Figure 21 is a preliminary analysis performed using publicly available data. Fed cattle pricing data was obtained from USDA – Agricultural Marketing Service, LM_CT118, LM_CT121, LM_CT124, LM_CT134, LM_CT137, accessed July 29, 2026, at https://mpr.datamart.ams.usda.gov/menu.do?path=Products\Cattle\Daily%20Cattle.
Feeder cattle pricing data was obtained from USDA – AMS, "Public Data," Reports, accessed July 31, 2026, at https://mymarketnews.ams.usda.gov/public_data.


Feeder Weighted Average Price ($ / cwt)
250
200
150
100
Fed Weighted Average Price ($ / cwt)
180
160
140
120
100
80
January-2010
July-2010
January-2011
July-2011
January-2012
July-2012
January-2013
July-2013
January-2014
July-2014
January-2015
July-2015
January-2016
July-2016
January-2017
July-2017
January-2018
July-2018
January-2019
July-2019
January-2020
July-2020
January-2021
July-2021
January-2022
July-2022
January-2023
Transaction Month
Feeder Cattle - Kansas, Heifers & Steers, Weight > 600lbs
Fed Cattle - Kansas, Heifers & Steers, Negotiated Cash, >80% Choice, Live, FOB


Feeder Weighted Average Price ($ / cwt)
250
200
150
100
Fed Weighted Average Price ($ / cwt)
180
160
140
120
100
80
January-2010
July-2010
January-2011
July-2011
January-2012
July-2012
January-2013
July-2013
January-2014
July-2014
January-2015
July-2015
January-2016
July-2016
January-2017
July-2017
January-2018
July-2018
January-2019
July-2019
January-2020
July-2020
January-2021
July-2021
January-2022
July-2022
January-2023
Transaction Month
Feeder Cattle - Nebraska, Heifers & Steers, Weight > 600lbs
Fed Cattle - Nebraska, Heifers & Steers, Negotiated Cash, >80% Choice, Live, FOB


Feeder Weighted Average Price ($ / cwt)
250
200
150
100
Fed Weighted Average Price ($ / cwt)
160
140
120
100
80
January-2010
July-2010
January-2011
July-2011
January-2012
July-2012
January-2013
July-2013
January-2014
July-2014
January-2015
July-2015
January-2016
July-2016
January-2017
July-2017
January-2018
July-2018
January-2019
July-2019
January-2020
July-2020
January-2021
July-2021
January-2022
July-2022
January-2023
Transaction Month
Feeder Cattle - Texas, New Mexico, and Oklahoma, Heifers & Steers, Weight > 600lbs
Fed Cattle - Texas, New Mexico, and Oklahoma, Heifers & Steers, Negotiated Cash, >80% Choice, Live, FOB

371. Figure 21 shows feeder cattle prices collapsed shortly after fed cattle prices collapsed and remained highly correlated during the relevant period. Indeed, each region boasted statistically significant correlation coefficients: 0.9022 for Colorado; 0.8793 for Iowa and Minnesota; 0.8869 for Kansas; 0.8955 for Nebraska; and 0.8439 for Texas, Oklahoma, and New Mexico.

## F. Supply and Demand Drivers Do Not Explain the 2015 Price Collapse or Subsequent Low Prices.

372. Prices for fed and feeder cattle bought across the United States followed a discernible pattern: increasing consistently from 2009 through 2014 (accounting for seasonal fluctuations in prices), collapsing dramatically in 2015, and then stabilizing below the prior trend line.[115]

373. Seasonal changes do not explain the dramatic depression of prices after 2014. Historically, prices tend to gradually rise during the first quarter until the early part of the second quarter, peaking in March or April. Prices then tend to trend downwards to a summer low typically established in June or July, before commencing an upward trend that typically peaks in November.[116]

374. As evidenced by the chart below and charts above, **the collapse in fed cattle prices led directly to a collapse in feeder cattle prices:**

[115] The below graphs are not adjusted for seasonal changes in fed cattle prices, which do not explain the dramatic depression of fed cattle prices after 2014.

[116] "Annual and Seasonal Price Patterns for Cattle," CORNHUSKER ECONOMICS, Univ. of Nebraska-Lincoln (Aug. 19, 2015), https://agecon.unl.edu/cornhusker-economics/2015/annual-and-seasonal-price-patterns-for-cattle.

**Figure 22: Fed Cattle Input Costs - Feeder Cattle Cost.**




375. Indeed, fed cattle producers enjoyed a profitable 2017 largely due to a significant drop in the input costs associated with fed cattle marketed during that year – in particular, the price of feeder cattle. Defendants were able to constrain the typical seasonal rise in fed cattle prices across the first half of 2017 and continued to profit from historic margins.

376. Nor do changes in beef demand or consumer preferences explain the drop in prices. While there was a 5.67% decline in retail beef prices from January 2015 to January 2016, prices rebounded in the months that followed, before going down, then up again thereafter. Importantly, the spread between retail beef prices and fed cattle prices continued a gradual increase, consistent with its upward trend during the past 20 years, suggesting beef demand remained robust.[117] On top of this, beef demand increased from its previous pre-collusion lows, as seen below:

---

[117] USDA, Economic Research Service ("ERS"), "Meat Price Spreads," accessed May 3, 2019 at https://www.ers.usda.gov/data-products/meat-price-spreads/.

**Figure 23: Monthly Beef Demand Indices, Jan. 1988 – Oct. 2017.**[118]




377. This high demand for beef was expressly acknowledged by Tyson's Head of Fed Cattle Procurement, John Gerber, at a November 2018 industry conference:

> "[The] [c]onsumer will pay more for beef, and have to pay more for beef because it is worth more. There is value out there in chicken and pork, but unless you have been living under a great big rock the last two years, you know that ***beef demand is off the charts***. We have a lot of supply coming at us, but we have been able to hold the price at a pretty good level, because of beef demand, it's been really good, and I think it will stay good."[119]

Tyson Fresh Meats: What the Consumer Demands - John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, Nov. 13-15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3WBcqzo.

---

[118] "Assessing Beef Demand Determinants" (Jan. 18, 2018), pp. 13-14, available at: https://www.beefboard.org/news/files/FY2018/Assessing%20Beef%20Demand%20Determinants_FullRe port.pdf.

[119] Tyson Fresh Meats: What the Consumer Demands - John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, Nov. 13-15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3WBcqzo.

378. What did change in 2015 was the meat margin. The meat margins realized by Defendants in the aftermath of the 2015 price collapse – which at times exceeded $600 per head – were historically unprecedented. These unheard of meat margins due to Defendants' deliberate underutilization of their plant capacities 2015 and 2016 led to unheard-of profitability in Defendants' beef businesses.

379. This expanding meat margin was also expressly recognized by Tyson. It was stated during a Q4 2016 earnings call that "[t]he dynamic is that the livestock prices have not come – they've come down faster than the retail prices have, which has allowed us to make the margins that we have right now in both beef...."[120]

**G. Other Explanations for the Drop in Prices Do Not Withstand Scrutiny.**

380. The United States Government Accountability Office's ("GAO") 2018 Report suggests potential explanations for the price collapse proffered by Defendants and others. These explanations are not borne out by the facts.

381. For example, the GAO Report mentions that the droughts of 2011, 2012, and 2013 might have reduced the forage supply to raise feeder cattle, leading to fewer feeder cattle.[121] Under this explanation, ranchers expanded their inventory once the drought eased, thereby oversupplying the market and causing cattle prices to crash. Any purported oversupply of feeder cattle, though, should have caused a collapse in feeder cattle prices. Instead, feeder cattle prices collapsed only *after* fed cattle prices collapsed.

[120] Tyson, Q4 2016 Earnings Call, Seeking Alpha Transcript (Nov. 21, 2016) at 15.

[121] 2018 GAO Report at 12.

382. Further, while the cattle herd began to rebuild by 2015, the supply of slaughter weight fed cattle was similar to 2014 levels. As a result, while 2015 cattle on feed inventory numbers were at or slightly above 2014 levels, 2015 industry annual slaughter volume was slightly down compared to 2014 driven by Defendants' slaughter reductions and the continuing tight supply of fed cattle. If GAO's suggested oversupply of slaughter weight cattle were true, the industry would have seen low prices and high volume, not low prices and low volume.

383. It has also been suggested that the increased corn supply seen after the 2011-2013 droughts "may have" led fed cattle producers to feed their cattle for longer.[122] The resulting fatter cattle then received lower prices per CWT, as is customary. This premise is faulty: most producers did not choose to overfeed their cattle but were forced to do so by Defendants' coordinated slaughter restrictions.

384. Finally, the strengthening U.S. dollar in 2014 and potentially related changes in U.S. imports and exports of live cattle and beef also cannot explain the price collapse.[123] These events were not even in lockstep with the price collapse in the second half of 2015. In fact, during the second half of 2014, when net imports of beef and the U.S. dollar were increasing, fed cattle prices still increased to their November 2014 peak. In the first half of 2015, net imports were transiently around 8% of U.S. production, but by November 2015 – when fed cattle prices had bottomed out – net imports of beef had turned slightly negative.

---

[122] *Id.* at 13.

[123] *Id.* at 14.

385. Importantly, the GAO did not conclude that these factors were the sole or dominant cause of the 2015 price collapse and emphasized that an investigation into potential antitrust issues was beyond the scope of its review.[124]

## THE CATTLE MARKET IS CONDUCIVE TO COLLUSION

386. The structure and characteristics of the market for the purchase of cattle make the market highly susceptible to collusion. These facts, when considered against the backdrop of Defendants' actions that are consistent with collusion and inconsistent with the proper functioning of a competitive market, support an inference that the anticompetitive agreement alleged herein existed.

### I. The Beef Packer Industry is Highly Consolidated and Highly Concentrated.

387. The Beef Packer industry is highly concentrated.[125] Since JBS's acquisition of Smithfield Beef Group, Inc. in 2008, Defendants' cumulative share of annual purchases of U.S. fed cattle has approximated 81-89% each year, with each Defendant's individual share of annual purchases remaining largely static. No Independent Packer possesses a double-digit market share, with Greater Omaha, Defendants' nearest rival, maintaining a 2.5-3.5%

---

[124] 2018 GAO Report at 29.

[125] The U.S. national four-firm concentration ratio (CR4) for beef packers rose from 25% in 1977 to 71% in 1992, the first year in which the national Herfindahl-Hirschmann Index ("HHI") exceeded 1800. Since that time, the HHI index for the industry has only increased, particularly in certain regions. *U.S. v. JBS* Amended Compl., ¶¶ 36-37; Cai, Stiegert, and Koontz, Regime Switching and Oligopsony power: the case of US beef processing, Food System Research Group, Working Paper Series (2010 Cai, X., K. W. Stiegert, and S. R. Koontz. "Oligopsony Fed Cattle Pricing: Did Mandatory Price Reporting Increase Meatpacker Market Power?" Proceedings of the NCCC-134 Conference on Applied Commodity Price Analysis, Forecasting, and Market Risk Management. Available at http://www.farmdoc.illinois.edu/nccc134/conf_2011/pdf/confp24-11.pdf.

market share through its Omaha, Nebraska plant. Unsurprisingly, the GAO's 2018 Report found that lower "packer competition in any given area was associated with lower fed cattle prices in that area."[126]

## II. The Supply of Cattle and Demand for Beef Are Relatively Insensitive to Short-Term Changes in Price.

388. Recent studies have shown that the quantity of beef U.S. consumers purchase has become less sensitive to changes in beef prices, and the impact of such price changes on beef demand is small relative to other factors. Beef's own price elasticity for the period 2008-2017 was estimated at -0.479, indicating that a "10% price increase would reduce [beef] demand by 4.79%."[127] As a result, Defendants are incentivized to reduce fed cattle slaughter and beef production, as neither they, nor their immediate customers, are harmed by the resulting wholesale and retail price increases.

389. Reduced slaughter volumes and/or lower cattle prices are unlikely to significantly alter the immediately available supply of fed cattle. Because of cattle's comparably long lifecycle, cattle producers typically require about 39 months to alter supply levels.[128] As a result, cattle supplies are relatively insensitive to short-term price changes, particularly given the absence of a substitute market into which cattle producers can sell their cattle.

---

[126] 2018 GAO Report at 15-16.

[127] Glynn Tonsor, Jason Lusk, Ted Schroeder, "Assessing Beef Demand Determinants" (Jan. 18, 2018), at 7-9, www.beefboard.org/news/files/FY2018/Assessing%20Beef%20Demand%20Determinants_ FullReport.pdf.

[128] Tyson Foods Inc. "Investor Fact Book – Fiscal Year 2017" (2018), at 10, https://s22.q4cdn.com/104708849/files/doc_factbook/Tyson-Foods-FY17-Fact-Book-(rev-042518).pdf ("Tyson 2017 Fact Book"); 2018 GAO Report at 5.

## III. Producers Face Significant Market Access Risk.

390. The risks due to the perishable nature of cattle, coupled with the absence of a substitute market to sell fed cattle, expose fed cattle producers to market access risk, namely "the availability of a timely and appropriate market outlet."[129]

391. That risk and the leverage it provides to Defendants is exacerbated by the significant information asymmetry faced by producers vis-à-vis Defendants regarding the available supply of fed cattle and Defendants' procurement needs. Producers have only limited information concerning the supply of fed cattle beyond the information conveyed by the USDA's Cattle on Feed Reports. By contrast, Defendants can construct detailed inventories of upcoming fed cattle supplies through their regular contacts with all the fed cattle producers situated within their respective procurement territories.

392. The impact of market access risk on the parties' relative bargaining power is meaningful. As shown by Defendants' threats regarding 2018's supposed "wall of cattle," the mere use of coordinated threats of increased market access risk can be sufficient to coerce producers to commit cattle to captive supply agreements or accept lower cash prices.

## IV. There Are Many Trade Organizations and Opportunities for Defendants to Meet and Collude.

393. Defendants' management and employees have regular opportunities to meet and collude through their membership in various trade and industry associations, including: the National Cattlemen's Beef Association ("NCBA"); the U.S. Meat Export Federation

[129] RTI International at 5-4.

("USMEF"); the Global and U.S. Roundtables for Sustainable Beef ("USRSB") and the North American Meat Institute ("NAMI").

394. For example, the NCBA holds an annual convention (known as "CattleCon"), a summer conference, a legislative conference, and regional meetings. The NCBA Product Council, which includes Defendants, other packers, and certain retailers and restaurants, meets quarterly for the Beef Executive Forum, an invitation-only event.[130] Representatives of each Defendant typically attend these events. Two of Defendants' executives, former CMS/Cargill Vice President of Cattle Procurement Bill Thoni and former Tyson SVP of Beef Margin Management and VP of Boxed Beef Pricing Kevin Hueser, were both officers, board members, or formally designated participants of the NCBA.[131] Defendants also participate in meetings of the Beef Checkoff program, run by the Federation of State Beef Councils, that are held in conjunction with the NCBA summer and winter meetings.[132]

395. Similarly, the USMEF – a trade association that develops export opportunities for U.S. protein producers, and whose leadership includes current and former employees and officers of Defendants – holds both two conferences and monthly international trade

---

[130] NCBA Allied Indus. Membership, NAT'L CATTLEMEN'S BEEF ASS'N (2019), www.beefusa.org/CMDocs/BeefUSA/AboutUs/2019NCBA%20Allied%20Industry%20Brochure.pdf; https://us13.campaign-archive.com/?u=3ac0220907d479b33ff07dbbc&id=1d27f4a1b7.

[131] Hueser was also a formal participant of the USRB.

[132] *See The Association*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/theassociation.aspx; and *Federation*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/federation.aspx.

shows.[133] Numerous executives and employees of Defendants participated or held leadership roles in the USMEF. For example, former CMS/Cargill Vice President of International Sales Pat Binger was an officer, board member, or formal participant of the USMEF; former Tyson Foods SVP of International Sales Roel Andriessen served as the Chair, Vice Chair, and on the Executive Committee of the USMEF; former Tyson Foods SVP of International Sales and VP International Sales Robert Shuey was a formal participant of the USMEF; National Beef International President and former Vice President of International Sales Peter Michalski served on the USMEF Export Committee; and former National Beef NBP International Sales President Mark Domanski served on the USMEF Export Committee. Also, in November 2017, Tyson's Roel Andriessen and CMS' Pat Binger both attended the USMEF Strategic Planning Conference in Tucson, Arizona.[134]

396. NAMI – a national trade association that represents companies that process 95% of red meat – conducts a series of annual conferences and educational workshops across the country.[135] Executives and employees of Defendants participated and held leadership positions in NAMI. For example, CMS President of Business Operations & Supply Chain and former Cargill Beef President John Keating was an officer, board member, or formally designated participant of NAMI; former Tyson Foods CEO, Group President of Fresh

---

[133] *See* https://www.usmef.org/usmef-events/.

[134] *USMEF Members Examine Challenges ahead, Elect New Officer Team*, U.S. MEAT EXP. FED'N (Nov. 3, 2017), https://www.usmef.org/news-statistics/member-news-archive/usmef-members-examine-challenges-ahead-elect-new-officer-team/.

[135] *See About NAMI*, NAT'L AM. MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/204/pid/204 and Events, https://www.meatinstitute.org/index.php?ht=d/sp/i/10422/pid/10422.

Meats & International, and COO Noel White served on the Executive Committee of NAMI; former Tyson Foods CEO and President Thomas Hayes also served on the Executive Committee of NAMI; National Beef President and CEO Timothy M. Klein served on the Executive Committee of NAMI; and JBS USA, Swift Beef, and Packerland CEO Andre Nogueira served on the Board of Directors of NAMI.

397. NAMI and the Food Industry Association host an annual Meat Conference that various executives and employees of Defendants attend every year. [136] In 2017, National Beef's Timothy Klein, Tyson Vice President of Boxed Beef Pricing Don Kieffer, JBS' Andre Nogueira, and CMS Vice President of Sales John Jay, amongst other Defendant executives, were listed as attendees of the Meat Conference.[137] In 2018, National Beef's Timothy Klein, JBS' Andre Nogueira, Cargill Vice President of Retail Beef Business Lead Elizabeth Gutschenritter, and Tyson's Don Kieffer attended the Meat Conference.[138] In 2019, JBS' Andre Nogueira, Tyson's Noel White, National Beef's Timothy Klein, and Cargill's Elizabeth Gutschenritter were listed as attendees.[139] In 2020, Tyson's Noel White

---

[136] *Meat Conference*, NORTH AM. MEAT INST. AND FOOD INDUS. ASS'N, http://meatconference.com/ (last visited Dec. 9, 2020).

[137] *2017 Annual Meat Conference: Registered Attendees*, FOOD INDUS. ASS'N (Dec. 9, 2020) https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId=43A35D00000DFE&sortBy=name.

[138] *2018 Annual Meat Conference Attendee List as of 2.9.2018*, MEAT CONFERENCE (Feb. 9, 2018), http://meatconference.com/sites/default/files/books/2018%20AMC%20Attendee%20List.pdf.

[139] *Meat Conference 2019 Attendee List (as of 2/27)*, MEAT CONFERENCE (Feb. 27, 2019), http://meatconference.com/sites/default/files/books/2019-AMC-Attendee-List.pdf.

and National Beef's Timothy Klein again signed up to attend the Meat Conference along with various other Cargill and JBS executives and employees.[140]

398. Various Defendants' executives and employees attended "AgCon," a joint conference from the CFTC and the Center for Risk Management Education and Research at Kansas State University, in 2018.[141] CMS' Bill Thoni and Tyson's Kevin Hueser were listed as attendees of the 2018 AgCon along with other Defendants' executives and employees, including Tyson Fresh's VP of Sourcing & Risk Management Randall Chambers; Tyson Fresh's VP of Cattle Procurement John Gerber; National Beef Vice President of Cattle Procurement Chad Barker; National Beef Vice President of Procurement and Risk Management Phil Groetken; and JBS USA Head of Risk Management Marco Sampaio.[142]

399. Tyson, JBS, and Cargill Defendant executives also had ample opportunities to meet privately, particularly at the beginning of the conspiracy, as a result of JBS's acquisition of Tyson and Cargill's Mexican and Brazilian chicken and U.S. pork operations, respectively. JBS S.A.'s purchase of Tyson's Brazilian and Mexican chicken operations was announced on July 28, 2014 and closed on December 1, 2014 and June 29,

---

[140] *2020 Annual Meat Conference: Registered Attendees*, FOOD INDUS. ASS'N (Dec. 9, 2020), https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId=571D81000004FF&includeUnpaid=1&sortBy=title.

[141] *Inaugural AgCon brings business, government together to discuss ag futures markets*, KANSAS STATE UNIV. (Mar. 8, 2018), https://www.ksre.k-state.edu/news/stories/2018/03/AgCon2018.html.

[142] *2018 AgCon Attendees*, KANSAS STATE UNIV. (Mar. 28, 2018), https://www.k-state.edu/riskmanagement/documents/Ag_Con_2018_Attendees_Mar30.pdf.

2015, respectively,[143] while its purchase of Cargill's U.S. pork operations was announced on July 1, 2015 and closed on October 30, 2015. Cargill, Tyson, and JBS executives with responsibilities relating to beef and cattle such as then-Tyson CEO and President Donnie Smith;[144] JBS USA, Swift Beef, and Packerland CEO Andre Nogueira;[145] and then-Cargill Senior Vice President Todd Hall[146] were all involved in the acquisition discussions. JBS S.A.'s Wesley Batista stated in July 2015 that its "courtship" with Cargill in relation to its U.S. pork operations "started years ago", with discussions intensifying at the beginning of 2015, the same year cattle prices plummeted.[147]

## V. Defendants Benefit from High Barriers to Entry.

400. Defendants benefit from substantial barriers to entry into the market. Because of these barriers, the entry of new fed cattle slaughter businesses, or the repurposing of existing cow and bull slaughter facilities, is unlikely despite any decrease in the price of fed cattle or increase in the wholesale price of beef. Construction of large-scale fed cattle

---

[143] JBS Foods Int'l B.V., Registration Statement (Form F-1) at 112 (Dec. 5, 2016), https://www.sec.gov/Archives/edgar/data/1691004/000119312516785274/d304020df1.htm.

[144] *Tyson to sell Mexico, Brazil poultry businesses to JBS*, REUTERS (July 29, 2014, 1:32 PM), https://www.reuters.com/article/us-tyson-foods-results/tyson-to-sell-mexico-brazil-poultry-businesses-to-jbs-idUKKBN0FX0UR20140729.

[145] Lawrence Aylward, *Inside the JBS, Cargill deal*, MEAT + POULTRY (July 2, 2015), https://www.meatpoultry.com/articles/13164-inside-the-jbs-cargill-deal.

[146] Press Release, Cargill, JBS USA Pork agrees to purchase Cargill Pork business (July 1, 2015), https://www.cargill.com/news/releases/2015/NA31861255.jsp.

[147] Luciana Magalhaes, *With Cargill Purchase, Brazil's JBS Poised to Become No. 2 Pork Producer in U.S.*, WALL STREET JOURNAL (July 2, 2015, 3:18 PM), https://www.wsj.com/articles/with-cargill-purchase-brazils-jbs-poised-to-become-no-2-pork-producer-in-u-s-1435864508.

packing facilities requires an upfront investment of over $250 million and can take years to get online due to permitting, planning, designing, and building requirements.[148]

401. The construction of smaller plants, with capacity to slaughter 1,000 - 1,500 head per day, takes a similar amount of time and costs at least $150 million.[149] Re-purposing an existing plant, or reopening a previously shuttered plant costs many millions of dollars.

402. Aside from the costs and time associated with opening a plant, new entrants face difficulties complying with a significant volume of regulations, finding and training a workforce of between 1,500 to 3,000 staff, and finding marketing outlets for the resultant beef. As such, the general principle in the industry is that a newly opened packing facility will lose at least 60% of its initial investment before it becomes profitable.

403. Given these substantial barriers, it is unsurprising new or re-launched independent fed cattle packers, including Northern Beef Packers and Kane Beef, have failed.[150]

## DEFENDANTS HAVE SIMILAR COST STRUCTURES AND HAVE SIGNIFICANT OVERSIGHT OF EACH OTHER'S PRICE AND PRODUCTION DECISIONS

404. Because of their similar cost structures, Defendants have limited ability to steal market share from each other by operating with compressed meat margins (*i.e.*, bidding high for cattle and asking low for beef). But also because of their similar costs, Defendants

[148] *U.S. v. JBS* Amended Complaint, ¶41.

[149] Amanda Ranke, "*What's the Future for Northern Beef Packers?*" BEEF (July 22, 2013), www.beefmagazine.com/blog/whats-future-northern-beef-packers.

[150] Dirk Lammers, "*Aberdeen beef plant open again and slaughtering*" CAPITAL JOURNAL (Nov. 19, 2015), www.capjournal.com/news/aberdeen-beef-plant-open-again-and-slaughtering-cattle/article_b0a76552-8f0b-11e5-aab0-4747ca2759bc.html; Greg Henderson, "*Kane Beef Now under Court Receivership*," DROVERS (Oct. 16, 2018), www.drovers.com/article/kane-beef-now-under-court-receivership.

have a common interest in manipulating the meat margin to extract increased profits from their existing market shares.

405. Defendants' field buyers would routinely share market color obtained from weekly trips to inspect feedlots in their territory, including producers' reports of their competitors' activities, back to their respective head offices and their firm's other field buyers through daily conference calls.

406. For example, Witness 2 reported that the field buyers from Tyson Fresh, Swift, CMS, and National Beef assigned to his feedlot would call him each week to confirm who bought his cattle that week and on what terms. The field buyers would request this information even when they had not placed a bid that week. Witness 2 felt obligated to provide this information and did. Field buyers from Tyson Fresh, Swift/Packerland, CMS, and National Beef made similar requests of other producers and feedlots across the feeding regions. Most producers would provide this information, unwilling to risk alienating one of their buyers.

407. Defendants also directed their field buyers and other staff to drive past their competitors' plants to determine and report on those plants' operating levels (*e.g.*, whether the plant had reduced labor hours or was operating on Saturday). Tyson had a standing policy that precluded these directives, and the resulting reports about their competitors' operations, being put into writing and thus were done by phone call. On information and belief, JBS, Cargill, and National Beef had similar policies. The activities of their competitors, including their slaughter volumes, were discussed by those attending Defendants' daily planning meetings.

408. Tyson Fresh, Swift/Packerland, CMS, and National Beef also regularly purchased beef produced by each other. Each Defendant would typically use its competitor's beef to produce certain value-added beef products.

409. These realities, combined with widespread formal and informal reporting of fed cattle and beef bids, transactions and volumes, and each slaughter plant's current and planned output, enable Defendants to monitor each other's adherence to any anticompetitive agreement. The purchasing dynamics of the fed cattle market, with its weekly cash trade, also provide Defendants with the ability to punish any suspected non-compliance with such an agreement.[151]

## DEFENDANTS ARE RECIDIVISTS WITH A HISTORY OF COLLUSION

410. Defendants' conduct is consistent with their previous use of production restraint to increase other commodities prices such as broiler chicken and pork, where JBS and Tyson have significant market shares. Cargill was the fourth largest U.S. pork processer until it sold its pork business to JBS in October 2015.

411. Broiler chicken and pork processers, including JBS and Tyson, are alleged to have engaged in a series of synchronized production cuts or restrictions designed to raise wholesale prices. The broiler chicken processors also allegedly manipulated the "Georgia

[151] Research shows that markets, such as the fed cattle market, where many sellers make repetitive sales to a small group of purchasers, facilitate the formation and maintenance of price-fixing agreements as they provide opportunities for the purchasers to agree, sustain and enforce market sharing arrangements. *See, e.g.,* "Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For," U.S. DOJ, ANTITRUST DIVISION, www.justice.gov/atr/public/guidelines/211578.htm.

Dock" price benchmark – a self-reported benchmark commonly used by market participants to set wholesale chicken prices.

412. In both cases, like here, the participants publicly called on each other to maintain supply discipline.

413. Government investigations[152] and civil litigation[153] regarding the processers' alleged conspiracies are ongoing.

414. In addition, Defendants have a long history of other misconduct, spanning breaches of the Packers & Stockyards Act as well as antitrust, anti-corruption, environmental, health and safety regulation, both domestic and foreign.

## DEFENDANTS' CONDUCT IS THE SUBJECT OF ONGOING INVESTIGATIONS

### I. The DOJ is Investigating Defendants for Price-Fixing, Market Manipulation and Unfair Practices in the Cattle and Beef Markets.

415. Defendants' conduct here is the subject of ongoing investigations by federal regulators and has elicited calls for investigations by numerous U.S. Senators, Members of Congress, State Attorneys General, and other state officials.

416. The CIDs were issued after appeals by numerous federal and state legislators and regulators calling for investigations into potential illegal and anti-competitive practices by Defendants.

---

[152] The Florida Attorney General's Antitrust Section opened an investigation into the broiler chicken processors' alleged anticompetitive practices, and the Georgia Department of Agriculture has suspended the Georgia Dock price index.

[153] *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017) ("Defendants' business strategies during the relevant time period are indicative of a conspiracy."); *see also In re Pork Antitrust Litig.*, 18-cv-1776 (D. Minn).

417. For instance, starting in March 2020, numerous U.S. Senators urged the DOJ to investigate anticompetitive practices in the cattle and beef packing industry including, among other things, price-fixing, market manipulation, and unfair practices.[154]

418. State Attorneys General and other state officials have also urged the DOJ to investigate "the dynamics that are depriving cattle ranchers and American consumers of the benefits of a competitive cattle industry."[155] For example, in a letter to former Attorney

---

[154] *See* Mar. 19, 2020 Letter from U.S. Senators Rounds, Cramer, Hoeven, and Daines to U.S. A.G. William Barr and Assistant A.G. Makan Delrahim, https://www.rounds.senate.gov/imo/media/doc/Letter%20to%20Department%20of%20Justice%20Regarding%20Cattle%20Prices.pdf; Mar. 31, 2020 Letter from U.S. Sen. Grassley to U.S. Dept. of Agric. Sec. Sonny Perdue and U.S. A.G. William Barr, https://www.grassley.senate.gov/sites/default/files/documents/2020-03-31%20CEG%20to%20DOJ%2C%20USDA%20%28Meat%20Packers%20Market%20Manipulation%29.pdf; Apr. 9, 2020 Letter from U.S. Sen. John Thune to A.G. William Barr, https://www.thune.senate.gov/public/_cache/files/44f205ea-bdbf-42b0-aa17-5799f6f8069e/A5F971C3A71FD1DB1FC60E98C2416856.4.9.2020-final-cattle-market-doj-letter.pdf; Apr. 23, 2020 Letter from U.S. Sen. Tester, Booker, Jones, and Merkley to U.S. A.G. William Barr, https://www.jones.senate.gov/imo/media/doc/2020-04-23%20Letter%20to%20US%20AG%20Barr%20re%20Cattle%20Markets.pdf; May 12, 2020 Letter from U.S. Sen. Fischer, Daines, Enzi, Hoeven, Cramer, Barrasso, McSally, Blackburn, Ernst, Baldwin, Crapo, Jones, Rounds, Smith, Hyde-Smith, Risch, Sasse, Hawley, and Thune to U.S. A.G. William Barr, https://www.fischer.senate.gov/public/_cache/files/86f483c7-9bcb-41c0-9b7c-01cb3d029104/final-senate-letter-to-doj-packers-investigation-request-finalwsignature.pdf. Similarly, on July 15, 2020, U.S. Sen. Steven Daines requested the DOJ and the USDA to coordinate efforts in investigating the "allegations of market manipulation and anti-competitive behavior by meat packers in the cattle industry https://www.daines.senate.gov/imo/media/doc/2020.07.15%20USDA%20DOJ%20Cattle%20Investigation%20Expansion.pdf.

[155] *See* May 5, 2020 Letter from Attorneys General Wayne Stenehjem (ND), Philip Weiser (CO), Eric Schmitt (MO), Tim Fox (MT), Mark Brnovich (AZ), Lawrence Wasden (ID), Tom Miller (IA), Keith Ellison (MN), Douglas Peterson (NE), Jason Ravnsborg (SD), and Bridget Hill (WY) to U.S. A.G. William Barr (https://attorneygeneral.nd.gov/sites/ag/files/documents/MediaAttachments/2020-05-05-

General Barr dated May 5, 2020, numerous state Attorneys General offered to "work with [the DOJ] on a careful examination of the competitive dynamics of this industry." [156]

419. Other officials have called for investigations,"[157] including Texas Department of Agriculture Commissioner, Sid Miller[158] and U.S. Representative Lucas, who urged former Attorney General Barr "to share the findings of the Department's investigation with Congress as soon as possible so that policymakers can address the concerns of their investigation and restore confidence back into cattle markets."[159]

420. On May 4, 2026, acting Attorney General Todd Blanche confirmed the United States Department of Justice is actively investigating Defendants for potential antitrust violations in the U.S. cattle and beef markets.[160]

---

Barr%2C%20AG%20William.pdf) and May 21, 2020 Letter from Utah A.G. Reyes https://attorneygeneral.utah.gov/wp-content/uploads/2020/06/2020-05-21-Beef-Packing-Industry-Ltr-to-Attorney-General-William-Barr.pdf.

[156] *Id.*

[157] Letter from Kentucky Comm'r of Agric. Ryan Quarles and Kentucky A.G. Daniel Cameron to U.S. A.G. William Barr (May 15, 2020), https://kentucky.gov/Pages/Activity-stream.aspx?n=AttorneyGeneral&prId=914; Letter from Texas Dept. of Agric. Comm'r Sid Miller to U.S. A.G. William Barr (May 7, 2020), https://www.texasagriculture.gov/Portals/0/forms/COMM/Media/Beef_Ind_to_AG_Barr20_v2.pdf.

[158] Letter from Texas Dept. of Agric. Comm'r Sid Miller to U.S. A.G. William Barr (May 7, 2020), https://www.texasagriculture.gov/Portals/0/forms/COMM/Media/Beef_Ind_to_AG_Barr20_v2.pdf.

[159] Press Release, U.S. Rep. Frank Lucas, Lucas Statement on DOJ Investigation of Beef-Processing Industry (June 5, 2020), https://lucas.house.gov/news/press-releases/lucas-statement-doj-investigation-beef-processing-industry.

[160] https://www.foxbusiness.com/economy/doj-confirms-antitrust-probe-major-meatpackers-over-beef-price-inflation.

421. Shortly thereafter, on May 15, 2026, Attorney General Ken Paxton issued a press release stating that Texas is also investigating Defendants for anticompetitive conduct, explaining, "According to reports, these firms may have used their dominance to decrease the prices paid to cattle ranchers while simultaneously driving up beef prices for consumers. These four firms have reaped enormous profits at the expense of Texas cattle ranchers and consumers nationwide."[161]

422. The DOJ's investigation remains ongoing.

## II. The USDA is Investigating Defendants' Activities in Light of the Fire at Tyson's Holcomb Plant and Covid-19 related Market Disruptions.

423. On August 28, 2019, the USDA launched an investigation into Defendants' conduct in the aftermath of the fire at Tyson's Holcomb slaughter and processing plant.

424. After the fire, Senator Thune, among others, raised concerns with the integrity of the cattle market, observing that "[t]he fact that losing just one beef plant in the United States created so much volatility in the cattle marketplace, including decreased cattle prices for producers and increased boxed beef prices, is deeply concerning."[162]

425. Seven months later, in March 2020, when beef packing plants closed due to

---

[161] https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-launches-sweeping-investigation-alongside-trump-doj-meatpacking-industry.

[162] Press Release, U.S. Sen. John Thune, Thune Hears From Livestock Industry Leaders on Market Transparency (Sept. 26, 2019), https://www.thune.senate.gov/public/index.cfm/2019/9/thune-hears-from-livestock-industry-leaders-on-market-transparency. Related concerns caused senators to request an investigation by the CFTC into whether parties were taking advantage of producers.[162] *See* U.S. Sen. Deb Fischer Letter to CFTC Chairman Heath Tarbert (Aug. 20, 2019), https://www.fischer.senate.gov/public/_cache/files/f33edda0-c81d-41bc-aa45-3ef1a7af3209/8.20.19-holcomb-letter-to-cftc.pdf.

infections of plant employees from the Covid-19 virus, Defendants' profits again soared—with the meat margin peaking at the highest level ever reached.

426. Following calls to expand USDA's investigation of beef pricing margins to include the market impacts arising from the COVID-19 plant shutdowns,[163] Secretary of Agriculture Sonny Purdue agreed, announcing on April 8, 2020, that the USDA would investigate cattle pricing throughout the pandemic, in conjunction with its continuing probe related to the 2019 Tyson plant fire.[164]

427. The USDA's July 22, 2020 report states that the "[f]indings thus far do not preclude the possibility that individual entities or groups of entities violated the Packers and Stockyards Act during the aftermath of the Tyson Holcomb fire and the COVID-19 pandemic." It also states that the investigation into potential violations of the Packers and Stockyards Act was ongoing. [165]

[163] Letter from U.S. Sen. Deb Fischer to U.S. Dept. of Agric. Sec'y Perdue (Apr. 6, 2020), https://www.fischer.senate.gov/public/_cache/files/29ace091-e363-403e-b64d-96a35a31362e/4.6.20-df-letter-to-usda-psa---final.pdf; Letter from U.S. Sen. John Thune to U.S. Dept. of Agric. Sec'y Sonny Perdue (Apr. 8, 2020), https://www.thune.senate.gov/public/_cache/files/0ba58dff-e870-4e0e-98db-51f46b6f6d04/0A984CF95521AEFDB343398C84EE1564.4.8.2020-cattle-market-letter-to-perdue.pdf.

[164] Jacob Bunge & Brent Kendall, *Justice Department Issues Subpoenas to Beef-Processing Giants*, WALL STREET JOURNAL (June 5, 2020, 11:42 AM), https://www.wsj.com/articles/justice-department-issues-subpoenas-to-beef-processing-giants-11591371745.

[165] *Boxed Beef & Fed Cattle Price Spread Investigation Report*, USDA AMS, at 10 (July 22, 2020), https://www.ams.usda.gov/sites/default/files/media/CattleandBeefPriceMarginReport.pdf

## III. JBA S.A.'s Brazilian Parent and Related Companies are Guilty of Bribery and Corruption.

428. On October 14, 2020, J&F Investimentos, the parent company of defendant JBS S.A, pleaded guilty to violations of the Foreign Corrupt Practices Act (FCPA), and agreed to pay $128.25 million in criminal fines, half of the $256.5 million fines levied, due to settlements made with Brazilian authorities.[166]

429. In referencing the investigations that led to the indictment and plea, Senators Rubio and Menendez stated: "We are troubled that JBS S.A. used the ill-gotten financing that it received ..., which totaled more than $1.3 billion, to acquire American companies...." "[This] only underscores our concerns that the questionable nature of JBS S.A.'s financial practices poses significant risks for its American subsidiaries and the U.S. food system."[167]

430. The SEC also commenced a civil case against J&F, JBS, and related entities. It alleged they engaged in a massive bribery scheme of Brazilian officials and others to obtain investments that would facilitate JBS' acquisition of Pilgrim's Pride Corporation, a U.S. company, and through that acquisition, its entry into the United States markets:[168]

---

[166] Press Release, DOJ, J&F Investimentos S.A. Pleads Guilty and Agrees to Pay Over $256 Million to Resolve Criminal Foreign Bribery Case (Oct. 14, 2020), https://www.justice.gov/opa/pr/jf-investimentos-sa-pleads-guilty-and-agrees-pay-over-256-million-resolve-criminal-foreign; Jody Godoy & Sabrina Valle, *Parent of Brazil's JBS pleads guilty to U.S. foreign bribery charges*, REUTERS (Oct. 14, 2020, 11:07 AM), https://www.reuters.com/article/us-j-f-brazil-crime/parent-of-brazils-jbs-pleads-guilty-to-u-s-foreign-bribery-charges-idUSKBN26Z2FZ.

[167] Letter from U.S. Senators Robert Menendez and Marco Rubio to Treasury Secretary Steven T. Mnuchin (Oct. 8, 2019), https://www.foreign.senate.gov/imo/media/doc/10-08-19%20RM%20Rubio%20letter%20Brazil%20CFIUS.pdf.

[168] *In the Matter of JBS, S.A. et al.*, Exchange Act Release No. 90170 (Oct. 14, 2020).

> 'Engaging in bribery to finance their expansion into the U.S. markets and then continuing to engage in bribery while occupying senior board positions at Pilgrim's reflects a profound failure to exercise good corporate governance,' said Charles Cain, Chief of the SEC Enforcement Division's FCPA Unit. 'This brazen misconduct flies in the face of what investors should expect from those occupying the role of an officer or director of a U.S. issuer' the SEC stated.'[169]

431. J&F Investimentos S.A. and JBS S.A., a global protein producer, and its principals have agreed to pay nearly $27 million to resolve the SEC charges.[170]

## STATUTE OF LIMITATIONS AND TOLLING

432. The statutes of limitations governing Plaintiffs' claims against Defendants were tolled under the doctrine of fraudulent concealment. The doctrine applies here because Defendants fraudulently concealed their misconduct through their own affirmative acts, and because Defendants' conduct was inherently self-concealing.

433. Defendants actively concealed their violations of law from Plaintiffs by, amongst other matters, (i) relying on non-public forms of communication; (ii) offering pre-textual justifications for their plant closures, slaughter reductions, low cattle prices and withdrawal from the cash cattle trade; (iii) explicitly and implicitly representing that the fed cattle bids and contract terms were the product of honest competition and not a conspiracy; (iv) affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws and (v) misrepresenting the nature of their agreements and their purported adherence to competitive safeguards to government officials and the general

---

[169] Press Release, SEC, SEC Charges Brazilian Meat Producers with FCPA Violations (Oct. 14, 2020), https://www.sec.gov/news/press-release/2020-254.

[170] *Id.*

public. Below is a list of non-exhaustive examples of such statements and misrepresentations that each Defendant made after the initiation of the conspiracy:

a. Tyson's Code of Conduct extols its compliance with antitrust laws, stating that it "compete[s] in the market with integrity and compl[ies] with competition laws.... We comply with the letter and spirit of competition laws ... wherever we do business."[171] In SEC filings between 2015 and 2018, Tyson stated that they had "limited or no control" over the production and pricing of cattle, rather, the price is "determined by constantly changing market forces of supply and demand."[172] The Tyson Defendants also stated that they "ceased operations at our Denison, Iowa plant" to "better align our overall production capacity with current cattle supplies."[173] Further, the Tyson Defendants stated, "[t]he Beef segment earnings improved ... due to more favorable market conditions associated with an increase in cattle supply which resulted in lower fed cattle costs."[174]

---

[171] Tyson Code of Conduct, https://www.tysoncodeofconduct.com/suppliers-and-customers/competition (last accessed May 6, 2019).

[172] Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 3, 2015) ("Tyson 2015 Annual Report"); Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 1, 2016) ("Tyson 2016 Annual Report"); Tyson Foods, Inc., Annual Report (Form 10-K) at 6 (Sept. 30, 2017) ("Tyson 2017 Annual Report"); Tyson Foods, Inc., Annual Report (Form 10-K), at 7-8 (Sept. 29, 2018) ("Tyson 2018 Annual Report).

[173] Tyson 2015 Annual Report, at 56; Tyson 2016 Annual Report, at 54, 68; Tyson 2017 Annual Report, at 57, 72.

[174] Tyson 2016 Annual Report, at 23; *see also* Tyson 2017 Annual Report, at 23 ("The Beef segment experienced strong export demand and more favorable domestic market conditions associated with an increase in cattle supply."); Tyson 2018 Annual Report, at 25 (same).

b. JBS's 2014 Annual Report detailed the policies it had in place to "ensure ethical conduct and integrity in the management of its business", including its Manual of Ethical Conduct, which "addresses issues related to violations, conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-corruption practices and other sensitive topics."[175] JBS also launched an "Always Do The Right Thing" compliance program in June 2017 to "ensure that JBS implements the best global compliance program in the industry in order to restore the trust of its stakeholders."[176] Additionally, in November 2015, JBS executive, Andre Nogueira, stated that "Cattle price will go down [sic]" in the United States because "we are going to see more cattle available."[177] In March 2016, JBS CEO, Wesley Mendonca Batista, similarly stated that JBS would enjoy "better margin[s]" because of an "increase in the herd in the U.S."[178] Similar statements continued throughout 2016 and into 2017 and 2018, with JBS executives repeatedly stating that its strong financial performance in the United States was due to "more cattle available in the U.S.,"[179] "cattle price[s] ... [being] back to the normal

---

[175] JBS 2014 Annual Report at 45 – 46, available at https://jbss.infoinvest.com.br/enu/4362/20150601_RelatorioJBS_ingles_menor.pdf.

[176] Available at https://jbss.infoinvest.com.br/enu/4197/JBS%20S.A.%20-%20Material%20Fact%20-%20Executive%20Committee2.pdf (last accessed May 6, 2019).

[177] JBS, Q3 2015 Earnings Call, Bloomberg Transcript (Nov. 12, 2015) at 11.

[178] JBS, Q4 2015 Earnings Call, Bloomberg Transcript (Mar. 17, 2016) at 6.

[179] JBS, Q2 2016 Earnings Call, Bloomberg Transcript (Aug. 11, 2016) at 6.

level,"[180] "greater cattle availability,"[181] and "strong demand for beef."[182] JBS made these pretextual public statements to conceal its participation in the conspiracy. Rather than disclose that the "improvement in EBITDA margin" JBS touted, in fact, reflected the supracompetitive profits of Defendants' unlawful conspiracy, it instead offered the innocuous pretexts of "greater cattle availability" and cattle prices mysteriously being "back to the normal level."

c. Cargill stressed in its 2015 Corporate Responsibility report that "[w]e obey the law. Obeying the law is the foundation on which our reputation and Guiding Principles are built.... We conduct our business with integrity.... We compete vigorously, but do so fairly and ethically. We ... comply with the laws and regulations that support fair competition and integrity in the marketplace." Cargill reiterated this message in its subsequent Corporate Responsibility reports and on its website.[183] To further the conspiracy, Cargill also repeatedly issued pre-textual public statements to conceal Defendants' anticompetitive behavior. For example, in May 2018, Cargill reported that "excellent results in North American beef" led the company's Animal Nutrition & Protein segment to deliver the largest share of corporate earnings on the year. Cargill concealed the true reason for its "excellent results," instead attributing them simply to "lower cattle costs and rising demand

---

[180] JBS, Q3 2016 Earnings Call, Bloomberg Transcript (Nov. 16, 2016) at 10.

[181] JBS, Q1 2017 Earnings Call, Bloomberg Transcript (May 16, 2017) at 2.

[182] JBS, Q2 2018 Earnings Call, Bloomberg Transcript (Aug. 15, 2018) at 4.

[183] *See* "Ethics & Compliance" https://www.cargill.com/about/ethics-and-compliance (last accessed May 6, 2019).

in both domestic and export markets." Similarly, in its 2017 Annual Report, Cargill reported that "favorable market conditions in North America" were simply the product of "[r]enewed consumer demand for beef...." In 2018, Cargill announced that its Animal Nutrition & Protein business surpassed even the prior year's "strong performance," "fueled by rising domestic and export demand for North American beef...."

d. National Beef's former majority shareholder, Jefferies Financial Group, Inc. (formerly Leucadia National Corporation) noted in its 2014 Annual Report that National Beef was "subject to extensive government regulation" and was subject to the Packers and Stockyards Act. To further the conspiracy, National Beef / Jefferies repeatedly issued pre-textual public statements to conceal Defendants' conspiracy. On information and belief, National Beef was the original and knowing source of every pretextual public statement ostensibly made by Jefferies and/or Marfrig to conceal Defendants' conspiracy. For example, in October 2015, Jefferies Financial Group stated that the expected expansion of the cow-herd "bodes well for [packing industry] margins as it will lead to an increase in the number of fed cattle available for slaughter."[184] In October 2016, Jefferies Financial Group touted that the "rebuilding of the domestic US cattle herd ha[d] dramatically affected the market for fed cattle" when explaining how "[f]rom June 27, 2015 to June 25, 2016, the average market price per pound of fed cattle has fallen from $1.48 to $1.16."[185] Jefferies

---

[184] Leucadia National Corp. (Jefferies Financial Group), 2015 Investor Day Presentation at 118 (Oct. 8, 2015).

[185] Leucadia National Corp. (Jefferies Financial Group), 2016 Investor Meeting Presentation at 53 (Oct. 5, 2016).

offered similar explanations in 2017 and 2018, noting, for example, that: "National Beef generated record results for [Last Twelve Months] on the back of a more balanced supply of cattle and robust end market demand";[186] "an increased supply of cattle in 2017 has driven higher margins and greater capacity utilization versus 2016";[187] "pre-tax income grew by $78.3 million, as increased cattle availability and strong demand for beef continued to support strong margins";[188] and "because the peak in supply of fed cattle ready for slaughter lags the peak size of the beef cowherd, throughput should continue to increase for at least the next several years, supporting continued above-average packer margins."[189] National Beef CEO Tim Klein attended the Jefferies Financial Group Investor Day presentations in 2015, 2016, and 2017 at which the above statements were made and was the speaker designated to address National Beef's performance.[190] Marfrig continued to offer similar pre-textual explanations for the low prices caused by Defendants' anticompetitive agreement after it bought a controlling stake in National Beef. For

---

[186] Leucadia National Corp. (Jefferies Financial Group), 2017 Investor Meeting at 1 (Oct. 5, 2017).

[187] *Id*. at 58.

[188] Jefferies Financial Group, 2017 Annual Report (Form 10-K) at 33 (Feb. 28, 2018).

[189] Jefferies Financial Group, 2018 Investor Meeting at 61 (Oct. 4, 2018). National Beef director, and Jefferies Capital Partners Managing Director, Nick Daraviras, presented in relation to National Beef at this event, further noting that "favorable supply and demand dynamics continue, leading to an enhanced margin environment industry-wide".

[190] Press Release, *Leucadia to Host Investor Day on October 8, 2015*, Leucadia National Corp. (Jefferies Financial Group) (Sept. 1, 2015), http://www.leucadia.com/All/1/1113; Press Release, *Leucadia to Host Investor Day on October 5, 2016*, Leucadia National Corp. (Jefferies Financial Group) (Sep. 12, 2015), http://www.leucadia.com/All/1/1113; Press Release, *Leucadia to Host Investor Day on October 5, 2017*, Leucadia National Corp. (Jefferies Financial Group) (Sept. 13, 2017), http://www.leucadia.com/All/1/1113.

example, in November 2018, Marfrig reported that "[i]n the United States, the cattle availability combined with stronger domestic and international demand has been supporting better margins."[191] Marfrig executives reiterated the point on the company's earnings call for the third quarter of 2018, stating that "the U.S. beef industry has delivered record results" thanks to "an ample supply of cattle" and "strong demands [sic] in both the domestic and international markets."[192] Marfrig acknowledged that it achieved these "record results" and "better margins" while reducing cattle slaughter volumes – but the company claimed that its reduced slaughter volumes were merely the result of there being "fewer weeks in the third quarter 2018 compared to the third quarter 2017."[193] National Beef CEO Tim Klein – referred to as "CEO of [Marfrig's] North American Operations" by Marfrig CEO, Eduardo de Oliveira Miron – participated in this call.[194] Similarly, in the fourth quarter of 2018, Marfrig announced that it achieved a "[s]olid result from North America Operation, sustained by strong demand for beef protein and the higher cattle availability."[195] Jefferies and Marfrig made these pre-textual public statements on behalf of National Beef – which, as pleaded above, was the original and knowing source of the pre-textual public statements – to conceal its participation in the conspiracy. Rather than disclose that these "record results" and "better margins" in fact reflected the

---

[191] Marfrig Global Foods S.A., Earnings Release 3Q18 (Nov. 5, 2018) at 2.

[192] Marfrig, Q3 2018 Earnings Call, Bloomberg Transcript (Nov. 6, 2018) at 5.

[193] *Id*. at 3.

[194] *Id*. at 2.

[195] Marfrig Global Foods, Earnings Conference Call 4Q18 and 2018 Presentation (Feb. 28, 2018) at 8.

supracompetitive profits of Defendants' unlawful conspiracy, Jefferies and Marfrig echoed the innocuous pretexts offered by the Tyson, JBS, and Cargill Defendants – suggesting, falsely, that "ample supply of cattle," "higher cattle availability," and "strong demand" were responsible for its supracompetitive profits. Because of Defendants' fraudulent concealment, Plaintiffs had insufficient information concerning Defendants' misconduct on which to base a complaint.

434. Defendants' conspiracy was inherently self-concealing because it relied on secrecy to be successful. Had the public learned that Defendants conspired to fix fed cattle prices, their conspiracy could not have continued for as long as it did. Accordingly, Plaintiffs could not have learned of Defendants' anticompetitive conduct until recently.

435. Because of Defendants' fraudulent concealment, Plaintiffs were not aware of Defendants' misconduct and could not have discovered it through the exercise of due diligence until recently. Plaintiffs acted diligently in seeking to bring their claims promptly.

436. Accordingly, Plaintiffs assert that the applicable statutes of limitations on Plaintiffs' claims were tolled. Defendants are also equitably estopped from asserting any statute of limitations defense.

437. Additionally, Defendants' conspiratorial conduct has caused and continues to cause continuing injuries to Plaintiffs. To the extent any statute of limitations was previously triggered – which is expressly disputed – these continuing injuries constitute continuing violations that start any statutory period running again.

438. The conspiracy alleged above began at least as early as June 1, 2015, and continued into the years beyond.

439. The Complaint alleges numerous conspiratorial acts and parallel conduct by each Defendant occurring within any applicable statutory period.

440. As a result of the anticompetitive conduct challenged in this Complaint, beginning at least as early as June 1, 2015 and until the present, Defendants have (i) purchased cash cattle at artificially suppressed cash prices, and (ii) purchased cattle at artificially suppressed prices pursuant to formula, forward, and/or grid contracts.

441. Thus, each Defendant's purchase of fed cattle, and its resulting impact on feeder cattle prices, at artificial and non-competitive prices constituted a new overt act causing injury to Plaintiffs.

442. A proposed class that would have included Plaintiffs was filed on October 31, 2022. Certification was denied on July 16, 2026. Plaintiffs' claims were tolled during the pendency of that class action until certification was denied.

443. Certification of the proposed class was denied because the class definition was not ascertainable. As a result of the unascertainable class definition, putative class members such as Plaintiffs were unable to identify with certainty whether they were members of the proposed class definition. As a further result of the unascertainable class definition, putative class members such as Plaintiffs were unable to identify with certainty whether their sales of feeder cattle to feedlots were included in the class.

444. Only those sales that may be unambiguously excluded from the class were not tolled, including for example, sales of cattle that are numerous steps removed from the Defendants because that proposed class was dismissed by the Court.

445. Plaintiffs' sales of Feeder Cattle directly to feedlots may not be unambiguously excluded from the class. Accordingly, all of Plaintiffs' sales of Feeder Cattle directly to feedlots were tolled by the pendency of the class action.

## CLAIMS FOR RELIEF

### COUNT I: MARKET ALLOCATION AND PRICE FIXING IN VIOLATION OF THE SHERMAN ACT (15 U.S.C. § 1; FOR INJUNCTIVE RELIEF UNDER THE CLAYTON ACT, 15 U.S.C. § 26)

446. Plaintiffs incorporate each prior paragraph as if set forth herein.

447. Defendants are horizontal competitors in buying fed cattle.

448. At all relevant times, Defendants controlled the slaughter of fed cattle in the United States and the available marketing outlets for fed cattle producers.

449. From at least June 1, 2015 until the present, the exact dates being unknown to Plaintiffs, Defendants engaged in a continuing agreement, understanding, and conspiracy in an unreasonable and unlawful restraint of trade to allocate the market for, and artificially fix, depress, suppress, or stabilize the price of fed cattle in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants' conduct is a *per se* violation of federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

450. Defendants' price fixing conspiracy deprived market participants up the supply chain in the relevant market of the benefit of price competition. The price impact on feeder cattle is traceable through the product distribution chain.

451. Defendants' conspiracy and the resulting impact on the prices received by fed and feeder cattle producers occurred in and affected U.S. interstate commerce.

452. As a material and proximate result of Defendants' unlawful conduct, Plaintiffs suffered injury to their business and property. These injuries included, but were not limited to, receiving artificial and non-competitive prices for their feeder cattle. Plaintiffs were also deprived of the benefits of free and open competition.

453. Plaintiffs are threatened with future injury to their businesses and property unless Defendants are enjoined from further unlawful conduct.

454. Plaintiffs accordingly seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future.

## COUNT II: VIOLATIONS OF PACKERS AND STOCKYARDS ACT (7 U.S.C. §§ 192 AND 209)

455. Plaintiffs incorporate each prior paragraph as if set forth herein.

456. Title 7 U.S.C. §192 provides, in pertinent part, "[i]t shall be unlawful for any packer with respect to livestock ... to ... (a) [e]ngage in or use any unfair, unjustly discriminatory, or deceptive trade practice or device; or ... (e) [e]ngage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or (f) [c]onspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; or (g) [c]onspire,

combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e)."

457. Title 7 U.S.C. §209 further provides that, "[i]f any person subject to this chapter violates any of the provisions of this chapter ... relating to the purchase, sale, or handling of livestock, ... he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation." Such liability may be enforced "by suit in any district court of the United States of competent jurisdiction[.]"

458. Deceptive trade practices under the Packers and Stockyards Act are addressed in 9 C.F.R. Part 201. Section 201.70 states "[e]ach packer and dealer engaged in purchasing livestock, in person or through employed buyers, shall conduct his buying operations in competition with, and independently of, other packers and dealers similarly engaged."

459. Since June 1, 2015, Defendants have violated 7 U.S.C. §192(a), (e), (f), and (g) by engaging in a course of business and doing acts for the purpose or with the effect of reaching and implementing a conspiracy, combination, agreement, or arrangement to allocate the market for, and artificially fix, depress, suppress, or stabilize the price of fed cattle, with the purpose or with the effect of suppressing and reducing competition among purchasers of fed cattle.

460. The effect of these acts and this conspiracy, combination, agreement, or arrangement, was to fix, depress, suppress, stabilize, or otherwise artificially manipulate the price of fed cattle bought by Defendants, with the purpose or with the effect of suppressing and reducing competition among purchasers of fed cattle. Defendants had no

legitimate business justification for these acts and this conspiracy, combination, agreement, or arrangement.

461. As a proximate result of Defendants' breaches of the Packers and Stockyards Act, Plaintiffs have been damaged in their business and property.

## PRAYER FOR RELIEF

462. Plaintiffs request relief as follows:

A. That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the Sherman Act and the Packers and Stockyards Act, and enjoin Defendants from engaging in future, similar unlawful conduct;

B. That the Court award Plaintiffs damages and interest in an amount to be determined at trial;

C. That the Court award Plaintiffs pre- and post-judgment interest;

D. That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses, including costs of consulting and testifying experts; and

E. That the Court award any and all such other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all matters so triable.

Dated: August 28, 2026

Respectfully submitted,

/s/ *Richard M. Paul III*
Richard M. Paul III
Mary Jane Fait
David W. Bodenheimer
**PAUL LLP**
600 Broadway Boulevard, Suite 600
Kansas City, Missouri 64105
Telephone: (816) 984-8100
Rick@PaulLLP.com
MaryJane@PaulLLP.com
David@PaulLLP.com

Francisco "Frank" Guerra IV
Alicia D. O'Neil
Michael Montaño
**GUERRA LLP**
875 E. Ashby Place, Suite 1200
San Antonio, Texas 78212
Telephone: (210) 447-0500
fguerra@guerrallp.com
aoneill@guerrallp.com
mmontano@guerrallp.com

Clyde Talbot "Tab" Turner
**TURNER & ASSOCIATES, P.A.**
4705 Somers Avenue
North Little Rock, Arkansas 72116
Telephone: (501) 791-2277
tab@tturner.com

**ATTORNEYS FOR PLAINTIFFS**